EVELYN DUNN

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

<span style="color:red">EXHIBIT 1</span>

ANGELA RUSSELL, AS ADMINISTRATRIX
OF THE ESTATE OF JEREMY T. RUSSELL
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JEREMY T. RUSSELL
          Plaintiffs,

VERSUS                CASE NO. 3:22-CV-294-HTW-LGI

MANAGEMENT & TRAINING CORPORATION;
MICHAEL MCCLINTON; ASHLEY RAY;
MARCUS ROBINSON; ROXIE WALLACE;
JACOB VIGILANTE; JOHN AND JANE DOE
CORRECTIONAL OFFICERS; VITALCORE
HEALTH STRATEGIES, LLC; EVELYN DUNN;
STACEY KITCHENS; WILLIAM BRAZIER; and
JOHN AND JANE DOE MEDICAL PROVIDERS
          Defendants.


          DEPOSITION OF EVELYN DUNN
     Taken at the East Mississippi
     Correctional Facility, located at
     10641 Highway 80 West, Meridian,
     Mississippi 39307, on Wednesday,
     February 8, 2023, beginning at
     9:51 a.m.


REPORTED BY:
     Laura Cross, CCR #1691
     Court Reporter and Notary Public

CONFIDENTIAL

```
 1   APPEARANCES:
 2
 3         GRAFTON E. BRAGG, ESQUIRE
           Bragg Law, PLLC
 4         Suite 3A-120
           Ridgeland, Mississippi  39157
 5         Telephone:  (601) 624-1153
           grafton@graftonbragglaw.com
 6             ATTORNEY FOR PLAINTIFF
 7
 8         MICHAEL E. CHASE, ESQUIRE
           Mitchell, McNutt & Sams, PA
 9         105 South Front Street
           Tupelo, Mississippi  38804-4869
10         Post Office Box 7120
           Tupelo, Mississippi  38802-7120
11         Telephone:  (662) 842-3871
           Fax:  (662) 842-8450
12         mchase@mitchellmcnutt.com
               ATTORNEY FOR VITALCORE HEALTH
13             STRATEGIES, LLC; EVELYN DUNN; STACEY
               KITCHENS AND WILLIAM BRAZIER
14
15
           R. JARRAD GARNER, ESQUIRE
16         Adams and Reese, LLP
           1018 Highland Colony Parkway
17         Suite 800
           Ridgeland, Mississippi  39157
18         Telephone:  (601) 292-0701
           Fax:  (601) 355-9708
19         jarrad.garner@arlaw.com
               ATTORNEY FOR MANAGEMENT & TRAINING
20             CORPORATION; MICHAEL MCCLINTON; ASHLEY
               RAY; MARCUS ROBINSON; ROXIE WALLACE AND
21             JACOB VIGLIANTE
22
23
24
25
```

CONFIDENTIAL

1  issues on other units. Having issues. They don't
2  want to go back to that zone. So we work with
3  security to work out what's some recommendations
4  for that client.
5       Q.   So I'm hearing that camp support is
6  really there if there are housing issues.
7       A.   It can be. That's one benefit. It can
8  be housing issues, one.
9       Q.   Do you view camp support as a form of
10 mental health observation, as well?
11      A.   Let me define observation. Now the
12 client won't -- is not on mental health suicide
13 watch or psychiatric observation. The terminology
14 we -- the terminology we use would be a mental
15 health hold, something like a mental health hold
16 where we work with security. We discuss this
17 person's having issues in population. When I say
18 "population," we're referring to the units. Unit
19 1 is a general population unit. Unit 2, 3, 4,
20 those are general population units. So, for
21 example, if I had a client that had issues on
22 those units we communicate with security and say,
23 Look. This person's having issues here. Let's
24 utilize camp support. And we agree. We don't
25 make the final decisions but they're going to work

