EXHIBIT 2

CONFIDENTIALITY NOTE: THIS REPORT AND ANY ATTACHMENTS MAY BE CONFIDENTIAL AND PROTECTED BY LEGAL PRIVILEGE. IF YOU ARE NOT THE INTENDED RECIPIENT, BE AWARE THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF THE E-MAIL OR ANY ATTACHMENT IS PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY REPLYING TO THE SENDER AND DELETING THIS COPY AND THE REPLY FROM YOUR SYSTEM. THANK YOU FOR YOUR COOPERATION.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| ANGELA RUSSELL, AS ADMINISTRATIX OF THE ESTATE OF JEREMY T. RUSSELL AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF JEREMY T. RUSSELL ) ) ) ) ) ) ) | CASE NO. 3:22-CV-294-HTW-LGI |

     Plaintiff

v.

MANAGEMENT & TRAINING CORPORATION; JOHN AND JANE DOE CORRECTIONAL OFFICERS; VITALCORE HEALTH STRATEGIES, LLC; EVELYN DUNN; STACEY KITCHENS' WILLIM BRZIER; and JOHN AND JANE DOE MEDICAL PROVIDERS

     Defendant(s).

## EXPERT REPORT STEVE LANGFORD

### I.    INTRODUCTION

My name is teve Langford and I have been retained by the law firm of Adams and Reese LLP to examine issues concerning the suicide of Jeremy Russell. Jeremy Russell was a 21-year-old medium security male inmate housed at East Mississippi Correctional Facility.



On October 7, 2021, Mr. Russell was housed in unit 7, an acute care unit often referred to as Camp Support. On October 7, at approximately 1123 hours, he was observed by Captain McClinton sitting on his bunk with a bed sheet fashioned round his neck and tied to the top bunk. He was observed to be non-responsive to verbal commands. A radio call was made for medical assistance. At approximately 1126 hours, Lieutenant Ashley Ray and Sergeant Robinson arrived on scene. McClinton, Ray, and Robinson entered the cell, lifted his body to relieve pressure on his neck, cut the sheet, placed him on the ground, and began to administer CPR. At approximately 1130 hours medical staff (VitalCore) arrived on scene, placed him on a gurney, assumed responsibility for administering CPR, and transported him to the medical department, where he arrived at approximately 1133. At approximately 1139 hours, Metro Ambulance Services arrived at the facility. At approximately 1145 hours he was pronounced dead by Metro Ambulance Services staff.

Specifically, I have been retained to offer expert opinions concerning the facts of this case, Plaintiffs' claims and MTC's defenses, suicides in a prison setting and their preventability, prevalence of contraband in a prison setting despite extreme measures to eliminate the same, rates of pay for correctional officers nationwide, and staffing issues in prisons nationwide.

After examining various documents and conducting research as detailed herein, it is my professional opinion that the actions of MTC staff were not the proximate cause of the death of Mr. Russell.

## II.   QUALIFICATIONS
I have attached my professional curriculum vitae to this report, which includes all the current education, training and experience relied upon in reaching the opinions offered in this report. To the extent requested or necessary, I will update this attachment after issuance of this report.

## III.   RETENTION
I was retained for this engagement in May, 2023. I did not reach any conclusions until completing my evaluation of the information and documents identified in this Report. I have never been employed by the State of Mississippi, The Mississippi Department of Corrections, Management & Training Corporation, or VitalCore. My rate of compensation for this engagement is $200 per hour for document review and report preparation. Should court testimony be required, my rate of compensation will be $350 per hour.

## IV.   METHODOLOGY
To facilitate my review, I examined all depositions and exhibits listed in attachment B. Additionally, I conducted research to address the issues for which I was retained. To the extent I relied on such research in preparing this report, I have included those items in attachment B as well.

## V.    FACTUAL BACKGROUND

On October 4, 2021, Jeremy Russell was placed on non-acute suicide watch by VitalCore staff. On October 5, Mr. Russell was examined by NP Evelyn Dunn, an employee of VitalCore. Attributing Mr. Russell's problems to behavioral issues – as opposed to mental health problems – and acting fully within her authority, she directed that he be discharged from non-acute suicide watch and instead be housed in Unit 7, often referred to as Camp Support.  No property restrictions were either mandated or recommended by VitalCore staff.

Relevant to this analysis is Russell's frequent use of drugs. In her deposition, NP Evelyn Dunn, relates that Russell advised "he uses drugs – daily, even prior to prison" (page 119:1). Additionally, his drug use during and prior to his incarceration are referenced in medical records, attached as exhibits to Dunn's testimony and other medical records produced in discovery.

To reconstruct the events of October 7, I relied on timelines provided by Captain Michael McClinton in his email dated October 7, 2021 and sent at 1:16 pm (MTC 000048 and MTC 000049), the timeline identified as exhibit 7 (MSTC 0000068 and MTC 000069), a memorandum from Sandy Townsend, Integrity Investigator dated October 15, 2021 (MTC 000075 and MTC 000076), and a Region III Incident Report dated October 7, 2021 (MTC 001283). While there are slight differences in the timeline (e.g., exhibit 7 has Lieutenant Ashley entering unit 7 at 1124 hours, while Captain McClinton's Region III incident report notes she entered the unit at 1126 hours), all time discrepancies are minor in nature and have no material effect on my analysis or conclusions.

The following is the timeline:

0852 hours: Officer Roxi Wallace entered Unit 7 camp support and conducted count/security check.

0853 hours: Officer Roxie Wallace exited Unit 7 camp support.

0930 hours: Sergeant Marcus Robinson and Nurse Lynn Portis entered Unit 7 camp support and conducted pill call, no security check conducted.

0936 hours: Sergeant Marcus Robinson and Roshanda Davis entered Unit 7 camp support went to the 2nd cell from entry, on left, and spoke with the inmate in that cell

0938 hours: Sergeant Marcus Robinson and Lynn Portis exited Unit 7 camp support

0939 hours: Sergeant Marcus Robinson and Nurse Roshanda Davis went to 2nd cell on right from the shower where the inmate's cell door was open and spoke with inmate

3

0940 hours: Sergeant Marcus Robinson and Mental Health Roshanda Davis went to cell of Inmate Jeremy Russell #201802

0944 hours: Sergeant Marcus Robinson and Mental Health Roshanda Davis exited the unit

0949 hours: Sergeant Marcus Robinson entered Unit 7 camp support to move inmate Archie Knight, no rounds or security checks were conducted

1000 hours: Count time, no count nor security check conducted

1120 hours: Captain Michael McClinton and Nurse Shana Carter entered 2nd cell on right to give medication

1122 hours: Captain Michael McClinton and Nurse Shana Carter went to Inmate Jeremy Russell's (#201802) cell. Finds inmate hanging inside his cell

