```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                   NORTHERN DIVISION


ANGELA RUSSELL, AS ADMINISTRATRIX          EXHIBIT 3
OF THE ESTATE OF JEREMY T. RUSSELL
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JEREMY T. RUSSELL,

                                    PLAINTIFF,
   V.

              CASE NO.3:22-cv-294-HTW-LGI

MANAGEMENT & TRAINING CORPORATION; et al.,
                                   DEFENDANTS.



       *****************************************
            DEPOSITION OF ANTHONY GIBSON
       *****************************************

            Taken at Adams & Reese
   1018 Highland Colony Parkway, Suite 800
            Ridgeland, Mississippi,
         on Wednesday, June 14, 2023,
     beginning at approximately 9:15 a.m.




       *********************************

              Southern Steno Reporters

               3541 Highway 13 South
                 Morton, MS 39117
                  601-507-0849
                cynthiaharr@att.net
```

```
 1                    A P P E A R A N C E S

 2

     For the Plaintiff:
 3
          GRAFTON E. BRAGG, ESQ.
 4        BraggLaw, PLLC
          1060 East County Line Road
 5        Suite 3A-120
          Ridgeland, Mississippi 39157
 6             grafton@graftonbragglaw.com

 7


 8   For the Defendants VitalCore Health Strategies,
     Evelyn Dunn, William Brazier and Stacey Kitchens:
 9
          MICHAEL CHASE, ESQ.
10        Mitchell McNutt& Sams
          105 South Front Street
11        Post Office Box 1720
          Tupelo, Mississippi 38802
12             mchase@mitchellmcnutt.com

13

14   For the Defendants Michael McClinton; Ashley Ray;
     Marcus Robinson; Roxie Wallace; Jacob Vigliante;
15   John and Jane Doe Correctional Officers:

16        RAY YOUNG, ESQ.
          JARRAD GARNER, ESQ.
17        Adams & Reese, LLP
          1018 Highland Colony Parkway
18        Suite 800
          Ridgeland, Mississippi 39157
19             ray.young@arlaw.com
               jarrad.garner@arlaw.com
20

21   Also Present:
          Riley Saunders
22

23

24

25
```

1  Correctional Facility?
2      A    Yes, I was the highest ranking health
3  administrator at the facility.
4      Q    Okay.  So there are doctors that work
5  at the facility, correct?
6      A    Yes.  It's the health services
7  administrator, and then it's a site medical
8  director.  And then you have the rest of the
9  staff, like psychiatrists, other doctors, nurse
10 practitioners, dentists.  Everyone else fall up
11 under us.  So it's HSA, site medical director,
12 then everyone else and then ancillary staff.
13     Q    So the site medical director answers to
14 the HSA?
15     A    Yes.
16     Q    And the site medical director in
17 October of 2021 was Patrick Arnold?
18     A    Yes.
19     Q    Is there a separate person who's in
20 charge of mental health services?
21     A    No.  The health services administrator
22 is in charge of everything.  Now, the regional
23 team, they are something like advisors to the
24 site staff.  But the health services
25 administrator is over psychiatry, mental health,

1    less likely for a person to commit suicide if you
2    have someone there watching them or someone in
3    the area.  It's less likely.  That's why they had
4    the one-on-ones, or that's why you have security
5    in these areas.
6           But if you don't have no one there and
7    you give these people space to just create -- be
8    creative and think, things happen, especially
9    from how my mental health team, they came up with
10   a conclusion, and they came up with this dealing
11   with from testing and observation, that a lot of
12   -- some of these guys, not a lot, some of these
13   guys, drugs had a play in it.  It confused their
14   minds and have you doing different things.  That
15   came from the mental health team, not from me.
16          But I had the conversation with the
17   commissioner something has to give here.  Do some
18   shakedowns in these prisons, take some of these
19   drugs from these folks.  And how are our mental
20   health folks end up receiving drugs?  How these
21   people receiving drugs?  And they locked up?  Who
22   getting it to them, you know?  And that same -- I
23   typed up the little thing.  It's even in the MAC
24   minutes that here it is, you have an inmate
25   floating around watching inmates.  Where is the

