EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ANGELA RUSSELL, AS ADMINISTRATRIX
OF THE ESTATE OF JEREMY T. RUSSELL
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JEREMY T. RUSSELL         PLAINTIFF

V.                              CASE NO. 3:22-cv-294-HTW-LGI

MANAGEMENT & TRAINING CORPORATION; MICHAEL
MCCLINTON; MARCUS ROBINSON; JACOB VIGLIANTE;
JOHN AND JANE DOE CORRECTIONAL OFFICERS;
VITALCORE HEALTH STRATEGIES, LLC; EVELYN
DUNN; STACEY KITCHENS; WILLIAM BRAZIER; and
JOHN AND JANE DOE MEDICAL PROVIDERS         DEFENDANTS

**SECOND AMENDED COMPLAINT – JURY TRIAL DEMANDED**

Twenty-one-year-old Jeremy T. Russell died by hanging in his cell at the East Mississippi Correctional Facility on October 7, 2021. Angela Russell, as administratrix of Jeremy's estate and on behalf of his wrongful death beneficiaries, files this complaint for damages. Angela seeks relief under 42 U.S.C. § 1983 and state law, and she demands a jury trial on all issues.

The certificate of consultation is attached as Exhibit 1 to the second amended complaint in compliance with Mississippi Code Section 11-1-58.

PARTIES

1.  Angela Russell is the mother, wrongful-death beneficiary, and administratrix of the estate of Jeremy T. Russell. Angela brings this case on behalf of the estate and wrongful-death beneficiaries of Jeremy. Angela is an adult resident citizen of Senatobia, Mississippi.

2. Management & Training Corporation ("MTC") is a corporation incorporated in Delaware with its principal place of business in Centerville, Utah. During all relevant times, MTC was the exclusive manager and operator of EMCF. MTC may be served through its registered agent for service, CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

3. Major Michael McClinton is a correctional officer and employee or agent of MTC who committed the wrongful and negligent acts described in this complaint. McClinton was the shift commander on the date of Jeremy's death. McClinton may be served personally.

4. Sergeant Marcus Robinson is a correctional officer and employee or agent of MTC who committed the wrongful and negligent acts described in this complaint. Robinson was assigned to monitor Jeremy's housing unit on the date of Jeremy's death. Robinson may be served personally.

5. Jacob Vigliante is the Deputy Warden of Operations and an employee or agent of MTC who committed the wrongful and negligent acts described in this complaint. Vigliante frequently spoke with Angela leading up to Jeremy's death and had actual knowledge of Jeremy's suicidal ideations. Vigliante may be served personally.

6. John and Jane Doe Correctional Officers are unknown employees or agents of MTC who committed wrongful and negligent actions described in this complaint.

7. VitalCore Health Strategies, LLC ("VitalCore") is a limited liability company organized under the laws of Kansas with its principal place of business in Topeka, Kansas. Since November 2020, VitalCore has been responsible for the provision of medical services within the Mississippi Department of Corrections ("MDOC"), including at Central Mississippi Correctional Facility ("Central Mississippi") and East Mississippi Correctional Facility ("East Mississippi"). VitalCore may be served through its registered agent for service, CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

8. Evelyn Dunn is a psychiatric-mental health nurse practitioner who was responsible for providing medical care to Jeremy at EMCF on behalf of VitalCore. Dunn may be served personally.

9. Stacey Kitchens is a nurse practitioner who was responsible for providing medical care to Jeremy at CMCF on behalf of VitalCore. Kitchens may be served personally.

10. William Brazier is a medical doctor who was responsible for providing medical care to Jeremy at CMCF on behalf of VitalCore. Brazier may be served personally.

11. John and Jane Doe Medical Providers are unknown employees or agents of VitalCore who committed wrongful and negligent actions described in this complaint.

3

BACKGROUND AND FACTS

12. Just after his 17th birthday, in February 2017, Jeremy was admitted to the Mississippi Department of Corrections ("the MDOC").

13. He was incarcerated at various facilities within the MDOC from February 2017 until May 2019 and from March 2021 until his death in October 2021.

14. When Jeremy was first placed in MDOC custody, he was in good physical and mental condition and aspired to attain his GED and reintegrate into society after his release.