CONFIDENTIAL

1  BY MR. BRAGG:
2      Q.    Is there -- okay.  So is it true that
3  every security concern is not a mental health
4  concern?
5      A.    Define concern for me.  Because I'm a
6  provider.  And when I speak -- when I hear concern
7  -- so I may see concern a little different.  So --
8      Q.    Okay.
9      A.    -- define concern for me.
10     Q.    Okay.
11     A.    Because my concern may be different
12 than someone else as a provider.  So define your
13 concern for me.
14     Q.    If a patient is presenting in a way
15 that indicates the need for mental health
16 treatment, okay, will they ever be sent to camp
17 support?
18     A.    Repeat that for me.
19     Q.    If a patient is presenting in a way
20 that indicates a need for mental health treatment
21 will that patient ever be housed in camp support?
22     A.    Yes, sir.
23     Q.    Okay.  And why is that?
24     A.    For example, if I have a patient that's
25 having mental health issues -- not suicidal -- not

```
 1   suicidal -- we try to put them on a mental health
 2   unit.  We have mental health units.  But the
 3   person may be paranoid; doesn't want to be on that
 4   unit.  It is a concern and -- but he's not
 5   suicidal.  He's not -- won't take medications.
 6   He's not at a point that I can force you to take
 7   medication.  We can utilize camp support.  That
 8   gives limited housing, a limited number of other
 9   patients or inmates in that smaller population.
10   So we can utilize that for a mental health hold --
11        Q.    Okay.
12        A.    -- to give us time to decide on what's
13   best interest for that patient rather than say,
14   You have a housing issue.  You don't want to stay
15   on that unit.  That's not a concern.  No.  We know
16   he has some behavior issues, some conduct issues,
17   some mental health issues.  The person doesn't
18   want to be in population.  Then we know that
19   there's a reason why this may be going on --
20   THE WITNESS:
21             -- let me know if I need to slow down
22   --
23        A.    -- with this patient.  Then we can
24   discuss that with security and recommend what's
25   appropriate for that.  And often we use camp
```

CONFIDENTIAL

Page 36

1   support for that.
2       Q.   Okay.  Thank you.
3       A.   Uh-huh (affirmative).
4       Q.   That answers my question.
5       A.   Because it gives us time to decide on
6   what's best rather than make some quick decisions.
7   What's in the best interest for the patient.
8       Q.   Okay.  That answered my question.
9       A.   So do we --
10      Q.   Okay.  You said mental health unit.
11  What unit is that?
12      A.   Unit 3 is what we consider -- when you
13  hear mental health unit that will be Unit 3.
14      Q.   Okay.  And that's general population?
15      A.   Yes, sir.
16      Q.   All right.  Are there -- is there
17  increased supervision at camp support?
18      A.   No, sir.
19      Q.   Okay.  Is it -- what --
20      A.   Define -- I'm sorry.  I do this every
21  day so I may ask you sometimes to define something
22  for me.  It's just to make sure we're clear.
23      Q.   That's fine.
24      A.   So let me know if I'm being a little
25  bit -- I may ask you to define something for me.

CONFIDENTIAL

1  precaution that would mitigate the risk that
2  someone would commit self-harm.
3      A.   Yes, sir.
4      Q.   Okay.  And what are those?
5      A.   If I had a patient over there that's on
6  mental health hold, if the person was engaging in
7  behaviors that needed medications we can
8  administer medications over there, as well.  I
9  could give someone medications over there because
10 they're on a mental health hold.  So we can give
11 medications on that unit.  That would be one...
12     Q.   Okay.
13     A.   We can treat, uh-huh (affirmative).
14     Q.   What about property -- orders about
15 property restriction?  Could there be -- could a
16 provider put an inmate on property restriction
17 while they're at camp support?
18     A.   If they're in camp support we could,
19 yes, sir.
20     Q.   Okay.  So you could basically issue an
21 order that says, This inmate at camp support can't
22 have access to a bed sheet?
23     A.   We couldn't give an order, we would
24 work with security more on the patients that -- we
25 could discuss that with security.