1123 hours: Medical Assistance called

1124 hours: Lieutenant Ashley Ray enters Unit 7 camp support. Sergeant Marcus Robinson and Nurse Penny Brookshire enter Unit 7 camp support

1125 hours: Sergeant Smith. Nurse Williams and Nurse Portis enter Unit 7 camp support

1126 hours: Major Justin Rowell and Nurse Penny Brookshire enter Unit 7 camp support

with the stretcher. Warden Hector Portillo and Lieutenant Winston enter Unit 7

camp support

1127 hours: Lieutenant Ashley Ray and Major Justin Rowell enter cell and bring Inmate

Jeremy Russell #201802 out of the cell and place him on the stretcher

1131 hours: Security and medical staff exit Unit 7 camp support

1133 hours: Russell arrives in Medical Services

1139 hours: Metro Ambulance Services arrives at the facility

1145 hours: Mr. Russell is pronounced dead by Metro Ambulance Services staff

On this day, Wallace was assigned to Unit 7 (Camp Support) as "Floor" and Robinson was assigned as the Control Officer (this unit has a control unit, which EMCF staff refer to as the "picket"). Typical duties for the floor position would be conducting security checks, delivering meals, supervising orderlies, handing out cleaning supplies, etc. Typical duties for the Control Officer would be to run the electronic cell door locks, handle

4

administrative duties, and provide general oversight of the unit. It should be noted that Robinson's deposition notes the control room does not allow the staff member to see into the cells.

From the above, we can verify that Mr. Russell was viewed, alive, by Robinson and Davis at 0940. Further, the timeline indicates that after Mr. Russell was viewed alive, the unit was unstaffed from 0944 to 0949 (5 minutes) and from 0949 to 1120 (a total of 91 minutes). Further, the timeline notes that neither security checks nor a count was conducted. The vacating of the posts is attributed to Wallace being pulled from her post to participate in a medical transport and that Robinson was pulled from the unit first to escort inmate Knight to another unit and then to respond to a disturbance in another housing unit.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## VI.    EXPERT OPINIONS

### OPINION NO. 1

Based upon my review of the relevant information and documentation, it is my opinion that the actions of EMCF staff on the day of Russell's suicide were not the cause of Russell's death.

The European Journal of Epidemiology notes that suicide in general is a major health concern, with nearly 800,000 people globally committing suicide every year; among those aged 15-29 (this is Mr. Russell's demographic) it is the second leading cause of death. Within state prisons, the Office of Justice Programs, Bureau of Justice Statistics indicates suicide in State Prisons have risen from 14 per 100,000 to 27 per 100,000 from 2000 to 2019, an increase of 92.9%. The report further noted that 75.3% of suicides were affected in the inmate's cell and 87.4% occurred by suffocation (includes hanging, strangulation, asphyxia, anoxia, and other methods of reducing oxygen intake). Finally, the National Institute of Corrections note that in 79% of suicides, it took over 15 minutes to discover the body.

While one may debate whether Mr. Russell should have been on suicide watch, what is beyond debate is whether East Mississippi Correctional Facility staff were responsible for such a decision. Sound correctional practices mandate that such determinations be left to qualified personnel, specifically the appropriate medical staff from VitalCore, who operates the Health Services Department under a contract directly with the Mississippi Department of Corrections. This simply cannot be over-emphasized; the decision as to whether to place one on suicide watch, keep one on suicide watch, or discontinue one from suicide watch *must be made by qualified medical personnel*. Security personnel simply lack the requisite training, detailed medical history of the subject, treatment plan, progress towards that treatment plan, and motivations and mind set of such subjects.

Likewise, one may debate whether there should have been property restrictions on Mr. Russell, specifically whether, considering his medical history, he should have been

5

allowed to have a bed sheet. Note, and as Captain McClinton detailed in his deposition, the decision to restrict property for mental health reasons must be made by qualified mental health personnel. This contrasts with the responsibility of security staff to restrict property for security reasons. An example here would be if security staff decided to restrict an inmate from having a sheet if he had used the sheet to start a fire in his cell. This too cannot be over-emphasized; sound correctional practices mandate that decisions concerning the restriction of property for mental health reasons *must be made by qualified medical personnel* for the same reasons detailed above.

Indeed, VitalCore's Suicide Prevention and Intervention policy explicitly states, "Suicidal inmates are evaluated promptly by the designated health professional, who directs the intervention and ensures follow up as needed" (VC00006). Elsewhere in the same policy, in a section titled "Referral of Potentially Suicidal or Suicidal Patients", it notes "the medical or behavioral health professional may take appropriate clinical intervention when determining that the incarcerated person is at risk of harm to self or others, or in need of more intensive behavioral health interventions" (VC00014). Referencing the same policy, in the section titled "Disposition" it clearly states that a QBHP (Qualified Behavioral Health Professional) is responsible for determining whether a patient "presents no evidence of psychological distress," determining "that the patient is distressed, agitated, and/or anxious, but not a suicide risk" and, determining "the patient is in danger of self-harm." In the latter two instances, it notes consultations and recommendations are to made to appropriate medical staff (physicians, psychiatrists, psychiatric staff, and mid-level providers) (VC00014).

It is prudent to note that East Mississippi Correctional Facility has a policy concerning "Suicide Precaution, Intervention, and Management" (MTC000120), but in as much as they do not hold the contract to provide medical services (VitalCore does), that policy is obviously superseded by VitalCore's policy.

Further, the fixation on the sheet is a bit of a red herring; parsing data contained herein, slightly over 12% of suicides are the result of something other than suffocation, and where suffocation is the manner of death, the act could have been facilitated by any number of items (e.g., pants, shirts, belts, shoelaces, etc.).

One's attention may also be drawn to the delay (approximately 2 minutes) between the discovery of Russell being non-responsive to McClinton's verbal commands and the decision to enter his cell. McClinton attributes the delay to his decision to wait for additional staff to arrive before entering the cell. This is entirely appropriate; sound correctional practices stipulate the cell of a non-compliant inmate should only be entered when sufficient staff are available to enter the cell safely. Indeed, in his deposition (page 111) McClinton testified to a previous incident where an inmate faked his hanging: "and when the door came open, guess who was standing on the ground – ready to fight. The inmate."

This opinion is supported by the evidence detailed herein, including depositions and exhibits, and data collected from the National Library of Medicine; Office of Justice

Programs, Bureau of Justice Statics; National Institute of Corrections; and emails from Management and Training Corporation staff . Therefore, based on my nearly three decades of experience within the profession and 23 years of experience at the Executive Staff level (the Executive Staff are the chief administrators of a facility), training, education, and the facts identified above, it is my firm opinion that the actions of MTC and its employees did not cause the death of Russell.