1   on seg areas, you know.  And they went for
2   it, and they started doing it.
3  BY MR. BRAGG:
4   Q   Why did you suggest to give them a
5  raise?  How would that make a difference?  Or to
6  give them bonus, I think you said.
7   A   They wouldn't go down there no other
8  way.  A little increase in pay, some of them went
9  for it.  But they would rather work in Housing
10 Unit 1 or Housing Unit 3 or 2 before they go to
11 5.  But you give them a couple dollars, you got
12 some to go there and work.
13  Q   That was only -- did that ever happen
14 in camp support?  Did you guys ever give a bonus
15 for folks in camp support?
16  A   Camp support always had staff.  I mean
17 always.  I can't recall a moment that staff
18 wasn't in camp support.  That day there was just,
19 you know, those officers were pulled to go
20 transport.  So they had to have been real short
21 in the facility in order to pull somebody out of
22 camp support.
23       Camp support have their own team, own
24 security team.  Just like medical.  Medical have
25 a team of security that they always up in there.

1  Now, if somebody go on vacation, you have
2  somebody come replace.  You know, sometimes they
3  never replace.  They have one person, you know.
4  But camp support always had, like, as two-woman
5  or man crew in there.
6      Q    Did you know of anybody working for MTC
7  at the time that you were there at East
8  Mississippi that left to take more money
9  somewhere else?
10          MR. YOUNG:  Object to the form.
11          THE WITNESS:  No, I can't recall that.
12     Not right now, I can't recall that.
13          MR. BRAGG:  Okay.  Then I also join in
14     your objection.
15 BY MR. BRAGG:
16     Q    Was there a -- did anybody have any
17 conversations about monetary compensation for the
18 family of Jeremy Russell that you're aware of?
19     A    Not that I'm aware of.
20     Q    Okay.
21          MR. BRAGG:  That's all I have.
22                  EXAMINATION
23 BY MR. CHASE:
24     Q    Mr. Gibson, my name is Michael Chase.
25 We were introduced before the deposition started.

1  That's Housing Unit 5.  I didn't have to say you
2  need security staff in camp support because you
3  already have it.  Security is always there in
4  camp support.
5         But Housing Unit 5, that was a concern
6  that officers needed to be down there.  We had
7  too many attempting suicides, suicides.  It was
8  just too much going on in that area to say that's
9  a seg location, there's no movement.
10    Q    I believe you testified that you-all
11 would discuss that often at the meetings,
12 correct?
13    A    Yes, because it wasn't getting done.
14 We couldn't get it done.
15    Q    And Exhibit 3 here would be the minutes
16 that were taken about the discussion had at the
17 meeting; is that right?
18    A    Yes.
19    Q    Okay.  I want you to take some time to
20 look through that document and show me where
21 you-all mentioned the lack of security or the
22 need for security in the facility.  You can take
23 your time and review it.
24    A    If you can look at that 0010.
25    Q    Is that the third page?  What page is

1  at any point relay that information to an MTC
2  official or staff member?
3       A    If a patient is talking suicide
4  ideations or anything like that, yes, we
5  communicate that to security and let them know.
6  And then the warden will ask us, "Well, what
7  y'all want to do?  Do y'all want to put that
8  person on one-on-one?"  It's up to the provider,
9  you know, to do that.  Every concern of a person
10 talking out of their mind or talking crazy, we
11 have to let them know so staff won't get hurt.
12 Yes, we always let them know, yes.
13      Q    I'm a little confused.  You testified
14 that you didn't talk to McClinton, Vigliante or
15 any staff prior to Russell's death.  But now
16 you're saying that you did relay Angela Russell's
17 concern about Jeremy to MTC.
18      A    Well, I didn't.  My staff -- and I know
19 this for sure -- that when a person is
20 threatening suicide or something like that, we
21 have to report and relay that to the warden and
22 them.
23      Q    How are you sure that happened in this
24 case?
25      A    I'm not sure that happened.  But that's