15. During his time in MDOC custody, Jeremy's condition deteriorated significantly. Jeremy began experiencing depression, anxiety, and suicidal thoughts and tendencies. For example, in April 2019, Jeremy disclosed to an MDOC psychiatrist that he intended to hang himself with a sheet. Later, in April 2021, Jeremy made a similar disclosure. Both of these disclosures were documented in Jeremy's medical records maintained by the MDOC and available to VitalCore and MTC.

16. Jeremy was exposed to an environment of widespread and rampant drug usage during his confinement. He was allowed access to illegal narcotics. Jeremy began to exhibit odd behaviors that were uncharacteristic for him.

17. In April 2019, medical staff at MDOC facilities began administering to Jeremy the medication haloperidol, in both fast-acting (haloperidol lactate) and slow-acting (haloperidol decanoate) forms. Haloperidol (also known as Haldol) is a strong

4

yet relatively inexpensive antipsychotic medication with serious and well-documented side effects.

18. Shortly after being administered haloperidol, Jeremy began to complain of the side effects. Among other things, Jeremy felt the drug was causing him mental problems and blurred vision. Jeremy expressed the desire to commit suicide as a result of his problems with haloperidol.

19. Jeremy was released in May 2019 and, thereafter, treated with Communicare in Senatobia, MS. While at Communicare, Jeremy was prescribed an alternative medication and was taken off of haloperidol.

20. When Jeremy returned to MDOC custody in the Spring of 2021, his problems with haloperidol were documented in his records. On numerous occasions, Jeremy and his mother, Angela, notified medical providers at the MDOC that Jeremy did not tolerate haloperidol.

21. Nevertheless, the medical staff at MDOC—both at Central Mississippi and East Mississippi—disregarded these complaints and symptoms and continued to administer Jeremy haloperidol, including significant doses of the drug in the weeks and days leading up to his death.

22. Throughout his time in the MDOC, the following individuals, all agents or employees of VitalCore, decided to give Jeremy haloperidol even though they knew or should have known about Jeremy's adverse reactions to haloperidol.

    a. NP Stacey Kitchens (Central Mississippi)

5

      b.    William T. Brazier, M.D. (Central Mississippi)
      c.    NP Evelyn Dunn (East Mississippi)

23. In late September 2021, Jeremy was transferred from Central Mississippi to East Mississippi and, while waiting for housing, placed a shirt around his neck, exhibiting obvious suicidal ideations. On September 28, 2021, Jeremy was admitted for non-acute suicide observation.

24. Jeremy was, shortly thereafter, stepped down from non-acute suicide observation to psychiatric observation. On September 30, 2021, Jeremy was released from psychiatric observation.

25. On October 4, 2021, Jeremy was again deemed to be a high suicide risk after admitting that he wanted to commit suicide. Among other things, Jeremy reported being depressed because his aunt had recently passed away. Jeremy admitted to a recent attempt to commit suicide. Jeremy was admitted back to non-acute suicide watch.

26. The next day, NP Evelyn Dunn evaluated Jeremy and, attributing Jeremy's problems to behavioral issues and substance abuse—as opposed to mental health problems—discharged Jeremy from non-acute suicide watch and into "camp support" housing.

27. Dunn evaluated Jeremy again the next day, on October 6, 2021, and, again, noted her belief that Jeremy was "acting out" and did not exhibit "severe mental illness."

6

28. Jeremy also had a conversation with his mother, Angela, on October 6. Jeremy told Angela that he intended to hang himself. Angela was able to talk with health services administrator, Anthony Gibson. Gibson assured Angela that he would alert the prison staff, that he would make sure that medical staff did not give Jeremy haloperidol, and that Jeremy was in the safest place he could be within the facility.

29. Angela also had several conversations with Jacob Vigliante, the Deputy Warden of Operations. As a result, Vigliante was well aware of Jeremy's suicidal ideations and Angela's concern about her son. Vigliante reported that Jeremy was in camp support "under medical/mental health evaluation."

30. Camp support, also called Housing Unit 7, is often used by VitalCore and MTC as a "step down" unit after mental health observation. Unlike acute suicide watch, officers in camp support do not provide full time one-on-one direct observation of inmates. And unlike non-acute suicide observation, officers in camp support do not perform 15-minute checks.