CONFIDENTIAL

Page 75

```
 1        Q.    You would just communicate with
 2   security.
 3        A.    Uh-huh (affirmative).  We could discuss
 4   that with security.  Uh-huh (affirmative).
 5        Q.    I asked you about whether you had the
 6   electronic medical record available that was
 7   generated under Mississippi Department of
 8   Corrections when you're treating a patient.  I
 9   asked you about that generally earlier.  Do you
10   recall that?
11        A.    Yes, sir.
12        Q.    Okay.  In this case we're obviously
13   here to talk about Jeremy Russell.
14        A.    That's right.
15        Q.    And so is it also accurate to say that
16   you would have had Jeremy Russell's electronic
17   medical records that were generated in the context
18   of the MDOC facilities?
19        A.    Yes, sir.
20   MR. BRAGG:
21             Do we want to take a short break?
22   MR. GARNER:
23             I was just about to ask to.
24                (A recess was taken.)
25   BY MR. BRAGG:
```

CONFIDENTIAL                                    Page 84

1   shirt.
2       Q.   All right.
3       A.   When we say ligature I think -- let me
4   explain terminology.  Ligature can be anything
5   that someone puts around -- it's a ligature.  But
6   it can be anything.
7       Q.   Right.  And it listed it as being a
8   shirt.
9       A.   A shirt.
10      Q.   All right.  Tell me what you -- tell me
11  what you found during your visit with Jeremy
12  Russell on 9/28/21.
13  MR. CHASE:
14           Object to form.
15  BY MR. BRAGG:
16      Q.   Okay.  How did the visit go?  What --
17  what happened during the visit?
18      A.   The visit is documented here.  So what
19  parts?  Just tell me what parts you're referring
20  to.  Because everything -- my assessment's
21  documented in here --
22      Q.   Okay.
23      A.   -- according to visits.
24      Q.   So did you make the decision to admit
25  him to the -- to non-acute suicide observation?

CONFIDENTIAL                                   Page 85

 1      A.    Yes, sir.
 2      Q.    Okay.  Why did you make that decision?
 3      A.    The decision to admit him?
 4      Q.    Uh-huh (affirmative).
 5      A.    Several reasons.  He's a new intake to
 6   the facility.  Just transferred today.  And based
 7   on the behaviors exhibited there was referred to
 8   me by mental health indicating he placed something
 9   around his neck.  Although he stated he did not --
10   he simply -- he showed me what he did indicating
11   that he did not try to hang himself, that he did
12   not tie it around his neck, that he laid it on top
13   of his shoulder is documented here in the records.
14   The reason I decided to admit him -- again, just
15   transferred from another facility.  Had been on
16   mental health watch previously at the previous
17   facility.  And based on his history of being on
18   suicide watch.  So a number of pos -- a number of
19   things led to my decision there as documented in
20   here in the record.
21      Q.    Okay.
22      A.    Uh-huh (affirmative).
23      Q.    So he showed you about the -- about how
24   he placed the T-shirt around him; is that correct?
25      A.    As I have it documented, he had the

CONFIDENTIAL

Page 121

1   want to answer the question.
2   MR. CHASE:
3           Yeah, take all the time you need to
4   read it.
5       A.   Okay. Uh-huh (affirmative). Do you
6   want me to read it out to you? Because I can tell
7   you if this is why I discharged him here based on
8   all this.
9   BY MR. BRAGG:
10      Q.   I want to know every reason you made
11  that decision.
12      A.   Okay.
13      Q.   So if there's anything that's not in
14  the record, I want to hear that.
15      A.   Okay.
16      Q.   If there's anything that's not in the
17  record, I want to hear that.
18      A.   In my decision he denied suicidal
19  thoughts. He asked to go to camp support. First
20  of all, he denied being suicidal. He was calm,
21  pleasant, cooperative. We had given him Haldol
22  the day before, Haldol Lac. Symptoms were stable
23  today. As I indicated, calm, pleasant, denied
24  suicidal thoughts. And that was basis for
25  discontinuing suicide watch.