## VII.    OPINION No. 2

Based upon my review of the relevant information and documentation, it is my opinion that the shortage of staff on the day of Russell's suicide was not the cause of Russell's death.

Particularly in the wake of COVID-19, staffing of prisons has been difficult, to say the least. A 2022 National Institute of Corrections report titled Effects of COVID-19 on Prison Operations "notes that many facilities note they are operating at "significantly reduced staffing capacities", with many jurisdictions "in full crisis mode" with officer vacancy rates in some prisons approaching 50%. A December 1, 2019, National Institute of Justice article likewise notes vacancies in the range of 50%, with some state prisons reporting staff turnover as high as 55%. A May 22 letter from the President of the American Correctional Association (posted on ACA's website) notes staffing shortages are having a "crippling impact", with applications for correctional officer positions declining 64% in recent years.

East Mississippi Correctional Facility has certainly not been immune to these difficulties. Indeed, as indicated in Management & Training Corporation's Responses to Angela Russell's second Set of Requests for Production, the facility paid nearly $187,000 in fines to the Mississippi Department of Corrections for unfilled posts.

McClinton and Wallace likewise noted these staffing challenges in their depositions.

I offer the foregoing not to excuse the vacating of posts, or diminish the frequency with which they occur, merely to offer context. The manner and frequency with which this occurs is not the operative question, however. The operative question is whether the staffing compliment on October 7 was the cause of Russell's death.

As McClinton testified in his deposition, a full complement for the day watch shift on October 7 was 34, with 32 staff present for duty that day (41:11). On the day in question, Wallace (assigned to the floor 1 position) testifies in her deposition (15:6) that her usual co-worker, J. Key was pulled from her assignment for a medical transport, with Robinson, working overtime, assigned to fill Key's control post. Wallace was subsequently pulled from her post for another medical transport, leaving the unit vacant from 0853 to 0930, when Robinson arrived on post, a period of 37 minutes. Robinson subsequently exits the unit 0938 and reenters at 0939, leaving the unit vacant for 1 minute. At 0940, Russell is seen alive by Robinson and Davis. Robinson and Davis subsequently depart the unit 0944. Robinson returns at 0949 to escort inmate Knight to another unit, indicating the unit was

vacant for 5 minutes. The timeline reflects him departing the unit at 0949 and the unit remains vacant until McClinton and Carter arrive at 1120, leaving the unit vacant for a total of 91 minutes. Inmate Russell is found in his cell at 1122.

To examine whether the absence of staff in the unit was the cause of Russell's death, let's consider what the situation would have been had both assigned officers been in the unit for the 91-minute period detailed above. Robinson would have been in control, a location which affords no direct observation into the cells according to McClinton's testimony. As such, even if present and performing his duties as assigned, he would not have been able to prevent Russell's suicide.

Now we turn to Wallace. Would her presence as the floor officer in the unit have prevented Mr. Russell from committing suicide? Before proceeding, consider a paper that was published in the Journal of Forensic Sciences titled Further Observations on the Speed of Death in Hanging, which notes that consciousness is lost at 13 seconds, convulsions begin at 15 seconds, and a cessation of respiration occurs at 2 minutes. The paper also cited another study that noted the asphyxial process lasted only 2 minutes and 43 seconds.

As reflected in the post orders for Unit 7 Acute Care unit, Wallace's duties include conducting 30-minute rounds at an irregular interval to ensure offender safety and well-being. It should be noted that the this does not require the officer to make rounds every 30 minutes, however. Indeed, use of the word "irregular" specifically prevents this. Within the corrections profession, the above would mean that a round is conducted within every 30-minute block of time, though some facilities may impose a "not to exceed requirement", such that no more than 40 minutes transpires between rounds (MTC post orders don't specify a not to exceed requirement). As an example, in the first case if one were to conduct a round at 1000 hours, the next irregular inspection would have to occur anytime during a 30-minute period encompassing 1030 hours and 1100 hours. As such, one could have as much as 59 minutes between the start of 2 sets of rounds. Under the not to exceed example, if one were to conduct a round at 1000 hours, the next round would be required no later than 1040 hours, allowing for up to 40 minutes between rounds. The reason for the irregularity of rounds is based on sound correctional practice, as one does not want inmates to be able to dial in to officer routines.

Inasmuch as Wallace, acting fully within her duties as detailed in her post orders, and in full comportment with sound correctional practices, could have taken as much as 40 to 59 minutes between rounds, it is not possible to attribute fault to her for an event that could have transpired in as little as 2 minutes to 2 minutes and 43 seconds.

East Mississippi's considerable efforts to improve staffing are noteworthy. To address staffing challenges across all its facilities, Management & Training Corporation has created a "employee experience department." Pilot facilities (EMCF was not in the pilot program) saw overall hiring increase at half of the pilot facilities, overall applications increasing 29%, and experienced a 35% drop in the time from application to interview. These recruitment measures were undertaken by MTC on January 16, 2023. Since assigning a veteran recruiter with years of experience in corrections, EMCF has seen a

8

78% increase in applications and a 324% increase in new hires. Additionally, to show appreciation for staff and enhance recruitment and retention, MTC paid over $184,000 in bonuses in December 2002. Further, to address call-offs (staff not reporting to work for their assigned shifts) during periods that traditionally experience high call-offs, East Mississippi implemented a novel program. As an example, staff were eligible to receive bonuses ranging from $50 per day to $150 per day if they showed up for work on December 24, 2022, December 25, 2022, January 31, 2022, and January 1, 2023. These efforts have proven effective; according to a 12/6/2022 memo from Warden Donald Jackson to Kerry Dixon, re: Thanksgiving Holiday Pay, MTC was able to avoid approximately $8,000 in fines for vacant posts on November 24 -25, 2022. Finally, the starting wage for correctional officers was raised from $12 per hour to $16 per hour, an increase of 25%, in January 2023.

This opinion is supported by the evidence detailed herein, including depositions, exhibits, post orders and data collected from the National Institute of Corrections, National Institute of Justice, American Correctional Association, Journal of Forensic Sciences, and emails from Management and raining Corporation staff. Therefore, based on my nearly three decades of experience within the profession and 23 years of experience at the Executive Staff level (the Executive Staff are the chief administrators of a facility), training, education, and the facts identified above, it is my firm opinion that staffing shortages at EMCF on October 7, 2021, did not cause the death of Russell.

## VIII.  OPINION No. 3

Based upon my review of the relevant information and documentation, and given my experience and lack of medical training, I am unable to from an opinion to the degree which, if any, Russell's admitted drug use while in prison – and extensive history of drug use which pre-dated and continued while he was incarcerated – was a factor in his suicide.