1   our process, that -- as a matter of fact, the
2   nurse practitioner is the one that communicated
3   to them about we've got to be careful or
4   whatever.  They the one that relayed that
5   information to security staff to let them know,
6   hey, this is what we've got going on.  And then
7   they decide to either put that person on
8   one-on-one or whatever.  But that's always
9   communicated out.  That's how you get your
10  orders.  That's how they do their orders.  And
11  security go by the orders.  Every day you might
12  see an order regarding a patient.  And that's how
13  the communication is going out there, is through
14  orders.  Yeah.
15       Q    I appreciate that.  What I want to know
16  is did you communicate that personally to anyone
17  on MTC's staff regarding Jeremy Russell talking
18  out of his head?
19       A    No.
20       Q    Okay.  You testified earlier that there
21  was no security in camp support because the
22  security was pulled to another unit.  Do you
23  recall that?
24       A    They was pulled away from the facility
25  for transport.

1  clothes.
2      Q    Did Angela Russell ever relay to you
3  that somebody told her that?
4      A    I can't recall that.
5      Q    Okay.  I want to go to the third bullet
6  point, October 6, 2021.  Did you have that
7  conversation with Angela Russell on October 6,
8  2021?
9      A    I remember having a conversation with
10 her about she's saying -- she's saying right here
11 the plan of self-harm.  But she said he was
12 talking crazy, talking out of his mind.  And she
13 needs to speak to Nurse Dunn.  I sort of remember
14 that.  But moving from camp support, I can't
15 recall a request for him to be moved.  I can't
16 recall that.  And saying that camp support is the
17 safest place, I can't recall that.
18     Q    Do you ever recall Angela Russell
19 mentioning self-harm or suicidal ideations to you
20 on October 6, 2021?
21     A    I can't recall.
22     Q    Are you familiar with the contract
23 between MTC and MDOC?
24     A    Can you repeat that?
25     Q    Are you familiar -- let me ask it like

| | |
|---|---|
| 1 | this.  Are you familiar with MTC's role at EMCF? |
| 2 | Do you know what their role is, that company's |
| 3 | role at that facility? |
| 4 | A    Not in its entirety, but I do know |
| 5 | provide security. |
| 6 | Q    Would you agree that MTC has no role in |
| 7 | the medical treatment, the healthcare treatment |
| 8 | of the inmates at the facility? |
| 9 | A    I agree. |
| 10 | Q    Okay.  Getting to my final questions, |
| 11 | so I appreciate your patience.  Mr. Gibson, you |
| 12 | made a lot of the comments here today and in your |
| 13 | statements about security issues at the facility. |
| 14 | Do you recall making these comments? |
| 15 | A    Pertaining to what? |
| 16 | Q    Security issues at the facility. |
| 17 | A    Yes. |
| 18 | Q    Do you recall making comments or |
| 19 | findings that the security issues and the drug |
| 20 | usage may have been the cause of suicides and |
| 21 | Jeremy Russell's at the facility? |
| 22 | A    We would always say it played a part. |
| 23 | We didn't -- we would never say it's the cause of |
| 24 | it.  But, you know, it's a part of what's going |
| 25 | on. |

```
 1   more days than the day of his death.  Do you
 2   agree with that, that camp support was
 3   chronically understaffed?
 4        A    As far as understaffed, no.
 5        Q    That's right, I believe you testified
 6   earlier that camp support always had staff in
 7   that area; is that right?
 8        A    I'm not going to say adequate staff,
 9   but they have someone there just about all the
10   time, even if it's one person.  But it usually be
11   two, you know, because you have somebody to float
12   and somebody working the board.  So you need two.
13   But even if it's one, someone is there.
14        Q    So would you agree with me if I said
15   that it's not typical for camp support to not
16   have staff in it?
17        A    Yes, I agree.
18        Q    I want to direct your attention now to
19   Page 9 of Exhibit 7.  That's Opinion 3, Roman
20   numeral VIII, I believe.  I want to give you a
21   second to review Opinion 3, which goes over to
22   Page 10.  Same instructions.  If you see anything
23   you disagree with, let me know and tell me why
24   you disagree with it.
25        A    All right.  Now, on the first paragraph
```