31. Jeremy was not placed on acute or non-acute suicide watch on October 6 or October 7.

32. By MTC policy, at least two officers are required, at all times, to be stationed at camp support.

33. By MTC policy, at least one officer is required to be stationed, at all times, within the camp support control room.

7

34. On October 7, 2021, Major (then Captain) McClinton and Nurse Shana Carter found Jeremy hanging from his top bunk with a bedsheet around his neck.

35. At the time that Jeremy placed the bedsheet around his neck, no officer was present in the camp support control room or any other part of the camp support unit.

36. Leading up to Jeremy's death, MTC and its employees or agents failed to monitor the camp support housing unit.

37. Officer Marcus Robinson was the lone officer stationed at camp support, but he left the area before Jeremy placed the bedsheet around his neck, and he did not return until after Jeremy had affixed the bedsheet. Ashley Ray had called Robinson away from his post, leaving the camp support unit inadequately monitored.

38. Further, after Jeremy was found unresponsive, there was a delay in providing him any sort of emergency interventions. Among other things, after finding Jeremy, Captain McClinton radioed for assistance but failed to timely intervene.

39. It is unclear how, or why, Jeremy was given access to a bedsheet, even though his medical records documented that Jeremy intended to use a bedsheet or similar ligature to end his life.

40. Jeremy was pronounced dead at 11.45am on October 7, 2021.

8

COUNT 1
FAILURE TO PREVENT SUICIDE

41. Defendants are liable for failing to prevent Jeremy's suicide. For the reasons explained below, NP Dunn, Robinson, Wallace, Ray, McClinton, Vigliante, and John and Jane Doe Correctional officers are liable for deliberate indifference under the Eighth Amendment and negligence under state law. Likewise, MTC and VitalCore are liable for their deliberate indifference under the Eighth Amendment, through vicarious liability under state law, and for their direct negligence under state law.

42. NP Dunn disregarded a substantial risk of serious harm to Jeremy by taking him off suicide watch on October 5, 2021, and by keeping him off of suicide watch until his death.

43. Dunn knew, as reflected in Jeremy's medical records, that Jeremy had threatened and attempted suicide in the recent past and was at substantial risk of self-harm. Dunn further knew that Jeremy had attempted self-harm with a sheet and had disclosed that he intended to hang himself with a sheet.

44. Nonetheless, Dunn discharged Jeremy from non-acute suicide observation without any legitimate justification.

45. As a result, Jeremy was discharged from non-acute suicide observation to "camp support." In "camp support," he was allowed access to a bedsheet by Nurse Dunn, who was working as an employee of VitalCore, as well as prison officials,

9

including Robinson, McClinton, and Vigliante, who were working as employees or agents of MTC. All these officials—and especially Vigliante—knew of Jeremy's suicidal ideations and the concerns of Jeremy's mother, Angela.

46. Had Jeremy been closely and properly observed on suicide watch, he would not have had the opportunity to carry out his suicide plan.

47. Similarly, had Jeremy been deprived of access to a bedsheet, he would not have had the opportunity to carry out his suicide plan.

48. Similarly, had Jeremy been appropriately monitored while in camp support housing, Jeremy would not have had the opportunity to carry out his suicide plan. And even if he had made an attempt, there is a substantial likelihood that MTC officials would have been able to intervene and spare Jeremy's life.

49. Therefore, NP Dunn violated the Eighth Amendment through her deliberate indifference to a serious medical need under the Eighth Amendment and 42 U.S.C. § 1983.

50. For the same reasons, NP Dunn failed to uphold the duty of reasonable care under state law—including by breaching standards of care for mental health NPs in correctional facilities, *See* NCCHC STANDARD MH-G-04, as well as by breaching the scope of practice restrictions embodied in MTCs suicide prevention policies that were developed in conjunction with (or supposed to be developed in conjunction with) VitalCore. In doing so, Dunn caused Jeremy's untimely passing. VitalCore, Dunn's principal or employer, is vicariously liable for her negligence. MTC

10

is also liable for Dunn's negligence because it was the exclusive manager and operator of the facility and, thus, had a non-delegable duty to make sure prisoners were given appropriate medical care.