CONFIDENTIAL

Page 124

1  discharge a patient.
2  BY MR. BRAGG:
3      Q.   Okay.
4      A.   Denied suicidal thoughts, behaviors,
5  calm, pleasant, cooperative.
6      Q.   Okay.  So he denied suicidal thoughts.
7  He was cooperative.  You had given him Haldol the
8  day before.  His symptoms were stable.
9      A.   Uh-huh (affirmative).
10     Q.   Did anything else enter into your
11 decision at that point?
12     A.   Well, let me explain that a little
13 here.  He had used spice the day before.  Spice,
14 drugs has a potential to alter your moods and
15 thoughts.  Give him Haldol, clinical evidence.  We
16 give you medicines such as that.  It can stabilize
17 symptoms pretty quickly in a short time.
18     Q.   Okay.
19     A.   It's not uncommon to have someone
20 present to you with drug-induced -- and you give
21 them medications, Haldol.  And they stabilize
22 immediately and be discharged the next day.  It's
23 not uncommon practice what we do.
24     Q.   Okay.  So let's talk about that.  So he
25 got spouse -- he got spice the previous day.

CONFIDENTIAL

Page 125

```
 1      A.      I'm sorry.  Yes.  Uh-huh (affirmative).
 2      Q.      Or I guess it was the day before he
 3  entered suicide watch.  Yeah.  Obviously he didn't
 4  get spice in suicide watch; correct?
 5  MR. CHASE:
 6          Object to form.
 7  BY MR. BRAGG:
 8      Q.      I was just trying to get our dates
 9  right.  So he reported having spice on October 3,
10  2021?
11      A.      According to my notes on October the --
12  October the 4th.
13      Q.      Okay.  It was on the 4th.
14      A.      As I have it indicated in the third
15  paragraph of my assessment we discussed his use of
16  illicit drugs to include used spice today.  So
17  that would have been on the 4th he used spice, the
18  third day of his admission.
19      Q.      And, for the record, you're going back
20  to --
21      A.      I'm sorry.
22      Q.      -- that was -- you were reading from
23  Exhibit 5 on that?
24      A.      No.
25      Q.      Oh, Exhibit 6.
```

CONFIDENTIAL

1  -- he informed me that he wanted to go to camp
2  support. That was one of his requests, that he
3  did not want to go back into general population.
4  He wanted to be in camp support.
5      Q.   He had been there before.
6      A.   Yes, been there before at the previous
7  housing. He was here before. So I weighed that
8  into my decision and recommended him to be there,
9  as well. We listen to patients. We try to listen
10 to what their opinion is. So he also stated he
11 wanted to be housed in camp support. He had been
12 there before so he was used to that environment.
13     Q.   And so you agreed with his request on
14 that?
15     A.   He had been there before. He was used
16 to the environment. He did not want to go back to
17 a larger unit. Camp support's a small unit.
18     Q.   At that time did you consider whether
19 it may be a good idea to restrict his property as
20 he was going to camp support?
21     A.   At that time he denied suicidal
22 thoughts. He did not exhibit any suicidal
23 behavior. He was not engaging in any dangerous
24 behaviors or any risky behaviors. So at that time
25 there was no indications to just restrict

CONFIDENTIAL

Page 131

1  someone's property and just take their property
2  for no reason, I should say.
3       Q.   All right.
4       A.   There was no indications at that moment
5  that he needed to be on property restriction.
6  Although he had a history of engaging in those
7  behaviors, at that moment the goal was to give him
8  the least restricted to give him opportunity if
9  he's not exhibiting any behaviors.
10      Q.   Were you aware as you sat there in
11 October of 2021, that Jeremy had disclosed in his
12 electronic medical record a plan to kill himself
13 with a bed sheet?  Did you know that as he was
14 going into camp support on October 5, 2021?
15      A.   Which date are you referring to he
16 would have discussed that?
17      Q.   So on October -- and it wasn't recent.
18 It was back in 2019, I believe.  But were you
19 aware that he had made a disclosed plan to hang
20 himself with a bed sheet at some point in his
21 medical history?
22      A.   When you say "disclosed plan," he had
23 been on suicide watch quite frequently throughout
24 his stay.
25      Q.   Uh-huh (affirmative).