I would surmise that contraband in prisons is as old as prisons themselves and it is obviously a concern that remains to this day. Corrections magazine published research from a 2018 National Survey of Correctional Contraband, which gathered data from 301 prisons across six state departments of corrections, that found that prisons recovered an average of 34 weapons, 31 cell phones, and 28 controlled substances over the 12-month study period. The authors of the report also cited various studies detailing the prevalence of contraband in prisons: The California Department of Corrections reports over 15,000 cell phones were confiscated in 2011, a ten-fold increase in the number seized in 2007; and data from a survey of 44 states found cell phone discoveries were particularly high in southern states. An article in USA today notes that the Federal Bureau of Prisons confiscated 5,116 phones from its facilities in 2016, with the number of confiscations increasing 28% in the first half of 2017. The problem is truly global in nature, with a secondary study published in Wires Forensic Science, which was based on 81 studies from 22 different countries, finding the average prevalence of drug use is 32%, with a range from 3.4% to 90%.

9

Contraband, defined as any items unauthorized by prison administration, is introduced into prisons in a myriad of ways, ranging from mail, through the visiting room, brought in by contractors and volunteers, thrown over the fence, vendor shipments into the prison, drone drops, in the property of newly transferred inmates, and, unfortunately, dirty staff. Indeed, in the National Survey of Correctional Contraband noted above, over 70% of respondents reported security staff bringing in contraband was somewhat of a problem to a big problem.

As noted in her deposition, Dunn states that Russell admitted his drug use during clinical encounters, averring that he was a daily user of drugs, even prior to prison and admitted to using Spice on October 4, 2021 (119:1).

East Mississippi Correctional Facility has not been immune to the issue of contraband. As detailed in Management & Training Corporation's Second Supplemental Responses To Plaintiff's First Set Of Interrogatories and additional information provided by Management and Training Corporation, EMCF identified 23 staff who were terminated for bringing illegal contraband into the facility from July, 2013 to August, 2022.

East Mississippi Correctional Facility has taken robust measures to address contraband, including a complete turnover in facility leadership (Warden, Assistant Warden, and Major) in late 2021, an increase in the use of canines at entry points, and increasing unannounced searches of inmate living areas and staff vehicles.

As indicated, based my experience and lack of medical training, I am unable to form an opinion to the degree which, if any, Russell's admitted drug use while in prison – and extensive history of drug use prior to his incarceration and which continued while he was incarcerated – was a factor in his suicide. It is prudent to note, however, that staff employed by MTC are similarly unable to make such a determination. This is consistent with the protocols, which mandate only qualified medical staff are authorized to place one on, continue one on, and remove one from suicide watch. Further, it should be noted that the person most aware of his medical history, mental state, and history of – and continued - drug use was Dunn, who testified in her deposition that placement in Camp Support was appropriate and that Russell's placement on suicide watch was unwarranted.


## IX.   OPINION No. 4

Based upon my review of the relevant information and documentation, it is my opinion that the rates of pay experienced at the time of Russell's suicide was not the cause of his suicide.

According to the Bureau of Labor Statistics, the May 2022 mean national annual wage for a for correctional officers and jailers was $54,760, with median at $49,610. Wages of $35,520 represent the 10th percentile, $39,850 the 25th percentile, $64,110 the 75th percentile, and $82,600 the 90th percentile.

At the time of Russell's death, the rate of pay for East Mississippi Correctional Facility correctional officers was $12 per hour ($24,960 annually), placing at the low end of the bottom decile.

To address the issue of pay, as well as increase staffing levels, East Mississippi Correctional Facility has aggressively increased starting pay for correctional officers from $12 per hour to $16 per hour, an increase of 25%, in January 2023.

In labor markets, it is axiomatic that higher wages will increase interest of job seekers, increasing the applicant pool and the quality of that pool relative to lower wages. As such, it is prudent to assume that higher wages at the time of Russell's suicide would have an increased both staffing and the quality of staff. However, that is not the issue here, as it has been demonstrated that neither the actions of MTC staff nor staffing shortages were the cause of Russell's death.

This opinion is supported by the evidence detailed herein, including data from the Bureau of Labor Statistics, and email communications with Management and Training Corporation staff. Therefore, based on my nearly three decades of experience within the profession and 23 years of experience at the Executive Staff level (the Executive Staff are the chief administrators of a facility), training, education, and the facts identified above, it is my firm opinion that rates of pay on October 7, 2021, did not cause the death of Russell.

## X.    CONCLUSION

I very much appreciate the opportunity to work with the men and women of Management & Training Corporation East Mississippi Correctional Facility who assisted greatly in providing information used in the preparation of this Report and I appreciate their dedication to serving the State of Mississippi.

**I WAS NOT** instructed, required, or paid any additional compensation to reach any particular conclusions or directed to make any specific findings, as the above represents my own conclusions. The opinions identified above are based upon my independent professional review of the particular facts in this case. My compensation is not dependent upon the results obtained in this action. Nevertheless, I am prepared to testify before the applicable court regarding these opinions.

I reserve the right to supplement or revise my report and my opinions in the event that new or revised information becomes available.

06/02/23
Date

Stephen Langford

## APPENDIX A – CURRICULUM VITAE

### Professional Summary

Formerly a member of the federal governments Senior Executive Service with over twenty-nine years of corrections experience in the Federal Bureau of Prisons and private secure services, including over twenty-two years executive staff experience. Have worked directly in processing centers, high, medium, and low security institutions with oversight of minimum-security institutions. Extensive experience effectively managing budgets in a prison environment, including for profit operations.

### Comprehensive Knowledge of:

| | |
|---|---|
| Large scale ICE Processing Center Operations | Performance Based National Detention Standards (PBNDS) |
| Large-scale prison operations | Management of large budget, multi cost center operations |
| Coalition Building | Conflict Resolution |
| Labor Management Relations | Prison Industrial Operations |
| ACA Certified | Conflict Resolution |
| Corrections Executive | Community Relations |
| Communicating Expectations | Variable, Marginal, Step-Fixed, and Fixed Costs |
| PREA | Perpetual Audits |

### Work History

Premier Corrections Consultants, LLC (PCC)
Chief financial Officer| Hattiesburg, MS| July 22 to Present

- Founding member of a consulting group that provide services pertaining to the field of corrections.
- Successfully built a team of former federal and county subject matter experts.
- In this capacity, I direct and obtain expert witnesses.
- Have served, and am currently serving, as an expert witness and corrections consultant.