51. Robinson, McClinton, and Vigliante also violated the Eighth Amendment. Although they knew about Jeremy's suicidal tendencies and behavior, they disregarded this excessive risk of serious harm by allowing him access to a bedsheet which Jeremy could and did use to carry out his suicide plan. Likewise, they disregarded this excessive risk of serious harm by failing to properly monitor the camp support housing area. Likewise, McClinton disregarded this excessive risk of harm by observing Jeremy with a bedsheet around his neck, yet delaying intervention for several minutes until it was too late.

52. For the same reasons, Robinson, McClinton, and Vigliante failed to uphold the duty of reasonable care under state law. The officials' principal or employer, MTC, is vicariously liable for their negligence.

53. Upon information and belief, the policies, customs, or practices at East Mississippi—attributable to both VitalCore and MTC—are to conserve financial resources by utilizing acute and non-acute suicide observation only in the most extreme cases and, then, only for limited and often inadequate periods. Under these policies, mental health NPs such as Nurse Dunn are allowed to discharge inmates from or keep inmates off suicide watch, even where the NCCHC standards require suicide watch.

11

54. These policies, customs, or practices were the moving force behind NP Dunn's decision to discharge Jeremy from non-acute suicide watch in violation of the 8th Amendment. These policies, customs, or practices likewise, represents a direct breach of the duty of reasonable care by VitalCore and MTC.

55. The custom or practice at East Mississippi—attributable to MTC—is to understaff facilities with poorly trained or not enough prison officials in order to maximize company profits. At the time of Jeremy's death, correctional officers were paid only $12 per hour, less than the national and state-wide average. MTC was chronically understaffed in the months leading up to Jeremy's passing.

56. This custom or practice was the moving force behind the inadequate observation of the camp support area and MTC officials' other failures to protect Jeremy from the substantial risk of self-harm.

57. It is, further, the policy, custom, or practice at East Mississippi—attributable to both VitalCore and MTC—to allow prisoners access to materials commonly used for self-harm, such as bedsheets, even when the prisoners have disclosed a plan for self-harm.

58. Rather than restricting prisoners' access to materials on an individualized basis based on their specific medical needs, prisoners are given access to items that are generally available to other prisoners in their housing unit.

59. This policy, custom, or practice, which exists to avoid additional expenses and thereby maximize company profits, was the moving force behind the

12

decision to allow Jeremy access to a bedsheet, in violation of the 8th Amendment. This policy, custom, or practice, likewise, represents a direct breach of the duty of reasonable care by VitalCore and MTC.

## COUNT 2
## WRONGFUL ADMINISTRATION OF MEDICATION

60. Defendants are liable for the wrongful administration of medication. For the reasons explained below, NP Stacey Kitchens, Dr. William T. Brazier, and NP Evelyn Dunn are liable for deliberate indifference under the Eighth Amendment and for negligence under state law. VitalCore is liable for its deliberate indifference under the Eighth Amendment. And VitalCore and MTC are liable through vicarious liability and for their direct negligence under state law.

61. Jeremy had documented complaints from the administration of haloperidol, including mental problems, suicidal ideations, and blurred vision.

62. Nonetheless, VitalCore and its agents or employees continued to administer Jeremy haloperidol, including significant doses of the drug in the weeks and days leading up to his death.

63. NP Kitchens, Dr. Brazier, and NP Dunn decided to give Jeremy haloperidol even though they knew or should have known about Jeremy's adverse reactions to haloperidol.

13

64. This wrongful prescription and administration of haloperidol caused Jeremy suffering and emotional distress and may have been a substantial contributing factor in his untimely passing.

65. In wrongfully deciding to administer haloperidol to Jeremy, Kitchens, Brazier, and Dunn breached the applicable standard of care and were deliberately indifferent to the risk of serious harm to Jeremy. VitalCore is vicariously liable for the actions of Kitchens, Brazier, and Dunn. MTC is also liable for their negligence because it was the exclusive manager and operator of the facility and, thus, had a non-delegable duty to make sure prisoners were given appropriate medical care.

66. It is the policy, custom, or practice at East Mississippi—attributable to both VitalCore as the medical services provider and MTC as the exclusive manager and operator—of administering haloperidol when other equally effective, more expensive, and less powerful medications are available. This policy or custom was the moving force behind the constitutional violations that caused serious harm to Jeremy through the wrongful administration of haloperidol. This policy, custom, or practice, likewise, represents a direct breach of the duty of reasonable care by VitalCore and MTC.