CONFIDENTIAL

1  correct?
2       A.    No, sir.
3       Q.    Did a physician or a psychologist
4  participate in the decision in any way to
5  discharge Jeremy from suicide watch on October 5,
6  2021?
7       A.    No, sir.  But can I explain that to
8  make it clearer?  As a psychiatric nurse
9  practitioner --
10      Q.    You can certainly explain your answer.
11 Can you answer my question before you explain?
12      A.    Yeah, I'm sorry.  Just like -- just
13 trying to make it easier for you.  So I just want
14 to clarify.  So a lot of my things may be
15 explained.  And just to make it clearer for you --
16      Q.    Uh-huh (affirmative).
17      A.    -- just to make it clear, you know --
18 just not make it difficult, just make it clear.
19 But as a psychiatric nurse practitioner we have to
20 -- can discharge or admit someone to suicide
21 watch.
22      Q.    You've got practice agreements with the
23 psychiatrist; correct?
24      A.    To discharge someone from suicide watch
25 you don't even have to collaborate with a

CONFIDENTIAL

1  psychiatrist.  We have the ability to discharge
2  and admit someone on suicide watch without
3  collaborating with someone.
4      Q.   Okay.  Is that the policy of VitalCore?
5      A.   I don't have that policy in front of
6  me.  So we would have to look at that policy if we
7  want to discuss that policy.  I don't have it in
8  front of me, the policy.  But scope of practice is
9  that we have the --
10     Q.   That's the way things are done at
11 VitalCore.  That's the way things are done here at
12 East Mississippi?  Is that fair to say?
13 MR. GARNER:
14          Object to form.
15     A.   You mean discharging someone from
16 suicide watch?
17 BY MR. BRAGG:
18     Q.   Yeah, you can discharge someone from
19 suicide watch; is that correct?
20     A.   I'm referring to my scope of practice
21 as a psychiatric nurse practitioner.  I have the
22 scope.  That's within my scope of practice.
23 Uh-huh (affirmative).
24     Q.   Okay.  I understand.
25     A.   Sorry.

CONFIDENTIAL

1  what would you do in that situation?  Would you
2  discharge someone from suicide watch?
3  MR. GARNER:
4           Object to the form.  And I'll explain
5  to you why.  Because MTC --
6  MR. BRAGG:
7           You're speaking.
8      A.   Yes.
9  MR. GARNER:
10          Huh?
11 MR. BRAGG:
12          Your speaking objection.
13 MR. GARNER:
14          Well, I mean --
15 MR. BRAGG:
16          Let me -- I want to get her answer.
17 MR. GARNER:
18          Object to the form.
19 THE WITNESS:
20          And I'm going to explain that.  I'm
21 going to explain that MTC doesn't govern us health
22 care mental health providers.  They don't -- we
23 don't have a policy that we follow with MTC.  MTC
24 does not guide in how we discharge, admit or treat
25 -- treat patients.

CONFIDENTIAL

BY MR. BRAGG:
    Q.    You were.
    A.    And that's what MTC -- and some people get a little confused and I just have to elaborate. MTC's security side -- when we say "security," --
    Q.    Right.
    A.    -- they do more than security and classification but they do not govern the decisions we make as far as our clinical care.
    Q.    I understand.
    A.    They do not govern that part of that. Uh-huh (affirmative).
    Q.    Okay. But VitalCore does have input in developing MTC's policies and protocols as it relates to mental health care?
    A.    I think it would be better to say that we have communication as a organization in what policies are in place and procedures --
    Q.    Okay.
    A.    -- to make sure that we are working well together and making sure that no one is overlapping the other. I hope that's not confusing for you.
    Q.    No. No, it's not.