Central Valley Annex
Facility Administrator | McFarland, CA | January 2021 – July 2021

- As the chief administrator of the facility, I directly supervised five staff that were responsible for supervising 140 full-time staff. Central Valley operated under a contract with the U.S. Marshall Service and housed 150 detainees in pre-trial, pre-sentencing status. Additionally, the facility provided transportation services to and from courts, and airports.
- I joined the facility during its activation stage and successfully prepared the facility to receive detainees. This included establishing policies, procedures, and post orders; training of new staff; hardening the institution; developing a strong working relationship with the client; establishing ties with influential members of the community; establishing contracts with vendors; placement and coverage of cameras; the establishment a Correctional Emergency Response Team (CERT); the creation of an armory; the establishment of a staff recognition program; implementation of programming opportunities for detainees; and creating an intelligence program.
- Established procedures for and conducted use of force reviews.
- Developed policies and procedures to ensure PREA compliance.
- Worked closely with the client and key facility staff to establish a program to screen detainees prior to arrival to ensure placement at the facility was appropriate.
- Oversaw the expansion of the Restricted Housing Unit (RHU) and the creation of an outdoor recreation area for the RHU.
- Given the political environment, corporate leadership decided a union presence would be an effective tool given their ability to effectively lobby lawmakers. To that end, I worked very closely with the National Federation of Federal Employees and facility leadership and line-staff to successfully establish a union presence.

Northwest ICE Processing Center
Facility Administrator | Tacoma, WA | July 2018 – January 2021
- As the chief administrator of the facility, I directly supervised four staff that were responsible for supervising approximately 400 full and part time staff. The Northwest ICE Processing Center is one of the largest ICE facilities in the nation, housing up to 1,575 detainees. Annual revenues are approximately $65 million with annual direct labor costs of approximately $27 million.
- Inheriting an institution that had historically underperformed in many areas, I immediately set about to change the culture, strategically focusing on four pillars: The institution is safe and secure for staff and detainees alike; The institution is ran in a manner that recognizes the dignity, humanity, and rights of detainees; The institution is ran in a manner that exceeds the expectations of the client (ICE); The facility is ran in a manner that exceeds corporate financial objectives and that recognizes and rewards the contributions of staff.
- To better monitor institutional operations and train and develop subordinates, I implemented the concept of an Executive Staff, consisting of the Facility

13

Administrator, Assistant Facility Administrator, Business Manager, Major, and Captain. This body conducts a daily close out Monday through Friday, where noteworthy events of the day are reviewed, progress towards established objectives are monitored, and the previous days labor usage is reviewed. Additionally, an open-up meeting is held each Monday morning where the Executive Staff is briefed by the off-going duty officer concerning events and issues from the previous week, including feedback from ine staff and the Human Resources Manager provides an update concerning staffing. This meeting also identifies and reinforces any objectives for the week.

- To address poor performance in the area of labor costs, I implemented robust procedures focused on planning, accountability, redundancy, and systematic review. For planning, I inculcated in key staff the notion that rosters are a weave of training schedules, leave schedules, appropriate staffing, and proper assignment of relief officers. To that end, these activities are meticulously planned prior to putting the roster out for bid. Further, I mandated that all rosters be scheduled three weeks in advance. Accountability was accomplished by designating one Lieutenant per shift as the Shift Commander, something that had not been previously done. This individual is responsible for planning the roster three weeks in advance, as well as reviewing the next day's roster and sending an email to all members of the Executive Staff identifying, by assignment (e.g., specific post and remote post needs), any overtime needs. At the end of the shift, the Shift Commander is responsible for sending another email to all members of the Executive Staff reconciling the previous days projected needs against actual usage and identifying the reason for any differences (e.g., call offs). Additionally, the Major reports to all members of the Executive Staff, on a daily basis, the previous days labor usage, detailing over usage, staff assigned to training, staff on scheduled paid time off, staff on unscheduled paid time off, staff on FMLA, and all remote post assignments (suicide watch, constant watch, 10-minute watches, med trips, hospital watches, and asylum assignments). Finally, the Captain is required to complete a locally developed labor utilization report by 1:00 pm each day. This report was locally developed and ensures two primary purposes. First, it ensures all labor hours were efficiently utilized and there were no excess bodies on the roster. Second, it allows the monitoring of what I call "slippage", which is a term used to describe the time between clocking in/out and arriving on/exiting one's post.
- To demonstrate the need for such intense focus on a labor usage, I showed supervisors, utilizing actual financial results, how a 1 per cent change in labor costs has a 7 percent change in profitability in the opposite direction and that a 1 per cent change at our facility constituted less than one full assignment per shift.
- These focused efforts allowed the facility to outperform pre-tax profit expectations by nearly three quarters of a million dollars, reversing a four-year period where the facility had underperformed against the budget by an average of $1.7 million.

- A thorough review of the contract and an understanding of billing practices caused me to question the manner in which we were receiving compensation for remote posts. I brought this to the attention of my Regional Office who conveyed my concerns to GEO's contracting department. As a result, over $400 thousands of additional revenue was booked at the end of fiscal year 2018. Another such concern was raised and is currently under review and which may result in additional billings. Finally, I raised concerns in the manner in which transportation routes have been added over the years with no modifications to the contract. As a result, I drafted a three-option proposal that contracting has submitted to ICE.

- A comprehensive review was conducted of all post orders within the first year. Post orders were reviewed using a four-tiered approach, with two-man teams of supervisors conducing an initial review, consulting with line staff and making recommendations, with second and third level reviews conducted independently by the Major and Assistant Facility Administrator prior to submission the Facility Administrator for a fourth and final review.

- Chaired the group of key staff that reviewed all uses of force.

- Successfully helmed the institution through multiple audits, including ACA, PREA, and Performance Based National Detention Standards (PBNDS) audits.

- Was a key participant in the renewal of the Collective Bargaining Agreement, ensuring clarity was added to passages concerning the definition of unexcused absences, which led to increased staff accountability and decreased use of overtime. That negotiations were completed in 2 weeks is a testimony to the excellent relationship I have established with the Union, which is facilitated by scheduled weekly meetings I hold with the President and Vice President.

- Worked with key GEO staff to address misuse of FMLA, reducing its usage by over 90%.

- While the recognition of the dignity, humanity, and rights of detainees is a worthy goal in and of itself, I convey to my Executive Staff and staff in Annual Training and other encounters the manner in which it actually supports the overriding objective of safety and security and demonstrably pushes back against the many false narratives proffered by an agenda driven media and misguided politicians. To that end, I regularly instruct on the concept of organizational justice, comprised of interactional/transactional justice (how is one is treated, spoken to), procedural justice (does one have means to raise concerns) or distributive justice (are outcomes fairly arrived at). Research strongly suggests that performance in these areas has a significant impact on the environment and, where lacking, can lead undesirable outcomes (e.g., hunger strikes, food strikes, work strikes, increased discipline problems, and, in an extreme circumstance, violent collective outbursts).