COUNT 3
FAILURE TO PROVIDE A DRUG-FREE ENVIRONMENT

67. Defendants are liable for the failure to provide a drug-free environment at EMCF. For the reasons explained below, John and Jane Doe Correctional Officers

14

are liable for deliberate indifference under the Eighth Amendment and for negligence under state law. MTC is liable for its deliberate indifference under the Eighth Amendment. And VitalCore and MTC are liable through vicarious liability and through their direct negligence under state law.

68. The state (and thus MTC acting under color of state law), was required by the Eighth Amendment to maintain "a drug-free setting to the greatest extent possible." *Amig v. Cty. of Juniata*, 432 F. Supp. 3d 481, 487 (M.D. Pa. 2020); *Hill v. Pennsylvania Dep't of Corr.*, No. 684 M.D. 2018, 2022 WL 480200, at *6 (Pa. Commw. Ct. Feb. 17, 2022).

69. Yet during his stays at East Mississippi, Jeremy was exposed to an environment of widespread and rampant drug trafficking and usage.

70. The drug availability is, according to Major McClinton, a direct result of MTC employees (who are paid a low wage) bringing narcotics into the facility for financial gain.

71. On numerous occasions, Jeremy was given access to illegal narcotics. The officers and medical staff at East Mississippi were aware of this environment of drug use. Just days before his passing, NP Dunn released Jeremy from non-acute suicide watch while knowing that, as a result, Jeremy would have access to and likely use illegal narcotics in the facility. Jeremy was, in fact, able to have access to illegal narcotics (brought into the facility by MTC employees) just days before he died.

15

72. In this way, the conditions at East Mississippi posed a substantial risk of serious harm to Jeremy. Nonetheless, MTC and its officers were deliberately indifferent to Jeremy's need for protection by bringing illegal narcotics into the facility and by allowing Jeremy to be housed in areas of the facility where narcotics were readily available.

73. MTC has not only failed to maintain a drug-free setting; officers working for MTC at East Mississippi have affirmatively contributed to the environment of drugs at East Mississippi.

74. The drug culture at East Mississippi, and the drugs that Jeremy was able to obtain, substantially contributed to the social and mental health problems that Jeremy experienced at the prison, including his untimely passing.

75. By failing to keep East Mississippi drug-free and protect Jeremy from the environment of drugs, John and Jane Doe Correctional Officers breached the duty of reasonable care and were deliberately indifferent to the risk of serious harm to Jeremy. MTC is vicariously liable for their actions.

76. By knowingly releasing Jeremy from non-acute suicide watch into the environment of drugs where he had been harmed in the past, NP Dunn breached the duty of reasonable care and was deliberately indifferent to the risk of serious harm to Jeremy. VitalCore is vicariously liable under state law for her actions. MTC is also liable for her negligence under its non-delegable duty as the exclusive manager and operator of the facility.

16

77. The uncontained and widespread environment of drug trafficking and usage is the product of and, in fact, represents the custom or practice at EMCF. Upon information and belief, MTC has chosen to maximize profits by compensating its prison officials at low levels, which in turn (1) attracts less qualified candidates and (2) incentivizes officials to participate in trafficking activities to earn additional compensation. This custom or practice was the moving force behind the failure to provide Jeremy with a drug-free environment in violation of the 8th Amendment. This custom or practice, likewise, represents a direct breach of the duty of reasonable care by MTC.

## RELIEF DEMANDED

Angela demands the following relief on behalf of the estate and wrongful death beneficiaries of Jeremy:

(a) Compensatory damages for the pain, suffering, and emotional distress to Jeremy during his life;
(b) Lost income;
(c) Present net cash value of Jeremy's life expectancy;
(d) Loss of companionship and society;
(e) Funeral expenses;
(f) Punitive damages;
(g) Attorney fees;
(h) Costs of litigation; and
(i) Interest

Submitted, this the 20th day of February 2023.

ANGELA RUSSELL

BY: *Grafton E. Bragg*

17

GRAFTON BRAGG
BraggLaw, PLLC
1060 East County Line Road
Suite 3A-120
Ridgeland, MS 39157
601.624.1153
grafton@graftonbragglaw.com

18