- As an overt example of practicing what I preach, I implemented a formal schedule of weekly "town halls" where each unit is visited at a prescheduled time by the

Executive Staff as well as the Safety Manger and Maintenance Supervisor;
participation by the Executive Staff demonstrates commitment to staff and detainees,
while the participation of the Safety Manager and Maintenance Supervisor allows life
safety issue and habitability issues to be directly addressed. With the Major providing
translation into Spanish and another staff member who speaks Punjabi also providing
translation, I broadcast to the unit information I feel may be important to them (e.g.,
the ICE sponsored legal orientation program provided by the Northwest Immigrants'
Rights Legal Orientation Program or The Advocates for Immigrants in Detention
Northwest's visitation program) or otherwise affect them (e.g., We will be upgrading
the transceivers on the TV's; while this will result in a clearer and sharper picture,
there may be periods of poor reception while the work is being done. We indulge
your patience). After sharing this information, I advise the detainees that, as walk by
their individual living areas, they should feel free to raise any issues or concerns they
may have.

- To raise sanitation levels and increase detainee morale, I modified an existing
  sanitation competition; where each unit had one competed against 18 other units for
  the chance to win the first place prize of a "chicken banquet" (4 pieces of chicken
  served in addition to their regular meal) or the second place prize of the use of two X-
  boxed for a week, I created 4 divisions, where units competed against 4 to 5 other
  units for the chance to win.

- I reconstituted the Community Advisory Board (CAB), which had become dormant.
  Through this process, I have been able to convey a positive image of both ICE and
  GEO. Additionally, the board has helped establish a crocheting program, where
  detainees, utilizing materials provided by GEO, crochet items for donation to under-
  privileged infants born at St. Joseph's hospital neonatal ward. Additionally, through
  this body a proposal, currently pending approval by ICE, was developed to teach
  English as second language to detainees.

- I have undertaken a number of initiatives to recognize the efforts and contributions of
  staff. Each month a staff recognition event is held, where all three shifts are provided
  a meal (e.g., pizza, sub sandwiches) and at least bi-annually the meal is cooked and
  served of the grill by the Executive Staff (the last such meal was Philly cheese steak
  sandwiches). Staff who receive and "above expectations" evaluation receive a
  handwritten from me with a challenge coin attached. Staff is submitted for national
  recognition as well, with one staff member receiving recognition as GEO's
  Transportation Officer of the Year and second being recognized for life saving aid he
  rendered to a detainee. Finally, to specifically recognize the efforts of supervisors, I
  implemented a quarterly Supervisor of the Quarter award.

- I have forged a strong partnership with the Assistant Field Office Director (AFOD),
  founded on transparency, integrity, and daily communication. An example of this
  partnership was the creation of a transitional housing unit for detainees who request

16

protective custody, allowing them substantially more out of cell time and movement unrestrained.

- I inherited what could best be described as a "stand-offish" relationship with the Tacoma Police Department. After a series of meetings, they conveyed a central concern that the previous facility administration had conveyed to them the expectation that the police department would respond to disturbances inside the facility. I looked the Assistant Chief of Police directly in the eye and assured him we would never request his assistance for such a matter but that it was my fullest belief that they would respond to events (e.g., protests) that transpired off the facility grounds. The resulting "all inside is mine, all outside is yours" understanding set the groundwork for greatly improved relations.

- Coordinated the facility response in the aftermath of the July incident where individual set fire our GTI building, attempted to blow up a propane tank, blew up a vehicle, and was eventually shot and killed by the Tacoma Police Department. The response included my arrival on scene and walking and talking to staff; utilizing our HNT team to walk and talk; advising affected staff of EAP services; coordinating with various law enforcement agencies; working with key GEO staff to recommend security enhancements; and meeting with local law enforcement and surrounding businesses to forge a mutually agreeable plan to limit access to the main arteries providing ingress and egress to the facility.

Federal Correctional Complex Lompoc
Complex Warden (Senior Executive Service) |Lompoc, CA | December 2015 – July 2018

- As the Chief Executive Officer (Complex Warden) Lompoc, I directly supervise six Executive Staff (GS-12/13/14) that are responsible for supervising approximately 470 staff (GS-05 through GS-15). FCC Lompoc is a complex of institutions comprised of one medium security institution, one low security institution, and two minimum security institutions (Camps) housing approximately 2,700 felons convicted of various offenses. It has an annual budget of approximately $72 million.

- Chaired the group of key staff that reviewed all uses of force.

- Successfully helmed the institution through multiple audits, including ACA, PREA, and Joint Commission on Accreditation of Healthcare Organizations (JCAHO)

- Achieved an average reduction of overtime expenses of $100,000 per month. Actions included furloughing minimum-security inmates for medical trips, shutting down four housing units, effective roster management, grouping of medical trips, and increased use of contract providers providing services on site.

- Changed mailroom policies to reduce incoming contraband, including mandating all correspondence be affected on white paper with white envelopes, banned home-made greeting cards, mandated all incoming publications come directly from vendors/publishers only, and banned the receipt of scented correspondence. The results of these changes were a 90% reduction in mailroom contraband finds.

- Immediately upon my arrival, I ordered a review of the status of cases referred to the FBI for investigation and took note that very few were accepted and the majority of those that were accepted were declined for prosecution by the U.S. Attorney's Office. Coordinated and communicated with both entities and conveyed the need for the entirety of the criminal justice system to hold inmates accountable or criminal actions while incarcerated. As a result, inmates have plead guilty to/been convicted of staff assaults, serious inmate assaults, and drug and weapons possession.
- I challenged staff to create quality programming opportunities in the special housing unit (SHU), specifically offering the opportunity for increased out of cell time. In cell programming includes a self-help library where inmates write essays and book reports and receive feedback from the psychology department. Out of cell programming takes place in the SHU recreation cages and is led by a psychologist who conducts Care Level 2 group sessions consisting of classes on criminal thinking, emotional self-regulation, basic cognitive skills, and anger management. To facilitate additional out of cell programming, I purchased 8 outdoor televisions and had the facilities department mount them on a wall. As a result, the psychology department now offers a video Rational Emotive Behavioral Therapy (REBT) program and the religious services department offers "SHU-GA", a yoga-based program.
- Reduced the backlog of staff investigations and pending discipline actions by 91% by implementing a weekly review process with the Human Resources Manager and Special Investigative Agent where I conveyed expectations, set due dates, and monitored progress.
- Coordinated with a local organization to implement the Alternative to Violence Project (AVP), an internationally renowned conflict resolution program, for inmates. The program is conducted in three phases, with each phase occurring over two days of focused contact. Since May 2016 a total of 246 inmates have participated.
- Implemented I.M.P.A.C.T (Inmates Mentoring Peers Against Criminal Thinking), a community outreach program targeting at risk youth. Since August 2016, the presentation has been given 21 times to 333 youth and has drawn raves reviews from school administrators, teachers, practitioners in the juvenile justice system, and community leaders.
- Implemented a program of weekly budget review meetings to review the status of 33 cost centers and ensure the solvency of all departments. This is a process I have adhered to since my initial appointment as an Associate Warden and I have never had to request "bail out" money from a regional office.
- Implemented two Department of Labor Apprenticeship programs designed to assist inmates in achieving skills necessary to facilitate successful reintegration into society. These programs are industry recognized and extremely cost efficient.

- Foster a positive image of the BOP by being a frequent presenter to community organizations, including the Chamber of Commerce, Rotary Club, Kiwanis Club, American Legion, and Elks.
- I serve as an Associate Member of the Santa Barbara County Law Enforcement Chiefs (CLEC), an organization consisting of Chiefs of Police, Sheriffs, Chief Probation Officers, FBI Special-Agents-in-Charge, and United States and County District Attorneys. Meeting monthly, we discuss and address a myriad of issues impacting Santa Barbara County.

Federal Correctional Institution Ray Brook
Warden | Ray Brook, NY | June 2014 – December 2015

- As the Chief Executive Officer (Warden) at Federal Correctional Institution (FCI) Ray Brook, I directly supervised four executive staff (GS-12/13/14) that were responsible for supervising 241 staff (GS-05 through GS-12). Ray Brook is a medium level institution housing approximately 1,000 felons convicted of various federal offenses, and I had an annual budget of approximately $25 million.
- Immediately implemented an aggressive hiring program that, coupled with effective roster management, allowed for a 40% reduction in overtime expenditures.
- Chaired the group of key staff that reviewed all uses of force.
- Successfully directed the institution through its first Prison Rape Elimination Act (PREA) audit and American Correctional Association (ACA) re-accreditation.
- Coordinated an institution reentry summit attended by 28 organizations and more than 60 people representing a cross section of government and private organizations. Forged numerous partnerships with whom we established concrete objectives, including enrolling inmates for health insurance prior to release, the provision of entrepreneurial training in partnership with Defy Ventures, literacy volunteer training for inmates, the establishment of the Alternative to Violence Program (AVP), and a program for inmate graduates of the Certified Alcohol and Substance Abuse (CASAC) program to serve as facilitators and receive credit hours towards credentialing prior to release.
- Personally worked with North Country Community College executive staff to return classroom post-secondary education to FCI Ray Brook.
- Recognizing the impact on children of having an incarcerated father, I directed the education department to hold two "Father/Child" literacy events for graduates of the institutions parenting program.
- Upon my arrival, I met personally with the Assistant United States Attorney to emphasize the importance of prosecuting inmates found to have committed crimes while incarcerated.

Federal Correctional Institution Williamsburg
Associate Warden | Salters, SC | May 2006 – June 2014

- During this time, I served variously as the Associate Warden of Operations (AWO) and Associate Warden of Programs (AWP) at a medium security institution housing approximately 1,650 inmates and a minimum-security camp housing approximately 130 inmates.
- As AWO, I supervised financial management and procurement, trust fund, laundry, facilities, food service, safety, human resources, computer resources and health services. In this capacity, I supervised 8 managers and approximately 80 staff and had oversight for an institution budget of approximately $30 million.
- As the AWP, I supervised correctional services, psychology, education, recreation, correctional programs, and religious services. In this capacity, I supervised 9 managers and approximately 220 staff.
- Upon may arrival at FCI Williamsburg I directed a project to increase security by placing razor wire on all interior buildings and the addition of "waterfalls" (cascading razor wire placed at areas where walls meet at 90-degree angles) in key areas.
- Through effective monitoring and realignment of funds, the institution consistently spent within 1% of its budget, remained solvent without need for additional funding and was consistently well below the average per capita for medium level institutions.
- I established and monitored a comprehensive monthly perpetual audit program for all departments under my supervision. As a result, Program Review (Bureau audits) ratings achieved a Superior (highest possible) rating at nearly twice the Bureau's overall rate.
- With my motivation and direction, a total of 19 staff achieved certification through the American Correctional Association's (ACA) professional certification program with another 12-15 pursuing certification when I left for my assignment as Warden at FCI Ray Brook.
- I developed and implemented a series of Cross Development classes designed to assist staff in the completion of Cross Development Courses. Since 2009, over 1,700 courses were taken and 112 staff completed 100% of them.
- Under my supervision, the Education Department set institution records for GED, VT, ACE, and Apprenticeship completions.
- Served as the PREA Compliance Coordinator and successfully led the facility to its first PREA audit.
- Participated in all use of force reviews.
- I developed a four-part series of Personal Financial Development seminars aimed at preparing staff for financial success that were attended by over 200 staff and spouses.
- As the Chairperson of the Affirmative Employment Committee, I initiated an Outreach Program with a local high school where staff met with at risk youth and their school assigned mentors. Additionally, I initiated an Angel Tree program to provide Christmas gifts to a local orphanage. The program was so successful a second orphanage was added to the program.

- I volunteered as a guest lecturer at Charleston Southern University concerning career opportunities and correctional culture and theory. In partnership with the Chair of the Criminal Justice Department, I developed a Student Volunteer Program that was exceptionally well received by the University.

Federal Correctional Institution Herlong
Associate Warden | Herlong, CA | September 2004 – May 2006

- I served at Herlong during its activation phase, which entailed hiring staff and preparing the institution for the designated complement of inmates.
- Working with other members of the Executive Staff, we undertook projects to harden the institution prior to the arrival of inmates. This included the placement of additional razor wire, the erection of a slowdown fence to split the compound, and the removal of furniture when it was determined the ease with which it could be converted to weapons. We developed and held training in the vacant housing units using live munitions.
- I reviewed all initial Institutional Supplements and initial Post Orders and was the final reviewing authority for those under my supervision.
- Represented the institution in meetings with the County Board of Supervisors, Commanding Officer of the Herlong US Army Depot, local law enforcement agencies, the Federal Bureau of Investigation, and the Assistant U.S. Attorney.
- Utilizing an Activation Task List, I monitored the progress towards a successful activation and redirected resources as necessary. I implemented an aggressive recruitment program that consisted of job fairs and newspaper and television advertisements. I personally reviewed all applications and made recommendations for selection/non-selection.

Federal Correctional Complex Beaumont
Associate Warden | Beaumont, TX | November 2000 – August 2004

- Federal Correctional Complex (FCC) Beaumont is complex consisting of a United States Penitentiary housing high security inmates, a Federal Correctional Institution housing medium security inmate, a Federal Correctional Institution housing low security inmates and a Camp housing minimum security inmates. Together, the institutions house approximately 5,000 inmates and employ approximately 900 staff.
- During this period, I was the Associate Warden of Industries and exercised sole budgetary and operational oversight of Federal Prison Industries (UNICOR) Cut and Sew, Plastics, and Engine Remanufacturing factories. I supervised eight managers that collectively supervised approximately 40 staff and provided job training to approximately 750 inmates. Collectively, the factories recorded sales in excess of $20 million on an annual basis.
- All factories recorded record sales during my tenure and the Plastics factory's and Cut and Sew factory's performance was such that they participated in UNICOR's gain sharing program.

- I negotiated Memorandums of Understanding with Central Office staff for operational objectives, including inmate employment, budget, sales, and earnings.
- After 9/11, I ordered comprehensive reviews of all factory operations in anticipation of increased orders from the military. As a result, the Plastics factory, having consulted with other departments within the institution to develop a template, was well prepared to implement 24-hour operations to meet increased orders for the military's ballistic helmets.
- My commitment to mentoring resulted in my being selected as Mentor of the Year in 2001.

Federal Correctional Institution Talladega
Superintendent of Industries | Talladega, AL | December 1998 – November 2000

- Federal Correctional Institution (FCI) Talladega is medium level institution housing approximately 1,000 medium security inmates with an adjacent secure Camp housing approximately 300 minimum-security inmates.
- During this period, I was the Superintendent of Industries and Education (SOI&E) and was a member of the institutions Executive Staff. In this capacity, I supervised the Federal Prison Industries (UNICOR) operations and the Education and Recreation departments.
- I exercised sole budgetary and operational oversight of a furniture factory that specialized in dorm and quarters furniture to be placed in military barracks. Sales were in the range of $10 million annually. I directly supervised one factory manager, one quality assurance manager, one business manager, and one systems administrator. Collectively these individuals supervised an additional 15 staff. The factory employed approximately 150 inmates.
- Upon arrival, I directed a comprehensive review of the factory's main supplier contract. As a result, I was able to have the contract terminated due to non-performance. The subsequent contract allowed for more timely delivery to customers and reduced costs.
- The operation achieved record sales and earnings during my tenure and was selected to participate in UNICOR's gain sharing program.
- During a conversion to a new Enterprise Resource Management system, I instituted a process of daily data reviews of bills of material, process routings, materials ordering, lead times, dock-to-stock times, and various other critical data. As a result, the factory was one of three corporates wide (over 80 factories) to achieve a Central Office award for

## EDUCATION
**MASTER OF SCIENCE** Criminal Justice
Charleston Southern University
North Charleston, SC | 2018
Graduated with 4.0 GPA. Criminal Justice Graduate School Student of the Year nominee in 2017.
**MBA**
Old Dominion University
Norfolk, VA | 1991
Member Phi Beta Sigma Honor Society for high academic achievement (3.57 GPA).
**BACHELOR OF ARTS** Management
Virginia Wesleyan College
Norfolk, VA | 1984
**UNITED STATES ARMY DRILL SERGEANTS SCHOOL**
Fort Jackson, SC | August 1989
**UNITED STATES ARMY NON-COMMISIONED OFFICERS ACADEMY**
Kitzingen, Federal Republic of Germany | September 1988

## JOB RELATED TRAINING
BOP Warden, National (attended annually from 2013 to 2018)
BOP Warden Familiarization
NIC Executive Training for New Wardens
BOP Associate Warden, National (attended annually from 2000 – 2014)
GEO Annual Warden's Leadership Conference (attended annually from 2018-2019
CSU Contemporary Issues in Criminal Justice
CSU Survey of the Criminal Justice System

## **APPENDIX B – DOCUMENTS RELIED ON**

4.25.23 – Responses to MTC's First Set of Requests for Production
2021-2022 GL Dec Page Redacted
Documents Produced with RFP (VC 00001-00022)
Evelyn Dunn deposition w-exhibits
Marcus Robinson deposition
Michael McClinton Deposition
MTC 1-1283
MTC Disclosures – Russell v. MTC, et al.
MTC Resp. to Interrogatories
MTC Resp. to Russell RPD
MTC Responses to 2nd Set of Interrogatories
MTC Responses to 2nd Set of RPD C3.10.23
MTC Supp Responses to FSI
MTC Supp. Resp. to RPD
MTCs 2nd Supplemental Responses to FSI
MTC's Responses to Third Set of RFP
Plaintiff's Production 1-1287
Responses to MTC's First Set of Requests for Admission
Roxie Wallace deposition
Russell's Expert Designation
Shana Carter Deposition
VitalCore's Responses to 1st set of Interrogatories001
VitalCore's Responses to 1st set of RPD001
VitalCore's Supplemental Answers to Plaintiff's 1st set of interrogatories.
VitalCore's Supplemental Responses to Plaintiff's 1st set of Request for Production
Bukten, A Stavseth MR. Suicide in prison and after release: a 17-year national cohort study. *European Journal of Epidemiology.* 36(10), 1075-1083.
Carson, E. Ann (2021). Suicide in local Jails and State Prisons. *U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.*
Hayes, Lindssay M. (2010) National Study of Jail Suicide: 20 years later. *National Institute of Corrections.*
Felix, Tammy; Pyrooz, David; Novisky, Meghan; Tostlebe, Jennifer; Dockstader, Jessica. (2022) Effects of COVID-19 on Prison Operations. *National Institute of Corrections.*
Russo, Joe (2019). Workforce Issues in Corrections. *National Institute of Justice.*
Parker, Tony C. (2022, May 23. American Correctional Association.
Gilbert, J.D. , Jensen, L., & Byard, R.W. (2008). Further observations on the speed of death in hanging. *Journal of Forensic Sciences*, 53(5), 1204-1205.
Petersen, Bryce; Kizzort, Megan; Kim, KiDeuk; Shukla, Rochista (2021, April). Prison Contraband: Prevalence, Impacts, and Interdiction Strategies. *Corrections*
Collins, Michael (2017, November 9). Congress is looking to stem the flow of cell phones into jails, prisons. *USA Today*
Norman, C. (2023) A global review of prison drug smuggling routes in the usage of drugs in prisons. *Wires Forensic Science*, 5(2), e1473

U.S. Bureau of Labor Statistics. Occupational Employment and Wages, May 2022: 33-3012 Correctional Officers and Jailers

Email from Michael Petrogeorge dated May 31 detailing the increase in wages

Email from Jarrad Garner dated May 30, forwarded from Management and Training Corporation detailing incentives, bonuses, recruiting efforts, and terminations of staff