IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ANGELA RUSSELL, AS ADMINISTRATRIX
OF THE ESTATE OF JEREMY T. RUSSELL
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JEREMY T. RUSSELL                          PLAINTIFF

V.                                        CASE NO. 3:22-cv-294-HTW-LGI

MANAGEMENT & TRAINING CORPORATION; et al.          DEFENDANTS

RECORDS AFFIDAVIT

My name is <u>Cindy Freeman</u> and I am an adult resident citizen of Mississippi.

I serve as <u>Director of the Office of Procurement and Contracts</u> for the Mississippi

Department of Corrections and, in my role, I am authorized to make this certification.

I certify that the following <u>63</u> pages affixed to this certification represent a true and

accurate copy of the contract documents between VitalCore Health Strategies, LLC

and the Mississippi Department of Corrections that (1) were in effect during and

including September and October 2021 and (2) were filed and recorded in the office

of the Mississippi Department of Corrections as authorized by law.  Said documents

include:

10/05/2020 Agreement between Mississippi Department of Corrections and VitalCore
Health Strategies, LLC for Onsite Inmate Care Services (3 pages in total)

Attachment A   July 1, 2016 Agreement between Mississippi Department of Correction and
Centurion of Mississippi, LLC for Onsite Health Services  (43 pages in total)
Attachment B   06/17/2019 Amendment 1 to the July 1, 2016 Agreement (7 pages in total)
Attachment C   06/30/2020 Amendment 2 to the July 1, 2016 Agreement (3 pages in total)

10/05/2020 Amendment 1 to the 10/05/2020 Agreement (2 pages in total)
07/01/2021 Amendment 2 to the 10/05/2020 Agreement (2 pages in total)

10/21/2021 Agreement between Mississippi Department of Corrections and VitalCore Health trategies, LLC for Onsite Inmate Health Care Services (3 pages in total)

Cindy Freeman, Director
Office of Procurement and Contracts

Sworn to and subscribed before me this the ___7___ day of ___July___, 2023.

NOTARY PUBLIC

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 28563
GIA NICOLE McLEOD
Commission Expires
Oct. 10, 2023
SIMPSON COUNTY

2

JEREMY 001332

C#: 8400001465

## AGREEMENT BETWEEN THE STATE OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AND VITALCORE HEALTH STRATEGIES, LLC FOR ONSITE INMATE HEALTH CARE SERVICES

THIS AGREEMENT ("Agreement") is entered into as of the 5th day of October, 2020 by and between the State of Mississippi Department of Corrections (Generally referred to as the "State" or the "MDOC") and VitalCore Health Strategies, LLC ("VitalCore"). The MDOC and VitalCore are sometimes referred to herein collectively as the "Parties."

### WITNESSETH:

WHEREAS, the MDOC is responsible for the care and security of inmates within its custody, whether incarcerated in MDOC correctional facilities, county regional facilities or privately operated prisons; and

WHEREAS, on July 1, 2016 the MDOC entered into an agreement ("the Agreement") with Centurion of Mississippi, LLC ("Centurion") through RFP No. 16-009 to provide or arrange for the provision of medical, dental, pharmacy and mental health services for inmates in its custody at the following facilities: Mississippi State Penitentiary ("MSP") at Parchman, Mississippi; Central Mississippi Correctional Facility ("CMCF"), and Youthful Offender Unit ("YOU"), at Rankin County, Mississippi, South Mississippi Correctional Institute ("SMCI"), at Leakesville, East Mississippi Correctional Facility ("EMCF"), at Meridian, Wilkinson County Correctional Facility ("WCCF") at Woodville, Walnut Grove Correctional Facility ("WGCF") at Walnut Grove, and Marshall County Correctional Facility ("MCCF") at Holly Springs, (known as the "Facilities"). The Centurion agreement also included responsibilities for services at MDOC's fifteen County regional sites, seventeen Community Work Centers; and for minimum security inmates residing at the three male Restitution centers, and the Governor's Mansion (collectively known as the "Satellite Facilities" and individually as a "Satellite Facility)"; and

WHEREAS, the terms of the Agreement between MDOC and Centurion, entered into on July 1, 2016, are provided in Attachment A of this Agreement; and

WHEREAS, on June 17, 2019, MDOC and Centurion agreed to amend that Agreement and it is known as Attachment B, Amendment One of this Agreement; and

WHEREAS, on June 30, 2020, MDOC and Centurion agreed to amend that Agreement and it is known as Attachment C, Amendment Two of this Agreement; and

WHEREAS, on July 7, 2020 Centurion gave written notice of termination as outlined in Section 8.2.2. of the Agreement dated July 1, 2016, by and between MDOC and Centurion of Mississippi, LLC; and

The short notice of intent to terminate the Agreement by Centurion has not allowed for adequate time to conduct a fair and competitive procurement process.

The MDOC having fully understood the limitations and risks of being without a vendor to provide healthcare services as outlined in the original Agreement between MDOC and Centurion, along with the short notice of intent to terminate the Agreement by Centurion, has not allowed for a full open bid process to establish an alternative vendor. Therefore, requiring the MDOC to take emergency actions to secure an appropriate vendor that can assume all tenants of the Agreement between MDOC and Centurion, as its own; and

1

WHEREAS, VitalCore has the capability and the desire to provide these services as outlined in the July 1, 2016 agreement and its amendments thereto on an "as is" basis for the period of one year to allow the MDOC an appropriate timeframe to create a Request for Proposal (RFP) and solicit competitive proposals.

NOW THEREFORE, in consideration of mutual covenants and agreements contained herein, the "Parties" agree as follows:

ARTICLES I THROUGH ARTICLES XI of the original Contract between MDOC and Centurion, dated July 1, 2016, will now then be part of this Agreement as "Attachment A" and the amendment dated June 30, 2020 as "Attachment B" and requires that both the MDOC and VitalCore honor those ARTICLES as written.

ARTICLE XII NON-WAIVER OF BIDDING RIGHTS - VitalCore shall have the right to offer a competitive proposal on any RFP for inmate healthcare services released by the MDOC without any prejudice or penalty brought on by the signing of this emergent Agreement between the Parties.

ARTICLE XIII PAYMENT STRUCTURE VitalCore shall be paid for the first month's work in three payments for the services rendered. Therefore, VitalCore will turn in a bill for services from October 1, 2020 to October 15th and be paid no later than October 22, 2020. A bill for services from October 16, 2020 to October 31, 2020 to be paid no later than November 7, 2020. Payments after the October service dates will be paid in accordance with the original Agreements set forth in Article 7.2 of the Original Agreement.

VitalCore shall be responsible for Onsite Inmate Health Care Services after 12:00 a.m. October 6, 2020 until 12:00 am on October 5, 2021 under this Agreement. VitalCore shall have their Regional Office established and in place by October 1, 2020 to ensure a smooth transition. VitalCore shall submit all bills related to start-up costs prior to October 6, 2020 for consideration for payment. This payment shall be limited to actual expenses, shall not include any administrative or profit fee, and be for the sole purpose of initiating the services related to this Agreement. The MDOC shall have final approval of reimbursement to VitalCore regarding all start-up costs. Requests for reimbursement for start- up costs shall not exceed $50,000.00 in total, and be included on the first invoice dated October 15, 2020.

VitalCore and MDOC agree to re-evaluate the payment structure and negotiate an appropriate per inmate per day payment if the cost of healthcare, administration, and litigation defense services exceeds the monthly payment as outlined in this Agreement.

ARTICLE XIV LIMITS OF LIABILITY VitalCore shall not be responsible for any work product, grievance, litigation, liability, debt, nor any other inmate health care processes prior to midnight October 5, 2020. However, VitalCore understands that litigation for declaratory and injunctive relief is pending, is in its early stages, and that VitalCore's obligations, duties and responsibilities under this section include but are not limited to the duty to defend and indemnify MDOC and its officials and employees in *Amos v. Taylor*, 4:20-CV-07-DMB-JMV (N.D. Miss.) and *Long v. Taylor*, 4:20-CV-00030-DMB-RP (N.D. Miss.) after October 6, 2020. VitalCore shall be responsible for any work product, grievance, litigation, liability, debt, or any other inmate health care process based upon its performance of this Agreement after October 6, 2020, pursuant to Article X of the Agreement with Centurion

2 $\sqrt{\chi}$

JEREMY 001334

IN WITNESS WHEREOF, the Parties hereto have caused their duly appointed representatives to set forth hands and seals hereto as of the day and year first above written.

ATTEST:

_____

TITLE:

Deputy Commissioner, Admin. and Finance

ATTEST:

_____

TITLE:

August 12th 2020

MISSISSIPPI DEPARTMENT OF CORRECTIONS

BY: _____

TITLE:

Commissioner

VITALCORE HEALTH STRATEGIES, LLC

BY: Viola A. Riggin, CEO

TITLE:

August 12, 2020

Lide. Freeman
MDOC - Contracts
08/12/2020

REVIEWED BY MDOC LEGAL COUNSEL

AUG 12 2020
APPROVED FOR SIGNATURE

3

ATTACHMENT A

To July 1, 2016 Agreement between Mississippi Department of Corrections and Centurion of
Mississippi, LLC for Onsite Inmate Health Services

AGREEMENT BETWEEN THE STATE OF MISSISSIPPI
DEPARTMENT OF CORRECTIONS AND CENTURION OF MISSISSIPPI, LLC
FOR ONSITE INMATE HEALTH SERVICES

**THIS AGREEMENT** (this "Agreement") is entered into as of the 1st day of July, 2016, by and between the State of Mississippi Department of Corrections (generally referred to as the "State" or the "MDOC") and Centurion of Mississippi, LLC ("Centurion"). The MDOC and Centurion are sometimes referred to herein collectively as the "Parties".

WITNESSETH:

Whereas, the MDOC is responsible for the care and security of inmates in its custody, whether incarcerated in MDOC correctional facilities, county regional facilities, or privately operated prisons; and

Whereas, MDOC issued RFP NO.16-009, dated December 11, 2015, as amended (the "RFP") and Centurion submitted a response to the RFP. Centurion's RFP response was evaluated to be the most advantageous to MDOC. MDOC now enters into this Agreement with Centurion pursuant to the RFP.

Whereas, the MDOC desires to engage Centurion to provide or to arrange for the provision of medical, dental, pharmacy and mental health care services for inmates in its custody at the following Facilities on the terms as provided in this Agreement: Mississippi State Penitentiary ("MSP") at Parchman, Mississippi; Central Mississippi Correctional Facility ("CMCF") and Youthful Offender Unit ("YOU") at Rankin County Mississippi; South Mississippi Correctional Institution ("SMCI") at Leakesville, Mississippi; East Mississippi Correctional Facility ("EMCF") at Meridian; Wilkinson County Correctional Facility ("WCCF") at Woodville; Walnut Grove Correctional Facility ("WGCF") at Walnut Grove; Marshall County Correctional Facility ("MCCF") at Holly Springs,(known as the 'Facilities').   Centurion has responsibilities as provided in this Agreement at the fifteen County Regional Sites; seventeen Community Work Centers; and for minimum security inmates residing at the three male Restitution centers and the Governor's Mansion (known collectively as the "Satellite Facilities" and individually as a "Satellite Facility").

Whereas, the MDOC and Centurion desire to set forth their understandings and agreements regarding inmate healthcare services as set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

ARTICLE I -- AGREEMENT DOCUMENTS

- 1.1     Governing Documents.  This Agreement and its exhibits, labeled Exhibits A through E, are the sole governing documents.

JEREMY 001337

ARTICLE II -- HEALTHCARE AND RELATED SERVICES

2.1     General Engagement.    The MDOC hereby engages Centurion to provide for the delivery of necessary onsite medical, pharmaceutical, mental health and dental care to individuals under the custody and control of the MDOC and sentenced to and incarcerated at the Facilities and Satellite Facilities ("Inmates"). Centurion will provide such services consistent with applicable American Correctional Association ("ACA") standards, National Commission on Correctional Health Care ("NCCHC") standards, constitutional, federal, state, and local laws, court orders, consent decrees, local regulations and MDOC policies and procedures governing health care service delivery. If there is a difference between the above standards and/or laws, then the higher standard will be followed. It is understood that the MDOC shall be financially responsible for off-site medical services and all specialty service on and off-site, unless otherwise specified in Section 2.10 below, for the inmates at the Facilities and Satellite Facilities. This will incorporate responsibility for Utilization Management, claims adjudication and payment and provider network contracting.

2.2     Administrative Services.    Centurion shall implement administrative components and operational policies and procedures necessary for compliance with Agreement specifications. The MDOC reserves the right to review and approve policies and procedures of Centurion in any areas affecting performance under the Agreement. Centurion will design and implement a process to report to the MDOC Chief Medical Officer or designee problems and/or unusual incidents in the performance of this Agreement, including but not limited to medical, security-related and personnel issues that might adversely impact the delivery of health care services. Centurion personnel shall abide by and comply with all MDOC policies and procedures.

    2.2.1    Therapeutic guidelines and protocols shall be updated by Centurion annually and reviewed by the MDOC Chief Medical Officer.

    2.2.2    The Centurion onsite Medical Director will apprise the superintendent/warden or designee of all relevant information regarding inmate participation in Centurion-related programs, as well as management and security implications of specific health care situations.

    2.2.3    Centurion will provide MDOC with the most current copy of Centurion's policy and procedure manual for approval, signature, and distribution to appropriate MDOC staff. Inmates will have access to health care policies and procedures based on MDOC policy. Centurion will also provide MDOC with medical and mental health protocols, dental protocols and nursing protocols.

2.3     Personnel.    The base compensation as described in Section 7.2 of this Agreement reflects the system-wide complement of staff as set forth in this Agreement Exhibit A. This staffing includes the number of full-time equivalents, and the distribution of staff among Facilities and Satellite Facilities.

    2.3.1    Full-time equivalent ("FTE") positions are defined to mean positions in which the employee or contractor is providing forty (40) hours of service per week. The forty (40) hours shall include designated break periods and mid-shift meal periods. These hours may be accomplished utilizing full-time, part-time, PRN employees and

2



agency on a "flexible" schedule to maximize efficiency and meet Facility and Satellite Facility needs.

2.3.2   Centurion will confirm that all the required registrations, licenses and credentials are active, appropriately unrestricted, and in good-standing for professionals contracted or engaged by Centurion to provide services in the Facilities and Satellite Facilities.  This includes, but is not limited to, medical, dental, physician assistant, nurse practitioner, nursing and other licenses, DEA numbers and registration with the appropriate Mississippi State Boards.  Centurion shall be responsible for providing educational services for all health services employees.  Centurion's contractual relationships with physicians, mid-level practitioners, and dentists shall confirm the professionals' pursuit and satisfaction of continuing medical education (CME) requirements.

2.3.3   Centurion will verify with the State the licensure and status of every physician, nurse, or other personnel requiring a license to practice his/her profession prior to contracting with or employing a healthcare professional to work in Facility and Satellite Facilities.  A copy of the verifying information will be kept in each professional's appropriate employment file.

2.3.4   Nurse practitioners and physician assistants will work under the clinical supervision of a physician contracted or employed under the Agreement, and will function in accordance with the applicable regulations for nurse practitioners and physician assistants under the applicable Mississippi licensing board.

2.3.5   Centurion will arrange for the provision of twenty-four hour, seven day per week physician or mid-level practitioner coverage on-site or on-call telephone coverage for the Facilities. Physician or mid-level practitioner services must be sufficient to meet the required needs of the day and medical evaluation/follow-up within time limits of nursing triage (including weekends and holidays), including infirmary and chronic care management for the Facilities. On-site coverage will consist of a minimum of sixteen (16) hours during the weekdays and for MSP, eight (8) hours during weekends and holidays.  A physician will be on-site during normal working hours.

2.3.6   Effective with the start-of services under this Agreement, licensed nursing staff provided by Centurion will assume the duty to administer medication. Centurion will utilize trained, dedicated health care staff for the administration of medication.  All health care staff involved in the administration of medication will complete a formal training program to be provided by Centurion.

2.3.7   Centurion full time employees and independent contractors who have not already attended required MDOC training will participate in required MDOC training and orientation programs. Training and orientation hours are considered hours worked.

2.3.8   Centurion employee and independent contractors will be available to provide court testimony for medical cases at the request of MDOC and at no charge to MDOC.  This time shall be considered official business and be counted as hours worked.

3



JEREMY 001339

2.3.9    MDOC will have the right to approve key Centurion personnel, and such approval shall not be unreasonably withheld or delayed, to include the following positions:

Facility Medical Directors
Physicians
Mid-Level Practitioners
Directors of Nursing
Site Managers

2.3.10 Centurion personnel will appropriately assist MDOC in preparation for any ACA and/or NCCHC accreditation audit during the contract term.

2.4    Medical Disaster.  Centurion shall have a medical emergency plan that is approved by the superintendent at each Facility and the MDOC Chief Medical Officer. The medical disaster plan shall be in compliance with ACA and NCCHC standards and MDOC policies and procedures.  All health care staff and appropriate MDOC staff shall be trained in their roles within the context of this plan.  Centurion shall provide an updated contact list for recall of key health care staff and qualified health care professionals. The medical disaster plan will address the following:

Communications system;
Recall of key staff;
Assignment of health care staff;
Establishment of command post;
Safety and security of the patient and staff areas;
Use of emergency equipment and supplies;
Establishment of a triage area;
Triage procedures;
Medical records · identification of injured;
Use of ambulance services;
Transfer of injured to local hospitals;
Evacuation procedures, including infirmary patients (to be coordinated with security personnel);
Practice drills for all shifts at each site, to be coordinated with Facility drills.

Personnel at the other Facilities shall be ready, if necessary, to assist a Facility or Satellite Facility experiencing an emergency.

2.5    Emergency Medical Services. In the event of an emergency at a Facility or Satellite Facility, health services staff will provide, when required, on-site emergency intervention for inmates, staff and visitors as described below.  Centurion personnel or contractors will coordinate all emergency transfers to designated emergency centers with security staff.  After a use of force incident or in any case where the shift commander or designee has determined that an inmate needs medical attention and cannot travel to the Facility's infirmary, appropriate medical personnel, i.e. physician, nurse, nurse practitioner or physician's assistant, will render immediate health care to the inmate at the location set by MDOC.

4



2.5.1    Centurion will provide emergency services to MDOC employees, official State guests, outside contractors, inmates' visitors, or other visitors at each of the Facilities, to include medical examination following necessary use of force incidents. Centurion will not be responsible for any costs related to emergency transportation of MDOC employees, guests, outside contractors and visitors, nor will Centurion be responsible for the costs of any offsite services rendered as a result of the emergency transportation.

2.5.2    The Centurion Facility Medical Director or the responsible physician must be ACLS certified (up-to-date) and all licensed health care staff will be Basic Cardiac Life Support certified (up-to-date) and will maintain the Automatic External Defibrillator(s) (AED) and emergency response kit(s) that presently exist at the three main Facilities.

2.5.3    Treating physicians at the Facilities and Satellite Facilities will utilize troponin testing for inmates who are appropriate candidates in the professional judgment of such physicians. The results of such testing along with review from the onsite physician will be used to determine the appropriate course of treatment.

2.5.4    All emergencies requiring a "911 call" or its equivalent will be reported immediately to the MDOC designated Facility or Satellite Facility staff member and to the MDOC Chief Medical Officer within twenty-four (24) hours, noting the elapsed time between the call for assistance and the arrival of trained personnel. Healthcare personnel at each Facility and Satellite Facility will maintain an on-site log of all such calls for review by MDOC officials.  Centurion shall provide Facilities and Satellite Facilities with recommended procedures for notifying Centurion and the MDOC in emergencies.

2.5.5    Centurion will implement the following emergency procedures, to include but not limited to:

- Centurion will confirm that all medical staff is aware of procedures to provide emergency medical care to any inmate.
- Emergency services will be available for acute illness or conditions that cannot wait until scheduled sick call.
- Emergency services will be available through physicians, other health care staff; Centurion arranged local ambulance services.
- Centurion will provide specific written procedures for medical emergencies as approved by the MDOC Chief Medical Officer.

Emergency health services will be provided at all Facilities and Satellite Facilities by qualified health care staff and in accordance with NCCHC and ACA Standards. Centurion shall make provisions and be responsible for twenty four (24) hour emergency medical, mental health and dental care, including twenty four (24) hours; seven (7) days per week on call availability.  MDOC shall ensure availability of indicated emergency treatment with community agencies, when available.  The on-site physician or designee will coordinate emergency transfers with site security staff. Mississippi State Penitentiary, Central Mississippi Correctional Facility, South Mississippi Correctional Institution, East Mississippi Correctional Facility, Wilkinson County Correctional Facility, Marshall County Correctional Facility, and Walnut Grove

5



JEREMY 001341

Correctional Facility will have at a minimum, appropriate qualified health care professional staff on-site twenty four (24) hours per day, seven (7) days a week.

2.6     Continuous Quality Improvement.  Centurion shall maintain a program of Continuous Quality Improvement (CQI) Program and Professional Peer Review at each Facility and Satellite Facility, which will include, but not be limited to, audits and medical record review.  Peer reviews shall occur no less than annually.     The CQI program will use multi-disciplinary committees and must involve all health care disciplines during the calendar year.  Morbidity and Mortality review must come under the scope of the CQI program.

2.6.1  All inmate deaths will be treated in accordance with the Mississippi State Statute regarding unattended deaths.  Centurion shall comply with the applicable state statutes, as well as the performance and conduction of a mortality review by appropriate personnel.  Centurion shall comply with MDOC policies and procedures regarding an inmate's death.  A report of the mortality review and mortality survey will be submitted by the Centurion site Medical Director or Centurion Corporate Medical Director to the MDOC Chief Medical Officer or designee within seventy-two (72) hours of the inmate death. Centurion medical personnel will be expected to notify the MDOC Commissioner, MDOC Chief Medical Officer, and MDOC HSA of any inmate death within their care no greater than 24 hours status post death.

2.6.2  The medical staff will convene monthly with MDOC representative(s) and staff to discuss issues relevant to medical care in the system.  Attendees will include the site Medical Director, designated site dentist, site administrator, site Director of Nurses, and designated site mental health representative.  Centurion shall chair this meeting with input from the MDOC Health Services Administrator. Centurion shall provide an administrative support person to document in writing the content of the meetings and decisions made. Meeting documentation will be given to the MDOC Health Services Administrator within seven (7) days of the meeting. Other employees or providers may be invited to attend.  Centurion will be responsible for all costs including transportation, housing and such other reasonable expenses associated with this meeting for Centurion employees' participation.  Centurion shall provide a quality management program to support the provision of the comprehensive health service program.  Quality management support services shall be system-wide and shall be in place within six (6) months following commencement of services under this Agreement.  Centurion shall provide written documentation to substantiate these services.

2.6.3  Centurion shall provide a peer review of all primary care providers to include the physicians, psychiatrists, dentists, nurse practitioners, physician assistants, licensed nurses and PhD level psychologists, conducted on no less than an annual basis with the first round of peer reviews completed prior to the beginning of the second contract year.  This is designed to monitor and enhance patient care.  Peer review shall include such activities as chart review, medical treatment plan review for special needs inmates, review of off-site consultations, specialty referrals, emergencies, and in-patient and outpatient hospitalizations.  The completion of the reviews shall be appropriately documented.  Where possible or appropriate to affect the purposes of peer review, such proceedings will be conducted in accordance with applicable peer review statutes or regulations and applicable confidentiality

6

JEREMY 001342

requirements. The results of every Peer Review shall be forwarded to the MDOC Chief Medical Officer as part of the required quarterly reports.

2.7     Receiving Screening and Health Assessments.  Receiving screenings shall be performed by qualified healthcare personnel on all inmates immediately upon their arrival at the Facilities, and will result in appropriate disposition, and/or treatment in accordance with the prescribed NCCHC or ACA standards and MDOC policy.  At a minimum, the receiving screening should include the following inquiries:  medical history, mental health conditions, urgent dental needs, medication therapy, and special needs. The receiving screening shall be documented in the Electronic Health Record, EHR.  Health assessments and physical examinations shall be completed within ACA and NCCHC guidelines. If an inmate is transferred to another Facility or Satellite Facility, the receiving screening report and health assessment shall be available in the EHR to be reviewed by the receiving Facility or Satellite Facility Medical Director or designated provider.

     2.7.1  Comprehensive health assessment and health history shall be performed by a qualified health care professional for each newly admitted inmate to the MDOC system within seven (7) days of admission and in accordance with NCCHC and ACA Standards.  The comprehensive health assessment shall include review of earlier receiving screening, physical examination, and collection of additional data to complete the medical, dental, psychiatric, and immunization histories, as outlined in NCCHC and ACA standards.

2.7.2      Communicable and STD disease testing are mandatory components of all intake health assessments.  Centurion shall conduct a TB test for each new inmate of MDOC utilizing the TST and IGRA as clinically appropriate. If an inmate fails/refuses to comply with mandatory intake disease testing, the inmate will be placed in medical isolation.  The MDOC Chief Medical Officer, the Centurion Facility Medical Director, the Superintendent and appropriate Facility authorities will be notified.  If a newly admitted or transferred inmate has a positive tuberculin skin test, an IGRA blood test shall be performed. If the inmate is symptomatic or HIV positive, the inmate should be isolated immediately until IGRA results, chest x-ray and sputum results have been received.  Active tuberculosis will be treated in collaboration with the State of Mississippi Department of Health TB consultants. The inmate will be evaluated for preventive therapy if active tuberculosis is not diagnosed. Preventive therapy (LTBI) will be in compliance with Centers for Disease Control (CDC) and State of Mississippi Department of Health guidelines utilizing the 12 week regimen of Isoniazid (INH) and Rifapentine. The Mississippi State Department of Health (MSDH) shall be notified within twenty-four (24) hours of any case of active TB to participate with management of such inmates.

Centurion shall conduct an annual TB test for each MDOC inmate during annual statewide TB testing utilizing TST and IGRA as clinically appropriate.

When a free-world TB patient is confined at an MDOC facility by court order, MSDH will be responsible for diagnosis, treatment and management of the patient's infectious disease state(s). Centurion will be responsible for other basic healthcare, particularly for acute care purposes.

7



JEREMY 001343

2.7.3    When an inmate is readmitted to MDOC, his/her health status shall be updated. In the absence of significant changes in previous health status, the full assessment does not need to be repeated if a routine assessment has been completed within the past ninety (90) days.

2.7.4    Centurion shall be responsible for reporting HIV/AIDS data to the MDOC.

2.7.5    Mental health evaluation shall be in compliance with ACA and NCCHC standards of care and shall be performed by a mental health professional within time frames outlined in the standards.

2.8    Primary Medical Care.  Centurion shall provide or arrange for the provision of on-site primary and preventive health care services in accordance with ACA and NCCHC Standards at each Facility and Satellite Facility covered by this Agreement.

2.9    Sick Call.  Centurion healthcare personnel or contracted providers shall conduct sick call within the parameters of applicable ACA and NCCHC standards.

2.9.1    MDOC inmates will be triaged within 24 hours of receipt of the sick call request. Sick call requests (SCR) shall be date-stamped received within twenty-four (24) hours of the inmate completing the SCR form. Sick call triage shall be conducted in a face-to-face encounter by a licensed nurse, operating within the scope of practice for their particular license, trained in triage each day at times that are coordinated with Facility staff and will not deter inmates from seeking care. Those inmates requiring evaluations beyond the capabilities of the triage nurse shall be referred to the physician or mid-level practitioner, such as a physician assistant or nurse practitioner. Non-emergent requests shall be evaluated by the physician or mid-level practitioner within seven (7) calendar days of the original receipt. The mid-level practitioner will perform evaluations and treatments within his/her scope of practice, referring appropriate patients to the primary care physician as indicated. If an inmate's custody status precludes attendance at sick call, then MDOC and healthcare personnel will cooperate to make arrangements to provide sick call services at the inmate's housing unit. Sick call triage will be conducted at the Community Work Centers twice monthly for all male institutions and weekly for the female institution by a nurse designated by the assigned parent institution.

2.9.2    Nursing staff will conduct and document daily (including weekends) rounds through all segregation units.

2.9.3    Centurion personnel will not perform medical experimentation or research that violates Mississippi statutes in any MDOC Facility or Satellite Facility and Centurion will inform its independent contractors of this MDOC prohibition.

2.10    Specialty Medical Care Services.  Centurion shall be responsible for the following specialty care services at the Facilities and Satellite Facilities:  optometry, radiology, dialysis, audiology, STD, HIV and TB care. Centurion shall be responsible for maximizing the use of telemedicine technology to provide timely, responsive care and to minimize transportation and security expense. Centurion shall utilize telemedicine and the 340B program for HIV care. MDOC shall be financially responsible for all other specialty care services, specifically including all Hepatitis C medications, specialty

8

JEREMY 001344

medications for bleeding disorders and HIV medication costs in excess of those set forth in Section 7.2.1. Centurion personnel and contracted providers shall direct medical services referrals to the MDOC Specialty Care Coordinator to make arrangements with specialists for the treatment of those inmates with health care problems that may extend beyond the primary care services provided on-site at the Facility or Satellite Facility. It shall be the responsibility of Centurion to track and follow-up on such referrals.

2.10.1 Centurion personnel shall endeavor to work with the MDOC Specialty Care Coordinator department to consolidate the scheduling of appointments and services for inmates with community physicians, hospitals and other health care providers and services to minimize the impact upon security staff and available vehicles.

2.10.2 All orders involving any special procedures or non-routine follow-up must be documented and communicated in writing, as an order between the consultant and a physician, licensed nurse, nurse practitioner or physician's assistant. All such specialty orders are subject to review and approval by the MDOC Chief Medical Officer.  Specialty consultants will prepare their specialty consultation form and return it with security to medical.  Medical personnel shall enter the consultation form into the inmate's medical record, EHR, according to EHR protocols.  Centurion will be responsible for laboratory and pharmaceutical services that result from the specialty consult other than all Hepatitis C medications, specialty medications for bleeding disorders and HIV medication costs in excess of those set forth in Section 7.2.1.

2.10.3 The positive results of all tests and consultations will be conveyed timely to the inmate after receipt by Centurion health care professionals.  Negative results or findings within normal limits may be communicated at a scheduled clinic encounter, however, at the time of the test, the inmate will be told that he should assume negative findings unless told otherwise.

2.11    Inpatient-Infirmary Medical Care Services.  Centurion personnel shall utilize the Facility inpatient infirmaries at CMCF and SMCI and the inpatient unit at MSP as appropriate to manage onsite care (e.g. where a patient's condition can be appropriately and effectively treated in the infirmary setting or at the MSP inpatient unit).  The Facility inpatient and infirmary units shall conform to ACA and NCCHC standards of care. The MSP inpatient unit shall comply with State of Mississippi Hospital Licensing Standards. The Facility and inpatient units shall be staffed twenty-four (24) hours per day, seven (7) days per week by sufficient and appropriate qualified health care professionals. The MDOC Chief Medical Officer reserves the right to admit and/or discharge inmates from any MDOC facility infirmary.  Operation and management of the infirmary shall include:

2.11.1 On site inpatient unit and infirmaries will meet all applicable Mississippi and local statutes and licensing requirements.

2.11.2 On-site supervision of the infirmaries by a registered nurse who is present daily for each shift.

9



JEREMY 001345

2.11.3 A physician or mid-level practitioner shall be on-call twenty-four (24) hours per day, seven (7) days per week, immediately available for telephone consultations and within one (1) hour of the facility if needed onsite.

2.11.4 All inmate patients are within sight and sound of a qualified health care professional.

2.11.5 Infirmary rounds shall be conducted and documented by a physician or mid-level provider daily including weekends. Progress notes entered by mid-levels must be reviewed and/or counter-signed by the responsible physician within five (5) working days or as otherwise required by law or regulation. Nursing rounds will be made daily, not less than once per scheduled shift or more often as ordered by the practitioner.

2.11.6 A manual of nursing care policies and procedures to be followed for inpatient, skilled, or infirmary care.

2.11.7 A complete in-patient record for each patient admitted to the infirmary will include physician or mid-level practitioner order for the admission, admission work-up, problem list and discharge planning. The admission work-up notes shall include the statement of the problem or complaint, the findings of the appropriate clinical exam, the assessment to its highest level of resolution (may include several rule-out diagnoses) and the infirmary plan. The plan must include expected length of stay, the need for vital signs and the need for any additional diagnostic studies. The plan should also contain special diet requirements and level of acuity. All infirmary encounters shall be documented in the inmate's medical record.

2.11.8 Discharge planning with discharge note is required prior to discharge from the infirmary. The discharge note must include an up-to-date problem list, final diagnosis, and assessment of the resolution of the problem, discharge medications and scheduled return appointment to the physician if necessary and ordered. Discharge must be ordered by the responsible physician or mid-level practitioner. Designated MDOC officials will be advised of the discharge plan regarding housing or work implications.

2.11.9 An infirmary log of inmates, diagnoses, and treatments shall be maintained and submitted to the MDOC Utilization Review team daily.

2.11.10 Sheltered housing units may be maintained at Facilities without infirmary units. All sheltered housing encounters shall be documented in the inmate's medical record by qualified health care personnel.

2.12   Tertiary Medical Care Services.  MDOC shall be responsible for all necessary hospitalization services for inmates incarcerated in the Facilities and Satellite Facilities. At the Facilities, Centurion site personnel or contracted providers must see that inmates whose medical conditions require non-emergent care are referred to the MDOC Specialty Care Coordinator to be hospitalized or given off-site consultations. MDOC will be responsible for security provisions and scheduling provisions. Inmates requiring emergent offsite care shall be transferred to an offsite emergency room for



JEREMY 001346

care. Centurion personnel shall coordinate emergency transport with appropriate security staff.

2.13    Oral Health Care Program.    Dental care services are to be provided to inmates incarcerated in the Facilities in accordance with ACA and NCCHC standards. All dental services shall be provided under the direction and supervision of a dentist licensed by the State of Mississippi.

    2.13.1 At those Facilities that have no on-site or mobile dental facilities, Centurion personnel will coordinate with MDOC to provide for the transportation of inmates for dental care, and will do so to minimize transportation and security time. Emergency dental care will be available on-call twenty-four (24) hours per day/seven (7) days per week by a qualified dentist or by a qualified health care professional as the need may dictate. Dental emergencies shall receive an evaluation within twelve (12) hours of complaint.

    2.13.2 Dental screening and oral hygiene instructions shall be performed within seven (7) days of admission of an inmate to the custody of MDOC. A dental examination is to be performed within one (1) month of admission. Dental prophylaxis, including a thorough and complete dental examination, cleaning, and treatment plan, shall be performed on all MDOC inmates at least every two (2) years.

    2.13.3 Dental treatment, not limited to extractions, is to be provided in accordance with the dentist's professional judgment, provided that it is in no manner detrimental to the inmate's health. The priorities of treatment are to eliminate pain, swelling or infection and preserve and maintain the inmate's oral integrity. Each inmate will have access to the preventive benefits of fluoride treatment in a form to be determined by the dentist and appropriate for the individual. Routine dental prophylaxis and evaluations by a dentist shall be performed within two (2) years from the date of the last treatment or exam. Two year dental visits shall be a separate encounter to include a "SOAP" describing services provided. This should be a comprehensive examination. Centurion shall, by priority of need, maintain a schedule of each inmate being seen by the dental staff to meet ACA Standards. In cases of readmitted inmates who have received a dental examination within the past ninety (90) days, a new exam is not required, except as determined by the supervising dentist. The readmitted inmate shall fall into the routine evaluation schedule based on the date of the last examination. Permanent dental prosthetics (full and partial dentures), as described below, will be provided to inmates within ninety (90) days of the initial date of the denture mold.

    2.13.4 As appropriate and as determined by a dentist, Centurion shall provide the following services:

- Extraction of teeth, which are not restorable due to infection, decay, periodontal disease, or trauma;
- Restoration of teeth;
- Periodontal treatment - non-surgical treatment of periodontal disease to include deep cleanings and polishing;



JEREMY 001347

- Root canal treatment on front teeth which have good bone support and enough remaining tooth structure to restore, to include crown work on a limited basis based upon the inmate's oral history and condition;
- Full dentures shall be provided to inmates who are edentulous or who are edentulated while in the Facility; and
- Partial dentures shall be provided to inmates who lack enough teeth to function adequately, i.e. three or more opposing teeth, to be able to chew.

2.13.5 Dental laboratory services shall be the responsibility of Centurion.

2.14    Mental Health/Psychiatric Services.  The delivery of comprehensive mental health services to inmates incarcerated in the Facilities shall be in accordance with NCCHC and ACA Standards of Care.  Written policies and procedures guiding mental health services shall be available for individual sites.  Centurion personnel will work closely with MDOC Mental Health Director or designee.

2.14.1  A physician or designee will examine all inmates isolated for psychiatric purposes within 24 hours of confinement.  Medical evaluation will support medical confinement of inmates based on risk of physical danger to self or others.  A medically trained professional and/or a qualified mental health professional will make rounds in the housing unit for all inmates who are segregated from the general population a minimum of three days a week.  Only a physician or licensed mental health professional, after consulting with designated MDOC officials, may determine when an inmate should be returned to the general population.  All inmates referred for mental health evaluation will receive a comprehensive diagnostic examination, including an update to the psychosocial history and a mental status evaluation.  The examination will include an assessment of suicidal risk, potential for violence, and special housing needs.

2.14.2  The mental health professionals shall provide or be responsible for:

a.  Completing and submitting psychological evaluations requested by MDOC;
b.  Screening and referring inmates for psychiatric or psychological evaluation;
c.  Crisis intervention to all inmates;
d.  Crisis assistance through an established on-call system;
e.  Completing diagnostic and classification reports designated by MDOC;
f.  Individual and group therapy;
g.  Providing and/or assisting with critical incident debriefing;
h.  Providing additional mental health information and/or evaluations;
i.  Providing monthly face-to-face interviews with every inmate on psychotropic medication; and

2.14.3  Qualified mental health staff will provide therapeutic treatment programs to include, but not be limited to, crime victim awareness, sex offender, and anger management.  Mental health staff shall be qualified, trained, certified and licensed in the provision of listed intervention programs.  Individual and group counseling will be provided based on inmate need.  Inmates with serious mental illness will receive priority in receiving these services.  Topics for group therapy will be determined by the need of each Facility inmate population.

12



2.14.4 The contracted/employed site psychiatrist at each Facility will be responsible for:

a. Prescribing and monitoring psychotropic medications;
b. Conducting ninety (90) day face-to-face interviews/evaluations of all inmates on psychotropic medications (including telepsychiatry where applicable);
c. Providing psychiatric evaluation and examination on inmates referred by mental health or medical staff;
d. Providing psychiatric treatment for inmates displaying serious and persistent mental illness;
e. Consulting and assisting mental health staff with treatment and care of identified special needs inmates;
f. Consulting with designated mental health policy and procedures (e.g., management of suicidal inmates, therapeutic restraints, and forced medications);
g. Coordinating the transfer of those inmates with severe mental health problems to EMCF, as clinically indicated, through coordination with the MDOC Administrative Psychologist;
h. Accepting and tracking those inmates transferred from EMCF to other Facilities who are stabilized and considered functionally able to be housed in a less restricted environment;
i. Requesting the transfer (through the MDOC Administrative Psychologist ) of inmates in Facilities that do not have on site mental health care to an MDOC facility with mental health professionals to receive an evaluation and treatment; and
j. Monthly review of EMCF-eligible inmate mental health records for referral to the MDOC Administrative Psychologist.

2.14.5 If a psychiatrist is not designated to the Facility, the Facility physician will assume these responsibilities. The contracted/employed Facility site physicians will also refer inmates, as appropriate, for psychiatric evaluation. A Facility psychiatrist or physician shall be available for crisis assistance, i.e., MDOC crisis stabilization program implementation, twenty-four (24) hours/day, seven (7) days/week.

2.14.6 Inmates referred by qualified MDOC or Centurion mental health staff for routine psychiatric evaluation upon intake will be seen by a psychiatrist within five (5) working days for initial urgent mental health screenings and fourteen (14) calendar days for all other referrals. Inmates initially prescribed psychotropic medication will be monitored monthly for three (3) months and then, every ninety (90) days thereafter or more frequently as deemed necessary by the prescribing psychiatrist.

2.14.7 Centurion will develop and implement mental health services and the provision of licensed mental health staff for crisis stabilization and suicide precaution within the Unit 42 mental health unit. The mental health unit shall be staffed twenty-four (24) hours/day, seven (7) days/week by licensed and qualified staff to provide mental health services and monitoring of mental health status, to include emergency mental health evaluations. A qualified mental health professional will supervise

13



JEREMY 001349

operation of the mental health unit. Staff assigned to the unit shall be licensed and shall have experience and knowledge in the care of mental health patients.

2.14.8 Centurion will provide on-call crisis intervention, mental health consultation, or direct services at all of the Facilities twenty-four (24) hours a day, three hundred sixty-five (365) days per year for crisis response in cases of inmates with suicidal ideation, treatment of inmates experiencing psychotic disorders or who are experiencing emotional/cognitive disorder.

2.14.9 Centurion will provide training to all casework and security staff in mental health dynamics (i.e. suicide prevention, crisis management), mental health treatment, assessment of treatment plans and crisis intervention.

2.14.10 Inmates housed in administrative or disciplinary segregation shall be evaluated in accordance with ACA and NCCHC standards and MDOC policies and procedures. Centurion shall provide mental health services and treatment plans for inmates housed in administrative and disciplinary segregation.

## ARTICLE III -- ANCILLARY AND OTHER SERVICES

3.1    Laboratory Services.  Centurion shall arrange for the provision of routine laboratory/diagnostic services. Services will include laboratory/diagnostic supplies, capability for lab pick-up and delivery daily (Monday through Saturday), a printer to provide test results at each Facility and interface with the electronic health record, reporting capability within twenty-four (24) hours and personnel capable of performing the appropriate collection procedures. All on-site qualified health care professional staff shall be trained in the collection and preparation of laboratory specimens. Laboratory/diagnostic services may be subcontracted by Centurion and shall comply with all federal and state standards.

3.1.1  Lab services shall include the capability to provide some on-site diagnostics with immediate results to include at a minimum: finger-stick blood glucose testing, urine analysis dip stick, urine analysis pregnancy test, rapid strep test, guaiac stool test, troponin I, and peak flow testing. Where separate diagnostic services are provided on-site, a procedure manual is to be developed and kept current for each service, to include the procedures for the calibration for accuracy of testing devices. Centurion will arrange for the drawing of blood in appropriate vials supplied by the Mississippi Crime Lab or cheek swab collection for DNA samples on all sex offenders and any others as required by Mississippi State law or mandated by court order.

3.1.2  The physician or mid-level practitioner (PA or NP) shall review all routine laboratory results within twenty-four (24) hours of receipt to ensure proper treatment and follow-up care. Any grossly abnormal results or laboratory values shall be communicated to the physician or mid-level practitioner immediately. A record of the date and time of this communication, as well as resulting intervention orders is to be documented in the inmate health care record. It shall be the responsibility of the qualified health care professional receiving the lab results to initiate appropriate intervention and to communicate positive or negative findings to the affected inmate.

14



JEREMY 001350

3.1.3  Centurion or its subcontracting laboratory shall provide a copy of its/their Standard Operations Procedure Manual (SOP) to the MDOC Chief Medical Officer and each MDOC Health Services Administrator.

3.1.4  Centurion or its subcontracting laboratory shall be capable of providing the level of required reporting for purposes of quality improvement and utilization review.

3.1.5  Pap smears shall be performed at initial intake and offered annually to each female MDOC inmate.

3.2    Pharmacy Services.  Centurion shall provide or arrange for the provision of pharmaceutical services in accordance with ACA and NCCHC standards for inmates incarcerated in the Facilities and Satellite Facilities.  These services shall be sufficient to meet the needs of each Facility.  Centurion and its pharmacy subcontractor shall abide by all applicable federal and state regulations relevant to prescribing, procurement, dispensing, administration, distribution, accounting, and disposal of pharmaceuticals.  Centurion or its pharmacy subcontractor shall be responsible for all mandatory record keeping and accountability applicable to all legal requirements.

3.2.1  MDOC and Centurion agree to utilize the existing joint physical inventory taken of all pharmaceutical supplies and drugs as of July 1, 2016.  The accepted inventory shall be priced at the lower of cost or market value.  At the end of this Agreement, a similar inventory shall be taken and priced.  Any increase in the value of the inventory received over the value of inventory at the end of the contract shall be payable to Centurion, and any decrease in the value shall be payable to the State. Should the Parties agree to utilize the services of an independent third party to prepare this inventory, the cost of same shall be acceptable to and split equally between the Parties.

3.2.2  Centurion, in conjunction with its pharmacy subcontractor, shall develop a proposed formulary and submit a copy thereof to the MDOC Chief Medical Officer for review and approval. The formulary shall be utilized for the majority of prescribed medications, and deviations will be documented clinically in the medical record.  Any proposed formulary changes must be submitted to MDOC for review and approval prior to implementation.  The MDOC approved formulary will be distributed to all MDOC Facilities and Satellite Facilities. Centurion will provide written procedures for non-formulary requests and approvals.  Specialists in the MDOC preferred provider network will be allowed to order from the formulary.  Non-formulary requests must be approved by Centurion.

3.2.3  Administration of pharmaceuticals/medications shall be upon the order of a physician, dentist or other authorized licensed individual with designated prescriptive authority, such as a physician assistant or nurse practitioner.  Centurion, or its pharmacy subcontractor, will ensure a method by which to notify the prescribing authority of the impending expiration date of a medication order.  This will allow the prescriber to review therapeutic response to the medication and permit continuation or modification of the medication order.



15

3.2.4   Centurion or its pharmacy subcontractor shall be responsible for the procurement, payment, inventory control, dispensing and disposal of all pharmaceuticals with the exception of Hepatitis C medications and specialty medications for bleeding disorders, the full cost of which shall be borne by MDOC, and costs for HIV medication in excess of those set forth in Section 7.2.1. The pharmacy program will include the following parameters:

   a. Medication will be prescribed only by a physician, physician assistant/nurse practitioner, psychiatrist, or dentist;
   b. Verification of all questionable medication orders or drug prescriptions with the prescribing provider;
   c. Oversight of the pharmacy program by a pharmacist licensed in the State of Mississippi who will conduct periodic audits and participate in quarterly Pharmacy and Therapeutics and CQI Committees;
   d. Ordered medications not administered will be returned to the pharmacy;
   e. Establishment of an inventory control system to affect availability of necessary drugs and to protect against loss of pharmaceuticals and controlled substances;
   f. Storage of all controlled substances, syringes, needles, and surgical instruments under security conditions; maintenance of a daily recorded inventory of controlled substances;
   g. Development of a policy to address medication refusals;
   h. Development of medication dispensing procedures;
   i. Institution of automatic stop orders for various drug categories;
   j. Routine review of all prescriptions;
   k. Documentation of all medication administration, to include any ordered medication not administered with reason given;
   l. Preparation, maintenance, and retention of all drug records in accordance with all state and federal laws and regulations;
   m. Adherence to the Federal Controlled Substances Act and the State Pharmacy Act and compliance with NCCHC Standards; and
   n. Arrangement for emergency stat medications through local pharmacies as necessary.

   3.2.5   A stocked emergency drug kit shall be available at all Facilities.  An adequate supply of emergency drugs will be available to meet the needs of each Facility.

   3.2.6   Stringent security standards shall be utilized with the storage, dispensing, and accountability for DEA controlled substances, needles, syringes, and other items that have an abuse or security potential.  The maximum duration of a controlled substance prescription will be thirty (30) days.

   3.2.7   When there is no staff pharmacist on-site, Centurion or its pharmacy subcontractor shall engage a consulting pharmacist who shall be utilized for quality assurance pharmacy inspections, visits and consultations on a regular basis, not less than quarterly.

   3.2.8   A program of self-administration Keep on Person ("KOP") medications with strict accountability may be implemented among those inmates who meet

16



JEREMY 001352

program criteria as mutually agreed upon by Centurion, in conjunction with its pharmacy subcontractor, and the MDOC Chief Medical Officer for use in all MDOC Facilities and Satellite Facilities. Federally DEA controlled medications, anticoagulants, medications with narrow therapeutic windows, medication for the treatment of HIV/AIDS, or preventive tuberculosis therapy shall not be administered through the use of the KOP Program. Inmates who demonstrate non-compliance or lack of responsibility shall be removed from this program and reported to facility staff.

3.2.9   Centurion or its pharmacy subcontractor shall develop and implement a Continuous Quality Improvement (CQI) program for the pharmacy program at the Facilities demonstrating a knowledge and focus on outcome measures and indicators.

3.2.10 Centurion or its pharmacy subcontractor shall develop a pharmacy and therapeutics committee that meets quarterly (or more frequently as needed) to discuss medication administration utilization patterns, success or corrections needed, issues associated with the approved formulary and any problems arising from pharmacy activities at the Facilities and Satellite Facilities, medication error review, adverse drug reaction review, policies and procedures review, provider prescription practices. Committee meetings shall be documented with the minutes provided to the MDOC Chief Medical Officer within seven (7) days of the meeting.

3.2.11 To facilitate continuity of care, whenever any inmate receiving prescription medication is discharged, paroled, or released on ERS, or remanded on court order, a supply of medication of either the remainder of the prescription or a thirty (30) day supply at the discretion of the prescriber shall accompany the inmate. Centurion healthcare personnel will coordinate with community healthcare providers to give HIV/AIDS, dialysis, chronic disease patients, and TB patients specific referral for follow-up. Notification to the State Department of Health shall be given for TB and HIV positive patients.

3.3   EKG Services.  Centurion shall provide EKG services, equipment, and supplies at the Facilities with on-site twenty-four (24) hour, seven (7) days a week coverage. Services shall include:

3.3.1   Training and orientation of all designated qualified health care professional staff;

3.3.2   Printed EKG rhythm strip and computerized interpretation report within ten (10) minutes; and

3.3.3   Appropriate referral of inmates with an abnormal EKG to a cardiologist for evaluation as recommended by the onsite attending physician.

3.4   Radiological Services.  Centurion will provide routine radiology services on-site by Centurion's radiology technician or contractual provider at those Facilities that have radiology (x-ray) units.  Radiology services for Satellite Facilities that do not have radiology units will be provided by Centurion through return of the inmate to the parent Facility, or by provision of services on site if available.  All supplies and materials necessary for the provision of on-site radiology services at the Facilities that have x-ray units shall be the responsibility of Centurion.

17



3.4.1   A licensed radiologist will interpret all radiographs. Radiographs are to be interpreted on the same day or the next workday, with written results received within 48 hours after reading. A physician or mid-level practitioner shall review all written radiograph reports the workday following the receipt of the written report. The physician or mid-level practitioner shall be responsible for communicating the results to the inmate in a timely manner.

3.4.2   For procedures, such as fluoroscopy or special studies, which are beyond the capacities of on-site equipment, the inmate will be transported to an off-site referral facility capable of performing the diagnostic procedure. The specialty consultation referral procedures shall be used for such referrals.

3.4.3   Centurion shall arrange for inspection, and calibration of on-site radiology equipment per manufacturer specified schedule. Centurion will provide all supplies and ancillaries needed to operate said equipment. Centurion is responsible for providing required certifications and equipment readings to the MDOC for use with any/all required OSHA reporting, standards and guidelines.

3.5   Dialysis Services.   Centurion shall provide or arrange for the provision of onsite renal dialysis services at CMCF for dialysis patients. Centurion shall post a monthly schedule of renal dialysis services and submit the schedule to the MDOC HSA at CMCF monthly. Centurion shall provide or arrange for the provision of all appropriate equipment, supplies, and medical personnel necessary for complete renal dialysis. MDOC will supply water and electricity at no cost to Centurion. MDOC will assign inmates requiring dialysis services to CMCF for housing.

3.6   Optometry Services.   A licensed on-site provider will perform optometry examinations and treatment for inmates incarcerated at the Facilities, to adequately attend to the needs of all inmates within the Facilities. Centurion will provide all equipment necessary for rendering these services. Treatment and care, which is beyond the scope of expertise of the optometrist, shall be referred to an off-site ophthalmologist in accordance with specialty care referral procedures. Physician or nurse referrals to see an optometrist will be accomplished within thirty (30) days of referral, with corrective eyewear, as described below, being provided within thirty (30) days after being seen by the optometrist.

3.6.1   Plastic eyeglasses shall be provided by Centurion to inmates requiring vision corrections or to inmates entering a Facility or Satellite Facility currently using some type of corrective lens. Centurion is required to replace broken or damaged lens only once per year, unless an eye condition requires replacement more frequently. Inmates are not allowed to wear contact lenses, and inmates entering a Facility or Satellite Facility wearing contact lens will require glasses supplied by Centurion to replace the contact lens. Special medical treatment requiring the wearing of replaceable contacts requires the approval of the MDOC Chief Medical Officer. Specially-approved contact lenses and supplies shall be provided by Centurion.

3.7   Auditory Services.   Centurion shall provide an auditory services program for inmates incarcerated at the Facilities. A licensed audiologist will perform a hearing exam when ordered by a physician. If a hearing amplification device is indicated,



JEREMY 001354

Centurion shall supply and maintain the device. Centurion will not be expected to render payment for more than one (1) amplification device per person, unless medically required on a more frequent basis.

3.8     Hospice Care. When indicated by the physician and accepted by the inmate, Centurion and MDOC will work together on a case-by-case basis to provide compassionate and palliative care within the palliative care unit at MSP using qualified compassionate and palliative care professionals. Centurion's contracted/employed physicians may recommend, where appropriate, and participate with MDOC staff in the evaluation of inmates who are eligible for Conditional Medical Release consistent with MDOC policy and State law.

3.9     Inmate Education. For inmates incarcerated in the Facilities and Satellite Facilities, Centurion shall develop, subject to the MDOC approval, a personal health education program minimally utilizing posters and pamphlets. To further this health education process, formal sessions shall be made available based on the assessed educational needs of the committed persons and upon approval by the MDOC. Selected topics for these sessions may include, but are not limited to:

> Personal hygiene;
> Stress management;
> Tuberculosis and other communicable diseases;
> Hepatitis;
> Prevention of HIV infection and other sexually transmitted diseases;
> Diabetes;
> Hypertension and cardiac disease;
> Pregnancy, birth control; and women's health topics;
> Adverse effects of tobacco use;
> Adverse effects of alcohol and psychoactive drug use;
> Positive effects of physical activity;
> Positive effects of healthy diet; and
> Prevention of dental and periodontal disease.

3.10    Inmate Grievances. Centurion personnel shall follow MDOC policies, procedures, and timelines to be followed in the formal Administrative Remedy Program (ARP) for inmate complaints regarding any aspect of health care and in accordance with MDOC regulations. Reasonable, good faith attempts will be made to resolve inmate complaints on an informal face-to-face basis.

3.11    Medical Records. Individual health care records will be initiated and maintained for every inmate regarding medical, dental or mental health services as a result of the inmate screening process or for services rendered following assignment to a Facility. The medical records shall be initiated and maintained on the MDOC Electronic Health Record, EHR system.

    3.11.1 Electronic Health Records. The MDOC has invested in a comprehensive electronic health records (EHR) system. The system is owned by MDOC. The GE Centricity EHR was implemented in 2009. Centurion agrees to utilize and input data into the EHR as currently utilized by MDOC. MDOC is responsible for the cost of the software, licensing of the system and annual maintenance including software upgrades

19



JEREMY 001355

and installation, additional licenses and server hardware. During the term of the Agreement, MDOC has requested, and Centurion has agreed, that Centurion will make all payments for software, licensing, upgrades, maintenance and other related costs directly to the EHR manufacturer, GE Healthcare, Inc. and MDOC will fully reimburse Centurion for all such payments within thirty (30) days of each such payment made by Centurion to GE Healthcare, Inc. MDOC agrees to allow Centurion access to the medical data module of the EHR system via computers located within the medical units. Centurion will ensure appropriate personnel are trained to utilize the system and that a formal program for training will be in place for both Centurion's employees as well as appropriate MDOC personnel. Centurion will be responsible to input data into the system and keep all relevant data fields populated on a timely basis. As part of its training Centurion will emphasize the importance of data integrity and data consistency by those entering data into the EHR. Centurion and MDOC agree that health information in the EHR will be used in accordance with applicable confidentiality laws and regulations. Centurion will provide EHR help desk support for contract site users. MDOC shall possess sole ownership of all inmate medical records. Any applicable software or data will be transferred to MDOC upon termination of the contract.

3.11.2  Facility medical records shall be managed and made available to MDOC according to ACA and NCCHC standards. Centurion personnel, as custodian for the MDOC, shall maintain, retain, and timely transfer complete, standardized "Problem Oriented Medical Records" for inmates incarcerated in the Facilities and Satellite Facilities. The "SOAP" format for progress notes shall be used for such inmate records. The MDOC shall possess sole ownership of all inmate medical records. Any applicable inmate medical record data will be transferred to the MDOC upon termination of this Agreement. Medical record information available electronically, will be transferred electronically in a delineated file format to the MDOC, as requested.

Medical record forms will include, but are not limited to:

a. Completed receiving screening form;
b. Health appraisal data form;
c. Laboratory, radiology, and diagnostic studies;
d. Multidisciplinary progress notes, to include date and time of each encounter with signature and title of documenting staff;
e. Prescribed medications, treatments, findings, diagnoses, and disposition;
f. Consent and refusal forms;
g. Release of information forms;
h. Health care progress notes (e.g., dental, psychiatric, psychological evaluations, off-site consultation/specialty);
i. Problem list;
j. Discharge summaries of any hospitalizations;
k. Special treatment plan, if applicable; and
l. Physician orders and treatment plans.

3.11.3 Medical records will be maintained with confidentiality as required by applicable law. The medical, dental and mental health records will be kept separate from the master file, working file and offender management file. Subject to

20



applicable laws, data necessary for the classification, security and control of inmates will be provided to the appropriate MDOC personnel. Medical records will be made available to MDOC officials, in accordance with applicable law, when requested or as required to defend any cause of action by any inmate against the MDOC. Health care information about an inmate shall be disclosed only in compliance with appropriate federal and state statutes and regulations. Adherence to applicable informed consent regulations and standards of the local jurisdiction must be maintained. Informed consent standards apply to all invasive examinations, treatments, and procedures with the exception of emergency treatment where informed consent is implied, situations with advanced directives, and the treatment of communicable diseases.

3.11.4 Release of medical records will only be made in accordance with Federal, State, and local regulations, and in accordance with MDOC policies and procedures.

3.11.5 An EHR Summary document will accompany all inmates when transferred to off-site medical appointments or to a correctional facility outside the jurisdiction of MDOC. Centurion staff will complete MDOC transfer screening forms according to MDOC policy.

3.11.6 Inactive medical records will be maintained at CMCF in accordance with the Laws of the State of Mississippi and the ACA and NCCHC Standards. After two (2) years, the inactive records may be stored off-site. The MDOC will provide storage, and cost of retrieval is the responsibility of Centurion or the requesting party.

3.11.7 Where and to the extent that the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191, Titled Administrative Simplification, and the rules and regulations promulgated there under, are applicable to services contracted by Centurion, Centurion will comply with such provisions.

3.12    Inmate Copay Services. Centurion shall be responsible for reporting various medical services provided to inmates in order to support the MDOC inmate copay process. A Centurion designated employee will summarize sick call and pharmacy services to be charged to inmates on a daily basis and provide to MDOC. Centurion will provide copay related data in a manner jointly agreed to by Centurion and MDOC.

3.13    Management Information Services ("MIS"). MDOC will provide Centurion with private virtual circuit networking capability between the three main facilities and MDOC's central office and any other State operated facility, which may be added to the network. Centurion will provide the end user hardware and software to utilize the network. MDOC will assist Centurion in determining the appropriate equipment needed and provide access to the system.

3.13.1 Centurion agrees to utilize and input data if requested, into the medical module of the Motorola OffenderTrack system. MDOC is responsible for the software, the licensing of the system and the annual maintenance. MDOC agrees to allow Centurion to have access to the medical data module of the OffenderTrack system via computers located within the medical units. MDOC will provide training and Centurion will ensure appropriate personnel are available for training to utilize the system. Centurion will be responsible for inputting data into the module and will if necessary

21



JEREMY 001357

keep all appropriate fields of this module populated. MDOC agrees that medical information in this OffenderTrack system will be used in accordance with applicable confidentiality laws and regulations.

3.13.2 MDOC will make available to Centurion in a jointly determined electronic format inmate information on a daily basis for purposes of updating Centurion's proprietary systems and relevant databases. The inmate information will include inmate name, date of birth, social security number, inmate DOC number and location. Any other relevant information required will be provided as mutually agreed in order to have current inmate eligibility.

3.13.3 Centurion will provide to MDOC in a jointly determined electronic format, if available, inmate information on a periodic basis for purposes of updating MDOC's relevant databases. The inmate information requested will be provided in a mutually agreed format. Centurion medical staff shall communicate special medical problems and special needs to correctional and healthcare staff via verbal or written means and the use of appropriate "medical holds" in the OffenderTrack system.

3.13.4 Inmate Transportation Data. Centurion's request for off-site medical transportation will be provided to MDOC in a format jointly agreed to by Centurion and MDOC.

3.14    Permits and Licenses. All permits, licenses, certificates and accreditations required by federal, state or local laws, rules and regulations necessary for the implementation of the work undertaken by Centurion pursuant to this Agreement shall be secured and paid for by Centurion. It is the responsibility of Centurion to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for which a certificate is required. Centurion will pay for NCCHC accreditation surveys.

3.15    Reporting Requirements. Centurion will provide periodic reports electronically when possible, to the MDOC Chief Medical Officer in a format and frequency set forth in Exhibit B to this Agreement. MDOC may request Centurion to provide ad hoc reports on a periodic basis. Centurion will use best efforts to provide MDOC with the data requested for these ad hoc reports in a timely manner.

3.16    Accreditation. Centurion agrees to maintain successful NCCHC accreditation at MSP, CMCF and SMCI from the commencement of this Agreement until it terminates. Centurion will maintain compliance with all healthcare related ACA accreditation standards and will maintain ACA accreditation related to medical services for each Facility and Satellite Facility. Centurion agrees to work with the accreditation manager at each Facility and Satellite Facility to maintain current knowledge of ACA standards, participate in the accreditation process and to provide relevant documents. All accreditation-related documents and materials developed by Centurion for either NCCHC or ACA accreditation at MDOC Facilities and Satellite Facilities are the property of MDOC. Copies of these materials shall be provided to the MDOC HSA.

ARTICLE IV -- SAFETY, PREMISES AND MATERIALS

22



JEREMY 001358

4.1    Bio-Hazardous Waste.  Centurion will arrange for disposal of all bio-hazardous medical waste material from the health care units at the Facilities and Satellite Facilities, and will provide for and bear the cost for an approved appropriate method of disposal of contaminated waste, including needles, syringes and other materials used in the provision of health care services at the Facilities and Satellite Facilities. These disposal methods shall be in compliance with all applicable standards and/or regulations, including OSHA, relevant to the disposal of bio-hazardous waste material.

4.1.1  Centurion shall take appropriate measures to confirm that only biomedical waste material is deposited within the designated contaminated waste containers. Air filters used in air recirculation and air conditioning units, which are removed or replaced by the maintenance department in rooms considered to harbor air-borne pathogens shall also be treated as biomedical hazardous waste and disposed of accordingly.

4.1.2  Centurion will confirm that all MDOC staff have received or will receive training in the proper handling and disposal of biomedical waste material. In addition, Centurion shall comply with all applicable laws and record keeping involving the handling and disposal of biomedical waste material.

4.2    Infection Control.  The infection control program describes resources that will help the healthcare provider in maintaining an environment that reduces unnecessary exposure to infectious and communicable diseases for inmates, security, and healthcare staff. The Infection Control Program will follow the guidelines and recommendations of the CDC, OSHA, MSDH and other pertinent documents related to infection control. The program will include written policies, procedures, and practices that define surveillance procedures to detect inmates with infectious and communicable disease, appropriate immunizations to prevent these diseases, the care that inmates with these diseases receive, including isolation when medically indicated, and compliance with treatment regimens, and shall be an ongoing process.

4.3    Safety.  Centurion will supply, check, and replace used supplies in first aid kits (two per each Facility unit), in compliance with ACA and NCCHC standards. The content of the first aid kits will be determined by the Centurion Medical Director, but at a minimum will include CPR shields, gloves, masks, biohazard cleanup kit, bandage supplies, eye supplies, iodine pads, and ammonia inhalant. In addition, Centurion will supply, check and replace used supplies in limited emergency first aid kits for MDOC emergency vehicles, as determined by the on-site health authority. In the training for MDOC staff provided by Centurion, as described in Section 4.1.2 of this Agreement, Centurion will include instruction on the use of items in the first aid kits.

4.4    Space, Equipment and Supplies.  Centurion shall provide all materials and supplies necessary for Centurion to deliver the services to inmates incarcerated in the Facilities, as required by this Agreement. These shall include, but are not limited to, medical, dental, optometry, diagnostic, mental health testing and office supplies required to provide comprehensive health care services. Centurion shall provide prosthetics, orthotics, and prosthetic appliances deemed necessary by the Facility physicians. All equipment and supplies must be reviewed by the MDOC for compliance with security requirements.

23



JEREMY 001359

4.4.1  MDOC shall provide phone sets and local telephone service. Centurion shall be responsible for long distance service used by Centurion employees and independent contractors.

4.4.2  All medical equipment listed in exhibit C is the property of MDOC. Centurion will be responsible for providing the repair, maintenance and certification of all equipment listed in exhibit C. If MDOC and Centurion determine that the equipment is beyond repair and/or the repair cost exceeds fifty percent (50%) of the replacement value, then MDOC will replace equipment. Any medical equipment procured by MDOC will follow state procurement procedures.

4.5     Inmate workers. Centurion will not assign inmate workers to health care related tasks of any kind, except for hospice care where appropriate and consistent with ACA and NCCHC standards. MDOC may assign inmate workers to the clinic, infirmary and hospital areas as janitorial orderlies.

## ARTICLE V -- SERVICES TO MDOC EMPLOYEES

5.1     Services to MDOC Employees. Centurion will provide certain limited and specified health care services for MDOC employees who work in the MDOC-run Facilities as described in Section 2.5 of this Agreement. Centurion shall conduct an annual TB test for MDOC personnel during annual statewide TB testing utilizing TST and IGRA as clinically appropriate. Centurion shall conduct a TB test for each new employee of MDOC utilizing the TST and IGRA as clinically appropriate. In addition, Centurion shall support the MDOC's provision of health services staff orientation at MDOC sponsored training.

5.1.1  Centurion will assist the MDOC in providing educational services to MDOC personnel on the following topics and others as reasonably requested by MDOC:

a. Crisis Intervention;
b. First Aid for Medical Emergencies;
c. Mental Health Emergencies;
d. CPR Certification;
e. Communicable Disease Prevention;
f. Blood Borne Pathogen Exposure Control;
g. Recognizing Signs and Symptoms of Mental Illness, Chemical Dependency and Mental Retardation;
h. Suicide Prevention, Detection, Intervention, and Response;
i. Abnormal Inmate Behavior;
j. Stress Management; and
k. ACA and NCCHC requirements.

## ARTICLE VI - SPECIAL NEEDS AND SERVICES

6.1     Special Needs Plans. Centurion will develop an individual treatment plan for each inmate with a special care need and ensure enrollment in appropriate chronic care clinic (s).



24

6.1.1  Special needs treatment plans shall be developed for inmates with any of the following conditions:

    A. chronic care (e.g., diabetes, heart disease, asthma, etc.)
    B. convalescent cases
    C. substance abuse cases
    D. serious communicable diseases
    E. physically disabled
    F. developmentally disabled
    G. serious mental health needs
    H. frail or elderly
    I. terminal illness
    J. pregnancy
    K. Youthful offender

6.1.2  Inmates with special needs shall receive close medical supervision and/or multidisciplinary care. Inmates with special needs shall have a written, individualized medical treatment plan developed by the physician or other qualified health practitioner. This plan shall address diet, exercise, medication, diagnostic monitoring, frequency of medical evaluation, adaptation to correctional setting, and areas of modification.

## ARTICLE VII -- COMPENSATION

7.1    Average Daily Population ("ADP").  ADP is defined to mean the sum total of all daily administrative inmate population counts performed during a calendar month divided by the number of days during the calendar month.  For purpose of reference, an administrative inmate population count (sometimes referred to as an administrative count) is performed at 12:00 midnight daily.  The ADP includes inmates housed in Facilities and Satellite Facilities and any free world TB patients beings housed in the above listed locations.  The ADP does not include any MDOC inmates housed in County jails or inmates that have been admitted to an off-site hospital.

7.1.1  Inmates housed in County jails are not the medical or fiscal responsibility of Centurion.

7.2    Compensation.  The form of reimbursement under this Agreement is per diem based.  Centurion shall be paid based upon the ADP as calculated by the MDOC, subject to a guaranteed minimum floor payment.  Should the ADP for any given month be less than the guaranteed population floor (the "Base ADP"), as set forth below, the monthly payment shall be based on the Base ADP.  The MDOC shall pay Centurion the fixed per diem multiplied by the number of days in the month of service, times the Base ADP.  Should the actual ADP be higher than the Base ADP, MDOC will pay Centurion a reduced fixed per diem for the difference in the actual ADP above the Base ADP.  The MDOC shall provide Centurion with the current ADP calculation each Monday of the month, along with a final ADP calculation on the business day following the end of the month.  Centurion shall submit an invoice in a format prescribed by the MDOC by the 3rd working day of the month following service, and the MDOC shall remit payment via Electronic Funds Transfer (EFT) to Centurion by the 10th working day of the month, following the month of service.



JEREMY 001361

Payments by MDOC using the Statewide Automated Accounting System (SAAS) shall be made and remittance information provided electronically as directed by the State. These payments shall be deposited into the bank account of Centurion's choice. MDOC may, at its sole discretion, require Centurion to submit invoices and supporting documentation electronically at any time during the term of this Agreement. Centurion understands and agrees that MDOC is exempt from the payment of taxes. All payments shall be in United States currency.

7.2.1 MDOC will compensate Centurion for the services agreed to under this Contract at a per diem rate of ▓▓ per inmate up to a Base ADP (guaranteed population floor) of 17,300 inmates. MDOC will compensate Centurion at a reduced per diem rate of ▓▓ per inmate for any difference in the actual ADP above the Base ADP. The Base ADP (guaranteed population floor) shall be 17,300 inmates. For the second year of the contract, MDOC will compensate Centurion for the services agreed upon under this Contract at a per diem rate of $7.87 up to a Base ADP. MDOC will compensate Centurion at a reduced per diem rate of $2.80 per inmate for any difference in the actual ADP above the Base ADP. For year three of the contract, MDOC will compensate Centurion for the services agreed to under this Contract at a per diem rate of $8.12 per inmate up to a Base ADP. MDOC will compensate Centurion at a reduced per diem rate of 2.89 per inmate for any difference in the actual ADP above the Base ADP.

MDOC and Centurion agree that, during the term of this Agreement, there could be an increase in the cost associated with pharmaceuticals for HIV due to changes in the number of inmates treated, an increase in the unit cost of HIV-related medications, a change in 340B regulations or any other reason. Under any of these circumstances, Centurion will endeavor to keep the cost of HIV-related pharmaceuticals below $0.45 PIPD. If the cost for HIV-related pharmaceuticals (inclusive of any management fees paid to the 340B provider) incurred by Centurion for the contract period exceed $0.45 PIPD, MDOC will pay to Centurion the difference between the total cost incurred by Centurion and $0.45 PIPD. In this event, Centurion will work with MDOC to find other cost savings within the Contract to offset this cost differential.

7.2.2. The pricing as set forth in this Article VII assumes a population of 17,300 inmates for the Facilities and Satellite Facilities contemplated herein, and further assumes that as population is added the population would be assimilated somewhat equally distributed in the Facilities consistent with the population distributions and staffing assumptions underlying this Agreement. Should the MDOC add inmate population, increase the numbers of inmates with chronic illnesses that require medical intervention, add or alter locations/sites to those covered under this Agreement or should the proportionate distribution of population significantly differ from the population as it exists as of the commencement of this Agreement, and the occurrence of either results in the need to increase staffing or incur other costs above the Per Diem Rate, Centurion and the MDOC shall negotiate compensation adjustment to the per diem rate to cover the increased costs. Centurion shall submit to the MDOC Chief Medical Officer the recommendation for staffing increases necessary to maintain proper medical care. Upon approval of MDOC, compensation shall be adjusted for approved staff based on the applicable salaries and benefits at the time of the increased staffing. If operating costs are affected, Centurion shall submit to MDOC a cost impact statement for review and approval. Should the inmate population drop

26



below the Base ADP, Centurion and MDOC agree to negotiate possible price adjustments to realize any potential cost savings to both parties.

7.3   <u>Limitations on Covered Expenses</u>.  The following services/costs are excluded from Centurion's responsibilities in providing services to the MDOC:

- All off-site specialty care referrals shall be at the expense of the MDOC. Final approval for off-site referrals is at the discretion of the MDOC Specialty Care Coordinator. The MDOC Chief Medical Officer will review all denials, discuss with referring physician and offer final approval as indicated.

- The MDOC will cover the cost of off-site emergency room visits and inpatient admissions.

- Centurion is responsible for only medically necessary on-site care and not for elective procedures or specialty services except as outlined in Section 2.10.

- MDOC shall provide for the transportation of incarcerated persons to any location within the State of Mississippi as Centurion may deem necessary and appropriate for the health care of such person subject to the approval of MDOC.  MDOC shall also arrange and pay for the use of any emergency medical transportation vehicle such as ambulances and medically equipped helicopters as necessary and appropriate for hospital-to-hospital emergency transportation.  Centurion shall assume responsibility for emergency transportation from the correctional facility to the hospital emergency room as necessary.   Centurion shall use its best efforts to make the most efficient use of emergency transportation and the accompanying security measures involved by judicious use of on-site resources, including specialists used on-site, simultaneous scheduling of multiple inmates for appointments, etc.

- The MDOC Specialty Care Coordinator shall be responsible for the arrangement and cost of all specialty care.  Centurion shall provide STD, HIV, and TB clinics in conjunction with the Mississippi State Department of Health.  MDOC shall provide specialty clinics to the maximum extent possible.

- All costs of Hepatitis C and specialty medications for bleeding disorders.

- Costs of HIV-related medication in excess of that set forth in Section 7.2.1.

7.4    <u>Non-Performance.</u>  A deduction may be taken in the event the MDOC has to pay for alternative sources of inmate health care due to non-performance by Centurion. The amount of the deduction shall be taken from any money due to Centurion, and will be limited to the amount the MDOC would have otherwise paid to Centurion.  The MDOC shall provide immediate written notification to Centurion of such proposed procurement of alternative sources, providing Centurion with a thirty (30) day period from date of notice in which to cure the non-performance, prior to commencing the deduction.

7.5 <u>Staffing Report and Vacancy Assessment.</u> Centurion will provide MDOC a monthly staffing report based on biweekly payrolls that end in 4 week and 6 week intervals

27



as detailed in the Exhibit D, "Centurion of Mississippi LLC Schedule of Pay Periods" for the contract period. The staffing report, as referenced in Exhibit E, will include a list of all positions and the total hours paid. Twice during the term of this Contract, Centurion shall provide MDOC a reconciliation of total hours paid compared to Contract. If the monthly average hours paid falls below 90% of staffing patterns as required contractually statewide, Centurion shall be responsible to reimburse MDOC for the vacant positions up to the 90% threshold. The reimbursement rate shall be based on the standard hourly rate for the vacant position as outlined in Exhibit E. Hours shall be divided into the following three categories:

- Providers including Physician, Physician Assistant/Nurse Practitioner, Dentist, Pharmacist, Psychiatrist, Psychologist, Nurses;
- Clinical and Mental Health including all non-provider positions other than administrative and clerical;
- Administrative and Clerical staff including Medical Records Director, Site Manager, Secretary, Administrative Assistant, Medical Records Clerk, Unit Clerk, and other non-clinical staff.

Reconciliation shall involve the calculation of actual hours paid to the contractually required hours. Variance in hours shall be calculated at the Exhibit D rates and Centurion shall be responsible to reimburse MDOC the negative net value of the total reconciliation (up to the 90% staffing threshold).

7.5.1   The first staff vacancy assessment will be due one hundred eighty (180) days after the start of the initial term of this Agreement.

7.6   Compliance Audits and Liquidated Damages.   Centurion will be responsible for meeting certain compliance standards based on the provisions of this Agreement. Compliance Reviews will be conducted each month using a mutually agreed upon methodology. MDOC will provide Centurion with written notification of the Review results within seven (7) days of completion of the Review. A Quarterly Audit will be conducted based on the monthly Compliance Reviews. After the first six months of the Agreement, MDOC may assess liquidated damages upon Centurion's failure to meet the compliance standards at each of the Facilities according to the following process:

It is expected that Centurion shall meet each compliance standard 90% of the time for each Facility. If any compliance standard at any Facility does not meet the 90% threshold during a quarter, then a Plan of Correction for that compliance standard at that Facility will be required. The Plan of Correction will be developed by Centurion and reviewed and approved by the MDOC Chief Medical Officer. The Plan of Correction will identify the deficiency, causes for the deficiency, proposed remedies for the deficiency, a specific timeline for remedies and a specific person who will be responsible for the remedy. A Plan of Correction must be completed by Centurion and approved by the MDOC Chief Medical Officer within thirty (30) days of the deficiency being identified in the written Compliance Audit. After submittal of the Plan of Correction, Centurion shall have an additional sixty (60) days to meet the 90% threshold before liquidated damages are assessed against it. If, for any quarter during the remaining life of the Agreement, Centurion fails to meet the 90% threshold for a

28

compliance standard at a Facility where a Plan of Correction for that compliance standard has been approved and the additional 60-day period to come into compliance has lapsed without Centurion coming into compliance, then liquidated damages will be assessed for that compliance standard at that Facility. The liquidated damages will include a penalty of ▮▮▮▮ for every percentage point below the 90% threshold for each compliance standard at each Facility for the time period beginning on the 61ˢᵗ day after submission of the Plan of Correction.

   7.6.1   Liquidated damages will be based on the following compliance standards:

- Emergent medications are filled and administered within 24 hours of being prescribed.
- Newly admitted inmates shall receive a comprehensive health assessment and history within seven (7) days of intake (CMCF) (Section 2.7.1)
- Non-emergent health care (sick call) requests shall be triaged (face-to-face encounter by a nurse) within twenty-four (24) hours of receipt (date stamp) (Section 2.9.1)
- Sick call referrals by a triage nurse to a medical provider for non-emergent issues shall be evaluated by a physician or mid-level practitioner within seven (7) calendar days of receipt of the original complaint (Section 2.9.1)
- All newly admitted inmates shall receive a dental exam within seven (7) days of admission (CMCF)(Section 2.13.2)
- All inmates shall have routine dental prophylaxis no less than every two (2) years (Section 2.13.3)
- Inmates referred for routine psychiatric evaluation upon intake shall be seen by a psychiatrist within five (5) calendar days for initial urgent mental health screenings (CMCF)(Section 2.14.6)
- Inmates referred for psychiatric evaluation in all cases except upon intake shall be seen by a psychiatrist within fourteen (14) calendar days of referral (Section 2.14.6)
- Inmates who are on psychotropic medications shall be seen by a psychiatrist at least every ninety (90) calendar days (or more frequently if deemed necessary by the prescribing psychiatrist), to include telemedicine evaluations where appropriate (Section 2.14.6)
- Inmates referred by a physician or nurse shall be seen by an optometrist within thirty (30) calendar days of the referral (Section 3.6).
- A licensed radiologist shall interpret all radiographs the next workday and provide written results within forty eight (48) hours after reading (Section 3.4.1).

   7.6.2   Liquidated damages shall be charged for all required reports in Exhibit B determined to be filed late. A report shall be considered late if received by the MDOC Chief Medical Officer after the following date:

   Daily reports - due the following day and considered late if not received by the second business day following the reporting date.

29



Monthly reports — due by the 25th day of the following month or the first business day following the 25th day of the following month.

Quarterly reports — due by the 25th day of the following month or the first business day following the 25th day of the following month.

Annual report — due March 31st of each year.

MDOC shall immediately notify Centurion in writing upon the delinquency of any required report. The liquidated damages for delinquency of any category (daily, monthly, quarterly or annual) of required report shall be ▓▓▓ per report for each workday from the date Centurion was provided written notification of delinquency until such report has been received in full by MDOC.

7.6.3 Centurion shall include adequate information in its monthly reports to determine its compliance with the required standards. The reports shall contain such information in a manner that can be independently verified including numbers of inmates subject to the requirements, numbers and percentages where Centurion met the Agreement requirements and numbers and percentages where Centurion failed to meet the requirement.

7.6.4 Centurion's failure to have on call for 24/7 emergency medical and mental health services shall be subject to a ▓▓▓ per day fine. Centurion's failure to provide emergency dental care in accordance with section 2.13.1 shall be subject to a ▓▓▓ per occurrence fine.

7.6.5 MDOC will conduct quarterly compliance audits using the agreed upon methodology. MDOC will provide Centurion with written notification of the audit results within thirty (30) days of completion of the audit. Centurion shall have thirty (30) days to respond in writing regarding any noncompliance and shall provide MDOC with a written explanation of corrective actions taken, including if applicable, evidence of such corrective actions Centurion shall then have an additional sixty (60) days to meet the 90% threshold for compliance with the items outlined as out of compliance in the Audit Report before liquidated damages are assessed against it.

7.6.6 This Section 7 of the Agreement sets forth the total agreement of the Parties relating to the topics and potential amounts of liquidated damages/penalties and withholds.

**ARTICLE VIII -- TERM AND TERMINATION**

8.1    <u>Term of Agreement.</u> This Agreement is effective upon the execution of it by the duly authorized representatives of both Parties. The term of this Agreement commences as of July 1, 2016 and continues through June 30, 2019. This Agreement may be renewed at the discretion of MDOC upon written notice to Centurion at least sixty (60) days prior to the contract anniversary date for a period of one (1) successive year. The total number of renewal years permitted shall not exceed two (2).

8.2    <u>Termination.</u> This Agreement may terminate as follows:

30



JEREMY 001366

8.2.1  If the Parties do not mutually agree to extend this Agreement pursuant to Section 8.1 above, then this Agreement will terminate at the end of the term; or

8.2.2  In the event that either Party shall give notice to the other Party that such other Party has defaulted in the performance of a material obligation hereunder, and such default shall not have been cured within sixty (60) days following the giving of such notice in writing, then the Party giving such notice shall have the right to terminate this Agreement thirty (30) days following the foregoing sixty (60) day cure period; or

8.2.3  In the event that the MDOC and Centurion mutually agree in writing to terminate this Agreement prior to the end of a term hereunder, then this Agreement may be terminated on such terms and on such date as stipulated in the written agreement; or

8.2.4  Either Centurion or MDOC may terminate this Agreement without cause with a 180 day written notification to the other party.

## ARTICLE IX -- STATE/MDOC UNDERTAKINGS

9.1    Undertakings.  The MDOC will perform the following:

9.1.1  Direct its employees, representatives, and contractors to take all actions required or reasonable to achieve NCCHC certification of the health program;

9.1.2  Provide security services and all other assistance necessary for the safe and orderly provision of medical care by Centurion personnel and contracted providers;

9.1.3  Provide all necessary utilities, including telephone service, provided that Centurion shall pay for the actual cost of long distance telephone communications.  An itemized log shall be submitted monthly by Centurion identifying long distance to include date; number called and estimated length of call.  Centurion may elect to install direct lines or equipment to capture this information to eliminate the logging;

9.1.4  Provide electronic connectivity between the three major institutions (MSP, CMCF and SMCI) for use by Centurion;

9.1.5  Provide administrative space for use by Centurion in the Facilities and Satellite Facilities, on an "as available" basis, which will include existing office furniture in place;

9.1.6  Provide clean bedding/linens for the medical use of Centurion within the Facilities;

9.1.7  Provide structural maintenance of the Facilities, MDOC departmental approved infrastructure changes, general maintenance and housekeeping where Centurion and its personnel and contracted providers are to provide health care services;

31

JEREMY 001367

9.1.8  Provide non-emergency transportation of incarcerated persons to any location within the State of Mississippi for the health care of such persons as deemed medically necessary and appropriate by both the MDOC Chief Medical Officer and Centurion;

9.1.9  Mandate a close working relationship, open communication and cooperation between Centurion, Superintendents, the transportation section, and/or their designated representatives, to minimize the impact upon MDOC's staffing, available vehicles, to operate within funding constraints, and to meet the inmates' health care needs as determined by healthcare personnel. To this end, the site HSA shall serve as the designated staff person to be the institutional/section liaison representative;

9.1.10  In the case of intrastate medical moves, the on-site Centurion Administrator will coordinate with the site HSA;

9.1.11  Medical moves to MDOC facilities from the counties and/or out of state will be the responsibility of the MDOC. Notification of these authorized moves will be coordinated with Centurion;

9.1.12  Provide security to Centurion's employees, staff, and contracted providers, consistent with that currently provided at individual Facilities. In addition, the MDOC will provide security procedures to protect Centurion's pharmaceuticals and supplies; provided, however, that Centurion will be responsible for enforcing compliance with MDOC security procedures among Centurion employees and contractors;

9.1.13  Provide and pay for food (including that required by written order of Centurion as medical diet) to incarcerated persons. Centurion or the contracted providers will make written diet orders consistent with medical needs, and will not make recommendations for religious diets. Nutritional supplements, i.e., Ensure and Boost, ordered by a physician shall not be considered food, but shall be treated as a prescription and will be the responsibility of Centurion.

9.1.14  Provide and pay for all services except those covered under section 7.3, Limitations on Covered Expenses.

9.1.15  In order for this Agreement to be successful, MDOC and Centurion must work together in partnership to resolve concerns, issues and disputes as identified by Centurion; as such, the MDOC will provide access to MDOC senior staff for guidance in policy and procedures, and will timely address any issues brought forth by Centurion to the satisfaction of both the MDOC and Centurion.

9.2     Availability of Funds. It is expressly understood and agreed that the obligation of the MDOC to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and the receipt of state and/or federal funds. If the funds anticipated for the continuing fulfillment of the Agreement are, at any time, not forthcoming or insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds or the

32



discontinuance or material alteration of the program under which funds were provided or if funds are not otherwise available to the MDOC, the MDOC shall have the right upon ten (10) days written notice to Centurion, to terminate this Agreement without damage, penalty, cost or expenses to the MDOC of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination. MDOC specifically agrees that no federal funds shall be paid to Centurion under this Agreement.

9.2.1    The MDOC will make payment for services rendered by Centurion up to the termination date of this Agreement. This provision shall not be construed so as to permit the MDOC to terminate this Agreement in order to acquire similar services from another entity.

9.3    Monitoring. The MDOC shall have the right to monitor Centurion's performance hereunder. This shall include reasonable access to documents, books, and records of Centurion that directly relate to this Agreement, for the purpose of audit, review, or reconciliation. In addition, the MDOC has the right to visit at any time any healthcare unit in any Facility in which Centurion has contracted to provide services to MDOC; MDOC agrees however, that in making such site visits, it will make good faith effort to do so in a manner contemplated to create the least disruption to care delivery at the site. To the extent that MDOC uses agents or third parties to perform such functions, MDOC will agree to have such parties enter confidentiality agreements regarding Centurion proprietary or trade secret information, which may be disclosed in the monitoring process.

## ARTICLE X -- INSURANCE AND INDEMNIFICATION

10.1    Indemnification and Representation.  To the fullest extent allowed by law, Centurion shall indemnify, defend, save and hold harmless, protect, and exonerate the MDOC, its commissioners, board members, officers, employees, agents, and representatives, and the State of Mississippi from and against all claims, demands, liabilities, suits, actions, damages, losses, and costs of every kind and nature whatsoever, including, without limitation, judgments, court costs, investigative fees and expenses, and attorney's fees, concerning, arising out of or caused by Centurion and/or its partners, principals, agents, employees and/or subcontractors in the performance of or failure to perform this Agreement. Centurion shall use legal counsel acceptable to the State. Centurion shall be solely responsible for all costs and/or expenses associated with such defense after it accepts an indemnification tender from the State. Centurion shall not settle any such claim, suit, etc. without the State's concurrence. Centurion's obligations, duties, and responsibilities under this section include, but are not limited to, the obligations, duties, and responsibilities contained in Miss. Code. Ann. § 47-5-1219. Centurion's obligations, duties, and responsibilities under this section include, but are not limited to, the continued duty to defend and indemnity MDOC and its officials and employees in *DePriest et al v. Walnut Grove Correctional Authority et al*, 3:10-cv-00663-CWR-FKB, (S.D. Miss.) and *Dockery et al v. Epps, et al*, 3:13-cv-00326-WHB-JCG (S.D. Miss.).

10.1.1  This indemnification clause shall survive the termination of this Agreement.



33

JEREMY 001369

10.1.2 MDOC hereby assumes the entire responsibility and liability for any and all damages or injury of any kind or nature, including death, proven to have resulted from MDOC's acts or omissions to all persons, including MDOC's employees, officers or agents and for all property damage caused by, or arising out of, the services performed by MDOC pursuant to this Agreement. MDOC will defend, at its expense, any actions filed against it or any of its employees, as defined by statute, based upon its performance of this Agreement. Centurion shall not be responsible for providing representation for the State of Mississippi, MDOC and its employees in any such action.

10.2    Insurance.  Copies of insurance certificates shall be filed with the MDOC Medical Compliance Officer within ten (10) days of award notice, and before the effective date of the Agreement.

10.2.1 Centurion shall maintain, at its expense, the established levels of insurance as shown below for Workers' Compensation, Professional Liability, Comprehensive General Liability and Property Insurance.

Workers' Compensation and Employees Liability in an amount of not less than One hundred thousand ($100,000) dollars.

Professional Liability: $1,000,000 per occurrence and $3,000,000 in the aggregate annually.

Comprehensive General (Public) Liability to include (but not limited to) the following:

    A. Premises/Operation
    B. Independent Contractors
    C. Personal Injury
    D. Contractual Liability-Bodily Injury $1,000,000.00 per occurrence
    E. Property damage $1,000,000.00 per occurrence
    F. Fidelity Bond on Centurion's employees at $50,000

10.2.2 Prior to the effective date of the Agreement, Centurion shall furnish the MDOC with an appropriately executed certificate of insurance.  Such certificate shall identify the Agreement and contain provisions that coverage afforded under the policies shall not be canceled, terminated or materially altered. All insurance certificates will provide coverage to the MDOC as an additional insured.

10.2.3 Failure on the part of Centurion to procure and maintain the required insurance and provide proof thereof to the MDOC, shall constitute a material breach of the Agreement, upon which the MDOC may immediately terminate the Agreement.

10.2.4 Centurion shall ensure that all subcontractors performing healthcare services under this Agreement meet the insurance requirements listed in this Section.

## ARTICLE XI -- GENERAL PROVISIONS

11.1    Changes in Scope.  The Parties agree that should there be any change in standards of care, including but not limited to a change in any material respect to any treatment protocol or modality or if any new medication or therapy is introduced to treat any illness, disease or condition, scope of services, State laws, regulations or policy, ACA or NCCHC standards, court orders or negotiated settlement of inmate-related

34

litigation that results in material costs to Centurion and the costs related to such changes or modifications are not covered in this Agreement, then Centurion will request that the MDOC increase its compensation in an amount equal to the actual, direct increased cost incurred by Centurion. If medical advances result in a substantial per patient cost decrease for Centurion, the MDOC may seek a corresponding decrease from Centurion. Any such adjustments shall be fully documented and attached to the Agreement in the form of amendments.

11.2    Confidentiality.  It is understood that in the course of the engagement established under this Agreement, each Party may learn of or obtain copies of confidential or proprietary software, systems, manuals, documents, protocols, procedures, or other materials developed by or belonging to the other Party, and not generally available to the public (the "Confidential Information"). All Confidential Information of a Party shall be and remain the property of the Party originally having ownership thereof, during the term of this Agreement and thereafter. Confidential Information shall not include information, which is or becomes public knowledge through no fault of the receiving Party or its employees, agents or representatives. Neither Party will, without the express written consent of the other Party, use the Confidential Information of the other Party, except as expressly contemplated by this Agreement, and the receiving Party shall cease all use of the other Party's Confidential Information upon the termination or expiration of this Agreement. Except as required by law or legal process, each Party shall maintain the confidentiality of the Confidential Information provided hereunder, and shall not disclose such information to any third parties. Notwithstanding any provision to the contrary contained herein, it is recognized that MDOC is a public agency of the State of Mississippi and is subject to the Mississippi Public Records Act, Mississippi Code Annotated §§25-61-1 et seq. (1972, as amended). If a public records request is made for any information provided to MDOC pursuant to the agreement, MDOC shall promptly notify the disclosing party of such request and will respond to the request only in accordance with the procedures and limitations set forth in applicable law. The disclosing party shall promptly institute appropriate legal proceedings to protect its information. No party to the agreement shall be liable to the other party for disclosures of information required by court order or required by law.

11.3    MDOC Records Available to Centurion with Limitations on Disclosure.  During the term of this Agreement and for a reasonable time thereafter, the MDOC will provide Centurion, at Centurion's request, the MDOC's records relating to the provision of health care services to inmates as may be requested by Centurion or as are pertinent to the investigation or defense of any claim related to Centurion's conduct.  The MDOC will make available to Centurion such records as are maintained by the MDOC, hospitals, and other outside health care providers involved in the care or treatment of inmates (to the extent the MDOC has any claim to those records) as Centurion may reasonably request consistent with applicable law; provided, however, that any such information released by the MDOC to Centurion that the MDOC considers confidential will be kept confidential by Centurion and will not, except as may be required by law, be distributed to any third party without prior written approval by the MDOC.

11.4    Centurion Records Available to MDOC with Limitations on Disclosure.  During the term of this Agreement and for a reasonable time thereafter, Centurion will provide MDOC, at MDOC's request, the Centurion records relating to the provision of

35



JEREMY 001371

health care services to inmates as may be requested by MDOC or as are pertinent to the investigation or defense of any claim related to MDOC's conduct. Centurion will make available to MDOC such records as are maintained by Centurion, hospitals, and other outside health care providers involved in the care or treatment of inmates (to the extent Centurion has any claim to those records) as MDOC may reasonably request consistent with applicable law; provided, however, that any such information by Centurion to MDOC that Centurion considers confidential will be kept confidential by MDOC and will not, except as may be required by law, be distributed to any third party without prior written approval by Centurion.

11.5   No Third Party Beneficiary Rights. The Parties do not intend to create in any other individual or entity, including but not limited to any inmate or patient, the status of third party beneficiary, and this Agreement shall not be construed so as to create such status. The rights, duties and obligations contained in this Agreement shall operate only between the Parties to this Agreement, and shall inure solely to the benefit of such Parties. The provisions of this Agreement are intended only to assist the Parties in determining and performing their obligations hereunder. The Parties intend and expressly agree that only Parties signatory to this Agreement shall have any legal or equitable right to seek to enforce this Agreement, to seek any remedy arising out of a Party's performance or failure to perform any term or condition of this Agreement, or to bring an action for the breach of or for damages or relief under this Agreement.

11.6   Independent Contractor Status. Centurion shall, at all times, be regarded as and shall be legally considered an independent contractor and shall at no time act as an agent for the MDOC. Nothing contained herein shall be deemed or construed by the MDOC, Centurion, or any third party as creating the relationship of principal and agent, master and servant, partners, joint ventures, employer and employee, or any similar such relationship between the MDOC and Centurion. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of the MDOC or Centurion hereunder creates, or shall be deemed to create a relationship other than the independent relationship of the MDOC and Centurion. Centurion's personnel shall not be deemed in any way, directly or indirectly, expressly or by implication, to be employees of the State. Neither Centurion nor its employees shall, under any circumstances, be considered servants, agents, or employees of the MDOC; and the MDOC shall be at no time legally responsible for any negligence or other wrongdoing by Centurion, its servants, agents, or employees. The MDOC shall not withhold from the contract payments to Centurion any federal or state unemployment taxes, federal or state income taxes, Social Security tax, or any other amounts for benefits to Centurion. Further, the MDOC shall not provide to Centurion any insurance coverage or other benefits, including Workers' Compensation, normally provided by the State for its employees.

11.7   Anti-Assignment/Subcontracting. Centurion acknowledges that it was selected by the MDOC to perform the services required hereunder based, in part, upon Centurion's special skills and expertise. Centurion shall not assign, subcontract or otherwise transfer this Agreement in whole or in part without the prior written consent of the MDOC, which the MDOC may, in its sole discretion, approve or deny without reason. Any attempted assignment or transfer of its obligations without such consent shall be null and void. No such approval by the MDOC of any subcontract shall



36

JEREMY 001372

be deemed in any way to provide for the incurrence of any obligation of the State in addition to the total fixed price agreed upon in this Agreement. Subcontracts shall be subject to the terms and conditions of this Agreement and to any conditions of approval that the MDOC may deem necessary. Subject to the foregoing, this Agreement shall be binding upon the respective successors and assigns of the Parties. Subject to the foregoing, MDOC recognizes that Centurion may subcontract portions of its duties set forth in this Agreement to subcontractors, and that unless the amount of such subcontract exceeds $25,000, no pre-approval of the subcontract by MDOC is required. Further, for the subcontractors identified by Centurion in its RFP Response, no pre-approval of the subcontract by MDOC is required.

11.8    Notice. All notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand, delivered by independent guaranteed overnight courier service, or mailed certified mail, return receipt requested, postage prepaid on the date posted, and addressed to the appropriate Party at the following address or such other address as may be given in writing by a Party to the other Party:

If to the MDOC:

Dr. Gloria Perry, Chief Medical Officer
Mississippi Department of Corrections
633 North State Street
Jackson, MS 39202

With a copy to:
Marshall Fisher, Commissioner
Mississippi Department of Corrections
633 North State Street
Jackson, MS 39202

If to Centurion:

Steven H. Wheeler, CEO
Centurion of Mississippi, LLC
1593 Spring Hill Road, Suite 610
Vienna, VA 22182

11.9    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws, provisions, and any litigation with respect thereto shall be brought in the courts of the State. Centurion shall comply with applicable federal, state and local laws and regulations.

11.10   Entire Agreement. This Agreement, together with the documents referenced in Article I above, constitutes the entire agreement of the Parties and is intended as a complete statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. No modification or amendment to this Agreement shall be binding upon the Parties unless the same is in writing and signed by the respective parties hereto.

37

JEREMY 001373

11.11  Waiver of Breach. No delay or omission by either party to this Agreement in exercising any right, power, or remedy hereunder or otherwise afforded by this Agreement, at law, or in equity shall constitute an acquiescence therein, impair any other right, power or remedy hereunder or otherwise afforded by any means, or operate as a waiver of such right, power, or remedy. No waiver by either party to this Agreement shall be valid unless set forth in writing by the party making said waiver. No waiver of or modification to any term or condition of this Agreement will void, waive, or change any other term or condition. No waiver by one party to this Agreement of a default by the other party will imply, be construed as or require waiver of future or other defaults.

11.12  Force Majeure. Each party shall be excused from performance for any period and to the extent that it is prevented from performing any obligation or service, in whole or in part, as a result of causes beyond the reasonable control and without the fault or negligence of such party and/or its subcontractors. Such acts shall include without limitation acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, earthquakes, floods, or other natural disasters ("force majeure events"). When such a cause arises, Centurion shall notify the MDOC immediately in writing of the cause of its inability to perform, how it affects its performance, and the anticipated duration of the inability to perform. Delays in delivery or in meeting completion dates due to force majeure events shall automatically extend such dates for a period equal to the duration of the delay caused by such events.

11.13  Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

11.14  Compliance with Laws. Centurion understands that the State is an equal opportunity employer and therefore maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, or any other consideration made unlawful by federal, state or local laws. All such discrimination is unlawful and Centurion agrees, during the term of the Agreement, that Centurion will strictly adhere to this policy in its employment practices and provision of services. Centurion shall comply with, and all activities under this Agreement shall be subject to, all applicable federal, state of Mississippi, and local laws and regulations, as now existing and as may be amended or modified by federal, state or local laws. Centurion shall comply with all court orders and agrees to provide medical care that meets all new requirements of state and federal law and the Eight Amendment to the United States Constitution.

11.15  Procurement Regulations. The Agreement shall be governed by the applicable provisions of the Personal Service Contract Review Board Rules and Regulations, a copy of which is available at 210 East Capitol Street, Suite 800, Jackson, Mississippi 39201 for inspection, or downloadable at http://www.mspb.ms.gov.

11.16  Contingent Fees. Centurion represents that it has not retained a person to solicit or secure a State contract upon an agreement or understanding for a

38

JEREMY 001374

commission, percentage, brokerage, or contingent fee, except as disclosed in the Centurion's bid or proposal.

11.17 Gratuities. Centurion represents that it has not violated, is not violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Personal Service Contract Review Board Rules and Regulations.

11.18 Amendments. Centurion and MDOC agree that the Agreement may be amended at any time, by mutual written agreement of the Parties.

11.19 Authority to Contract. Centurion warrants (a) that it is a validly organized business with valid authority to enter into this Agreement; (b) that it is qualified to do business and in good standing in the State of Mississippi; (c) that entry into and performance under this Agreement is not restricted or prohibited by any loan, security, financing, contractual, or other agreement of any kind, and (d) notwithstanding any other provision of this Agreement to the contrary, that there are no existing legal proceedings or prospective legal proceedings, either voluntary or otherwise, which may adversely affect its ability to perform its obligations under this Agreement.

11.20 Mississippi Employment Protection Act. Centurion represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act of 2008, and will register and participate in the status verification system for all newly hired employees. Mississippi Code Annotated Section 71-11-1 et seq. (1972, as amended). The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Centurion agrees to maintain records of such compliance. Upon request of the State, and after approval of the Social Security Administration or Department of Homeland Security when required, Centurion agrees to provide a copy of each such verification. Centurion further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws. Centurion understands and agrees that any breach of these warranties may subject Centurion to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license, permit, certification or other document granted to Centurion by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Centurion would also be liable for any additional costs incurred by the State due to contract cancellation or loss of license or permit.

11.21 Change in Scope of Work. The MDOC may order changes in the work consisting of additions, deletions, or other revisions within the general scope of the Agreement. No claims may be made by Centurion that the scope of the project or of Centurion's services has been changed, requiring changes to the amount of compensation to Centurion or other adjustments to the Agreement, unless such changes or adjustments

39

JEREMY 001375

have been made by written amendment to the Agreement signed by the MDOC and Centurion.

11.22 Stop Work Order. The Procurement Officer of MDOC, may, by written order to Centurion at any time, and without notice to any surety, require Centurion to stop all or any part of the work called for by this Agreement. This order shall be for a specified period not exceeding 90 days after the order is delivered to Centurion, unless the Parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, Centurion shall forthwith comply with its terms and take all reasonable steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the Parties shall have agreed, the Procurement Officer shall either:
- A. Cancel the stop work order; or,
- B. Terminate the work covered by such order as provided in the 'Termination for Default Clause' or the 'Termination for Convenience Clause' of this Agreement.

Cancellation or Expiration of the Order. If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, Centurion shall have the right to resume work. An appropriate adjustment shall be made in the delivery schedule or Centurion price, or both, and the Agreement shall be modified in writing accordingly, if:
- A. The stop work order results in an increase in the time required for, or in Centurion's cost properly allocable to, the performance of any part of this Agreement; and,
- B. Centurion asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage; provided that, if the Procurement Officer decides that the facts justify such action, any such claim asserted may be received and acted upon at any time prior to final payment under this Agreement.

11.23 Attorney's Fees and Expenses. Subject to other terms and conditions of this Agreement, in the event Centurion defaults in any obligations under this Agreement such that the State opts to terminate for cause and is successful in any legal challenge to said for cause termination, Centurion shall pay to the State all costs and expenses (including, without limitation, investigative fees, court costs, and attorney's fees) incurred by the State in defending the legal action regarding the termination of this Agreement. Centurion agrees that under no circumstances shall the State customer be obligated to pay any attorney's fees or costs of legal action to Centurion.

11.25 Centurion Personnel. The MDOC shall, throughout the life of the Agreement, have the right of reasonable rejection and approval of staff or subcontractors assigned to the work by Centurion. If the MDOC reasonably rejects staff or subcontractors, Centurion must provide replacement staff or subcontractors satisfactory to the MDOC in a timely manner and at no additional cost to the MDOC. The day-to-day supervision and control of Centurion's employees is the sole responsibility of Centurion.



40

11.26 E-Payment. Centurion agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. The MDOC agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," which generally provides for payment of undisputed amounts by the MDOC within forty-five (45) days of receipt of invoice. Miss. Code Ann. §31-7-305 (1972, as amended).

11.27 Oral Statements. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this Agreement. All modifications to the Agreement must be made in writing by the MDOC and agreed to by Centurion.

11.28 Recovery of Money. Whenever, under the Agreement, any sum of money shall be recoverable from or payable by Centurion to MDOC, the same amount may be deducted from any sum due to Centurion under the Agreement. The rights of MDOC are in addition and without prejudice to any other right MDOC may have to claim the amount of any loss or damage suffered by MDOC on account of the acts or omissions of Centurion.

11.29 Third Party Action Notification. Centurion shall give MDOC prompt notice in writing of any action or suit filed, and prompt notice of any claim made against Centurion by any entity that may result in litigation related in any way to this Agreement.

11.30 Transparency. This Agreement, including any accompanying exhibits, attachments, and appendices, is subject to the "Mississippi Public Records Act of 1983", and its exceptions. See Miss. Code Ann. §§ 25-61-1 *et seq.*, (1972, as amended) and Miss. Code Ann. §§ 79-23-1 (1972, as amended). In addition, this Agreement is subject to the provisions of the Mississippi Accountability and Transparency Act of 2008. Miss Code Ann. §§ 27-104-151 *et seq.* (1972 as amended). Unless exempted from disclosure due to a court-issued protective order, a copy of this executed contract is required to be posted to the Department of Finance and Administration's independent agency contract website for public assess at http://www.transparency.mississippi.gov. Information identified by Centurion as trade secrets, or other proprietary information, including confidential Centurion information, or any other information which is required confidential by state or federal law or outside the applicable freedom of information statutes, will be redacted.

41

JEREMY 001377

IN WITNESS WHEREOF, the Parties hereto have caused their duly appointed representatives to set their hands and seals hereto as of the day and year first above written.

MISSISSIPPI DEPARTMENT OF CORRECTIONS

Attest:

*[signature]*
Chief of Staff

By: *[signature]*

Title: Commissioner

CENTURION OF MISSISSIPPI, LLC

Attest *[signature]*

John Campbell EVP & CFO

By: *[signature]*

Steven H. Wheeler

Title: Chief Executive Officer

42

JEREMY 001378

ATTACHMENT B

To July 1, 2016 Agreement between Mississippi Department of Corrections and Centurion of Mississippi, LLC for Onsite Inmate Health Services

JEREMY 001379

# Amendment One

In addition to the terms and conditions set forth in the original agreement between the State of Mississippi Department of Corrections and Centurion of Mississippi, LLC for onsite inmate health services effective July 1, 2016 through June 30, 2019, the following Amendment One is made part of the original agreement.

*Effective July 1, 2019,* both parties agree to enact the option to renew the Agreement for an additional year. The election of the optional renewal shall extend the end date of this agreement to June 30, 2020.

*Effective July 1, 2019,* both parties agree to add the following to Section 7.2.1:

> Contract Section 7.2.2 and RFP Sections 4.3 and 4.24.2(1) allowed an optional price adjustment not to exceed the medical consumer price index for the Mississippi area and requiring mutual agreement. Pursuant to the Consumer Price Index for All Urban Consumers (CPI-U) for the Southern Region for January 2019, prices for medical care professional services rose two percent (2%) over the past year (January 2018-2019). Therefore, MDOC will compensate Centurion for the services agreed to under Amendment One (year four of the contract) at a per diem rate of $█████ per inmate up to a Base ADP and at a reduced per diem rate of █████ per inmate for any difference in the actual ADP above the Base ADP.

> Although MDOC shall be financially responsible for all other specialty care services, specifically all Hepatitis C medications, specialty medications for bleeding disorders, and HIV medication cost in excess of those set forth in the second paragraph of Section 7.2.1 of the agreement, the Contractor may provide such items at cost to MDOC as long as said provision meets the State's needs without sacrifice of economy or services and is a demonstrated cost savings to the State annually. MDOC will perform a cost comparison of the individual rates and cost of same items provided by the Contractor to those provided to the State via the DFA OPTFM contract, Morris & Dickson Company Cooperative Agreement for Pharmaceuticals (MMCAP). Provision of Contractor's rates are required annually congruent with the contract renewal determination. If the Contractor's rates and cost are determined not to be in the best interest of the State, MDOC shall cancel in whole or in part the Contractor's provision of Hepatitis C medications, specialty medications for bleeding disorders, and HIV medication cost in excess of those set forth in the second paragraph of Section 7.2.1 of the agreement.

*Effective July 1, 2019,* in accordance with the Public Procurement Review Board Office of Personal Service Contract Review Rules and Regulations (effective May 2018), both parties agree that the following amended/added to the agreement:

Section 1.1, Governing Documents. This Contract, any amendments thereto, and all exhibits (Exhibits A through E) to this Contract constitute the entire agreement of the parties with respect to the subject matter contained herein and supersedes or replaces any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto.

Second paragraph of Section 7.2, Compensation. Payments by state agencies using the State's accounting system shall be made and remittance information provided electronically as directed by the State. These payments shall be deposited into the bank account of Contractor's choice. The State may, at its sole discretion, require Contractor to electronically submit invoices and supporting documentation at any time

during the term of this Agreement. Contractor understands and agrees that the State is exempt from the payment of taxes. All payments shall be in United States currency.

Section 11.2, _Confidentiality._ Notwithstanding any provision to the contrary contained herein, it is recognized that MDOC is a public agency of the State of Mississippi and is subject to the Mississippi Public Records Act. Mississippi Code Annotated §§ 25-61-1 et seq. If a public records request is made for any information provided to MDOC pursuant to the agreement and designated by the Contractor in writing as trade secrets or other proprietary confidential information, MDOC shall follow the provisions of Mississippi Code Annotated §§ 25-61-9 and 79-23-1 before disclosing such information. The MDOC shall not be liable to the Contractor for disclosure of information required by court order or required by law.

Section 11.8, _Notices._ All notices required or permitted to be given under this agreement must be in writing and personally delivered or sent by certified United States mail, postage prepaid, return receipt requested, to the party to whom the notice should be given at the address set forth below. Notice shall be deemed given when actually received or when refused. The parties agree to promptly notify each other in writing of any change of address.

For Contractor: Steven H. Wheeler, CEO
             Centurion of Mississippi, LLC
             1593 Spring Hill Road, Suite 610
             Vienna, VA 22182

For the agency: Dr. Gloria Perry, Chief Medical Officer
             Mississippi Department of Corrections
             633 North State Street Jackson, MS 39202

With a copy to: Pelicia E. Hall, Commissioner
             Mississippi Department of Corrections
             633 North State Street Jackson, MS 39202

Section 11.9, _Applicable Law._ The contract shall be governed by and construed in accordance with the laws of the State of Mississippi, excluding its conflicts of laws provisions, and any litigation with respect thereto shall be brought in the courts of the State. Contractor shall comply with applicable federal, state, and local laws and regulations.

Section 11.10, _Entire Agreement._ This amendment and the original agreement, including all contract documents, represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations or agreements, irrespective of whether written or oral. This agreement may be altered, amended, or modified only by a written document executed by the State and Contractor. Contractor acknowledges that it has thoroughly read all contract documents and has had the opportunity to receive competent advice and counsel necessary for it to form a full and complete understanding of all rights and obligations herein. Accordingly, this agreement shall not be construed or interpreted in favor of or against the State or Contractor on the basis of draftsmanship or preparation hereof.

Section 11.14, _Compliance with Law._ Contractor understands that the [State] is an equal opportunity employer and therefore, maintains a policy which prohibits unlawful discrimination based on race, color, creed, sex, age, national origin, physical handicap, disability, genetic information, or any other

2

consideration made unlawful by federal, state, or local laws. All such discrimination is unlawful and Contractor agrees during the term of the agreement that Contractor will strictly adhere to this policy in its employment practices and provision of services. Contractor shall comply with, and all activities under this agreement shall be subject to, all applicable federal, State of Mississippi, and local laws and regulations, as now existing and as may be amended or modified.

Section 11.15, Procurement Regulations. The contract shall be governed by the applicable provisions of the Mississippi Public Procurement Review Board Office of Personal Service Contract Review Rules and Regulations, a copy of which is available at 501 North West Street, Suite 701E, Jackson, Mississippi 39201 for inspection, or downloadable at http://www.DFA.ms.gov.

Section 11.17, Representation Regarding Gratuities. The bidder, offeror, or Contractor represents that it has not violated, is not violating, and promises that it will not violate the prohibition against gratuities set forth in Section 6-204 (Gratuities) of the Mississippi Public Procurement Review Board Office of Personal Service Contract Review Rules and Regulations.

Section 11.22, Stop Work Order.
1) *Order to Stop Work:* The Chief Procurement Officer, may, by written order to Contractor at any time, and without notice to any surety, require Contractor to stop all or any part of the work called for by this contract. This order shall be for a specified period not exceeding 90 days after the order is delivered to Contractor, unless the parties agree to any further period. Any such order shall be identified specifically as a stop work order issued pursuant to this clause. Upon receipt of such an order, Contractor shall forthwith comply with its terms and take all reasonable steps to minimize the occurrence of costs allocable to the work covered by the order during the period of work stoppage. Before the stop work order expires, or within any further period to which the parties shall have agreed, the Chief Procurement Officer shall either:
   a. cancel the stop work order; or,
   b. terminate the work covered by such order as provided in the Termination for Default clause or the Termination for Convenience clause of this contract.
2) *Cancellation or Expiration of the Order:* If a stop work order issued under this clause is canceled at any time during the period specified in the order, or if the period of the order or any extension thereof expires, Contractor shall have the right to resume work. An appropriate adjustment shall be made in the delivery schedule or Contractor price, or both, and the contract shall be modified in writing accordingly, if:
   a. the stop work order results in an increase in the time required for, or in Contractor's cost properly allocable to, the performance of any part of this contract; and,
   b. Contractor asserts a claim for such an adjustment within 30 days after the end of the period of work stoppage; provided that, if the Chief Procurement Officer decides that the facts justify such action, any such claim asserted may be received and acted upon at any time prior to final payment under this contract.
3) *Termination of Stopped Work:* If a stop work order is not canceled and the work covered by such order is terminated for default or convenience, the reasonable costs resulting from the stop work order shall be allowed by adjustment or otherwise.
4) *Adjustments of Price:* Any adjustment in contract price made pursuant to this clause shall be determined in accordance with the Price Adjustment clause of this contract.

Section 11.26, E-payment. Contractor agrees to accept all payments in United States currency via the State of Mississippi's electronic payment and remittance vehicle. The agency agrees to make payment in

*VcK*

3

accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies," which generally provides for payment of undisputed amounts by the agency within forty-five (45) days of receipt of Invoice. Mississippi Code Annotated § 31-7-301 et seq..

Section 11.31, Approval. It is understood that if this contract requires approval by the Public Procurement Review Board and/or the Mississippi Department of Finance and Administration Office of Personal Service Contract Review and this contract is not approved by the PPRB and/or OPSCR, it is void and no payment shall be made hereunder.

Section 11.32, Trade Secrets, Commercial and Financial Information. It is expressly understood that Mississippi law requires that the provisions of this contract which contain the commodities purchased or the personal or professional services provided, the price to be paid, and the term of the contract shall not be deemed to be a trade secret or confidential commercial or financial information and shall be available for examination, copying, or reproduction.

Section 11.33, Termination for Convenience.
1) *Termination.* The Agency Head or designee may, when the interests of the State so require, terminate this contract in whole or in part, for the convenience of the State. The Agency Head or designee shall give written notice of the termination to Contractor specifying the part of the contract terminated and when termination becomes effective.
2) *Contractor's Obligations.* Contractor shall incur no further obligations in connection with the terminated work and on the date set in the notice of termination Contractor will stop work to the extent specified. Contractor shall also terminate outstanding orders and subcontracts as they relate to the terminated work. Contractor shall settle the liabilities and claims arising out of the termination of subcontracts and orders connected with the terminated work. The Agency Head or designee may direct Contractor to assign Contractor's right, title, and interest under terminated orders or subcontracts to the State. Contractor must still complete the work not terminated by the notice of termination and may incur obligations as are necessary to do so.

Section 11.34, Termination for Default.
1) *Default.* If Contractor refuses or fails to perform any of the provisions of this contract with such diligence as will ensure its completion within the time specified in this contract or any extension thereof, or otherwise fails to timely satisfy the contract provisions, or commits any other substantial breach of this contract, the Agency Head or designee may notify Contractor in writing of the delay or nonperformance and if not cured in ten (10) days or any longer time specified in writing by the Agency Head or designee, such officer may terminate Contractor's right to proceed with the contract or such part of the contract as to which there has been delay or a failure to properly perform. In the event of termination in whole or in part, the Agency Head or designee may procure similar supplies or services in a manner and upon terms deemed appropriate by the Agency Head or designee. Contractor shall continue performance of the contract to the extent it is not terminated and shall be liable for excess costs incurred in procuring similar goods or services.
2) *Contractor's Duties.* Notwithstanding termination of the contract and subject to any directions from the Chief Procurement Officer, Contractor shall take timely, reasonable, and necessary action to protect and preserve property in the possession of Contractor in which the State has an interest.
3) *Compensation.* Payment for completed services delivered and accepted by the State shall be at the contract price. The State may withhold from amounts due Contractor such sums as the Agency Head or designee deems to be necessary to protect the State against loss because of outstanding liens or



claims of former lien holders and to reimburse the State for the excess costs incurred in procuring similar goods and services.

4) *Excuse for Nonperformance or Delayed Performance.* Except with respect to defaults of subcontractors, Contractor shall not be in default by reason of any failure in performance of this contract in accordance with its terms (including any failure by Contractor to make progress in the prosecution of the work hereunder which endangers such performance) if Contractor has notified the Agency Head or designee within 15 days after the cause of the delay and the failure arises out of causes such as: acts of God; acts of the public enemy; acts of the State and any other governmental entity in its sovereign or contractual capacity; fires; floods; epidemics; quarantine restrictions; strikes or other labor disputes; freight embargoes; or unusually severe weather. If the failure to perform is caused by the failure of a subcontractor to perform or to make progress, and if such failure arises out of causes similar to those set forth above, Contractor shall not be deemed to be in default, unless the services to be furnished by the subcontractor were reasonably obtainable from other sources in sufficient time to permit Contractor to meet the contract requirements. Upon request of Contractor, the Agency Head or designee shall ascertain the facts and extent of such failure, and, if such officer determines that any failure to perform was occasioned by any one or more of the excusable causes, and that, but for the excusable cause, Contractor's progress and performance would have met the terms of the contract, the delivery schedule shall be revised accordingly, subject to the rights of the State under the clause entitled (in fixed-price contracts, "Termination for Convenience," in cost-reimbursement contracts, "Termination"). (As used in this Paragraph of this clause, the term "subcontractor" means subcontractor at any tier).

5) *Erroneous Termination for Default.* If, after notice of termination of Contractor's right to proceed under the provisions of this clause, it is determined for any reason that the contract was not in default under the provisions of this clause, or that the delay was excusable under the provisions of Paragraph (4) (Excuse for Nonperformance or Delayed Performance) of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the State, be the same as if the notice of termination had been issued pursuant to such clause.

6) *Additional Rights and Remedies.* The rights and remedies provided in this clause are in addition to any other rights and remedies provided by law or under this contract.

Section 11.34, Termination upon Bankruptcy. This contract may be terminated in whole or in part by MDOC upon written notice to Contractor, if Contractor should become the subject of bankruptcy or receivership proceedings, whether voluntary or involuntary, or upon the execution by Contractor of an assignment for the benefit of its creditors. In the event of such termination, Contractor shall be entitled to recover just and equitable compensation for satisfactory work performed under this contract, but in no case shall said compensation exceed the total contract price.

All other terms and conditions of the original agreement not in conflict of this amendment shall remain in full force and effect.

√ct
5

JEREMY 001384

In witness whereof, the Parties hereto have caused their duly appointed representatives to set their hands and seals hereto on the date indicated below.

**Mississippi Department of Corrections:**

_____
Date  4/17/19

By: _____

Title: Commissioner

**Centurion of Mississippi, LLC:**

6/4/2019
Date

By: _____

Steven H. Wheeler

Title: Chief Executive Officer

REVIEWED BY MDOC LEGAL COUNSEL

JUN 17 2019

APPROVED FOR SIGNATURE

ATTACHMENT C

To July 1, 2016 Agreement between Mississippi Department of Corrections and Centurion of Mississippi, LLC for Onsite Inmate Health Services

**Amendment Two**

**To the Agreement By and Between**

**State of Mississippi Department of Corrections**

**And**

**Centurion of Mississippi, LLC**

In addition to the terms and conditions set forth in the original agreement between the State of Mississippi Department of Corrections ("MDOC") and Centurion of Mississippi, LLC ("Centurion") for onsite inmate health services effective July 1, 2016, through June 30, 2019 ("Agreement") and Amendment One, the following Amendment Two is made part of the original Agreement.

*Effective* July 1, 2020, both Parties agree to renew the Agreement for an additional six (6) months. Either party may terminate the Agreement for convenience by providing the other party with at least ninety (90) day written notice.

Pursuant to section 7.2.1 of the Agreement and Amendment One, the Parties mutually agree to a price adjustment. MDOC will compensate Centurion for services agreed to under Amendment Two ( year five of the contract) at a per diem rate of ▮▮▮ per inmate per day up to the Base ADP and at a reduced per diem rate of ▮▮▮ per inmate per day for any difference in the actual ADP above the Base ADP.

All other terms and conditions of the original Agreement and Amendment One not in conflict of this Amendment Two shall remain in full force and effect.



In witness whereof, the Parties hereto have caused their duly appointed representatives to set their hands and seals hereto on the date indicated below.

**Mississippi Department of Corrections:**

6/30/2020
Date

By: _____
Title: Commissioner

**Centurion of Mississippi, LLC:**

6/30/2020
Date

By: _____
Steven H. Wheeler
Title: Chief Executive Officer

Approved by: _____ 6/30/2020
Karel McDonald
Deputy Commissioner Admin. & Finance

REVIEWED BY MDOC LEGAL COUNSEL

JUN 3 0 2020

APPROVED FOR SIGNATURE

√cf
2

## *Amendment to Service Agreement No. 1*

### Mississippi Department Of Corrections

WHEREAS, on August 12, 2020 a Service Agreement (the "Agreement") was entered into by and among Mississippi Department of Corrections (MDOC) and VitalCore Health Strategies, LLC, (VitalCore) to provide Health Care Services to the inmates within the Mississippi Department of Corrections facilities. The Agreement, by its terms, provides for amendment upon the written agreement of all parties; and

WHEREAS, Effective October 12, 2020, in accordance with the Public Procurement Review Board Office of Personal Service Contract Review Rules and Regulations (effective May 2018), both parties agree that the following be amended/added to the agreement;

WHEREAS, MDOC and VitalCore wish to amend that agreement to include additional services and funding for four (4) positions to provide the technical work supporting, scheduling and monitoring of offsite health care services and appointments for the inmates within the MDOC system;

IT IS THEREFORE AGREED:

1.  Contract Obligations – In addition to the terms and conditions set forth in the original agreement between MDOC and VitalCore, effective October 12, 2020, VitalCore shall be responsible for setting up and monitoring offsite healthcare appointments and hospitalizations. It shall remain the responsibility of MDOC to provide payment for said services.

2.  Payment of Services – Effective October 12, 2020, the payment for staffing services will increase from ▆▆▆ per inmate per day to ▆▆▆ per inmate per day.

3.  Staffing – To promote offsite patient service stabilization, the staffing plan is hereby increased to include:

    a.  4.0 FTE (40 hours) LPNs

In witness whereof, the parties have signed this instrument.

Executed this the ___ day of October_____, 2020.

_____                Date: ___10/5/2020___

Viola Riggin
CEO-Co-Owner
VitalCore Health Strategies, LLC

_____                Date: ___10/5/2020___

Burl Cain,
Commissioner
Mississippi Department of Corrections

_____                Date: ___10/5/2020___

Karel McDonald
Deputy Commissioner, Finance
Mississippi Department of Corrections

JEREMY 001389

Employees to Transition to VitalCore

Positions to move to VitalCore and MDOC pays for them
if addendum to contract can be done

| | Rate/Hr | Hrs | Weekly | Annual | MDOC SS/Med | Total |
|---|---|---|---|---|---|---|
| Specialty Care Coordinator Nurses (LPN) | | | | | | |



|  |  | $ | 128,167.23 |
|---|---|---|---|

Hospital Utilization Nurses (LPN)



|  | 114,866.86 |
|---|---|

Total positions and $'s to reimburse VitalCore   $   243,034.08


Total positions and $'s to reimburse VitalCore

| Total positions and $'s to reimburse VitalCore | $ | 243,034.08 |
|---|---|---|
| Original Price of Contract 17,300 inmates x $8.53 per inmate per day | | $53,862,685.00 |
| With additional 4 FTE | $ | 54,105,719.08 |
| Per inmate Per year new calculation | $ | 3,127.50 |
| Per inmate Per Day new Calculation | $ | 8.57 |

JEREMY 001390



## _Amendment to Service Agreement No. 2_

### Mississippi Department Of Corrections

WHEREAS, on August 12, 2020 a Service Agreement (the "Agreement") was entered into by and among Mississippi Department of Corrections (MDOC) and VitalCore Health Strategies, LLC, (VitalCore) to provide Health Care Services to the inmates within the Mississippi Department of Corrections facilities. The Agreement, by its terms, provides for amendment upon the written agreement of all parties; and

WHEREAS, MDOC and VitalCore wish to amend that agreement to include services and funding sixteen (16) positions to provide the technical work supporting CMA services for CMCF to provide additional coverage for the separation from one clinic to four clinic medication administration sites at CMCF. This staff shall provide medication administration services for the inmates within the MDOC system;

WHEREAS, MDOC and VitalCore wish to amend that agreement to include services and funding two (2) positions to provide the technical work supporting the scheduling, approving, processing, cleaning, and registering all health care offsite service claims for inmates receiving care outside of the MDOC facilities. The payments for these billable offsite services will remain the responsibility of the MDOC. Claims will be submitted to the MDOC for payment processing within 15 days receipt of a clean claim from the vendor.

WHEREAS, MDOC and VitalCore wish to amend that agreement to include an extension of performance of all comprehensive services by VitalCore in accordance with the original Agreement dated August 12, 2020 and the first amendment to the Agreement dated October 4, 2020, and this Amendment No 2. That extension shall include funding for eighteen new positions outlined in this Agreement to provide the technical work supporting CMA services for CMCF to provide additional coverage for the separation from one clinic to four clinic medication administration sites at CMCF. This staff shall provide medication administration services for the inmates within the MDOC system. And, the full responsibility of the claims processing for inmate offsite healthcare services

IT IS THEREFORE AGREED:

1. <u>Contract Obligations</u> – This amendment only amends the addition of responsibility (VitalCore's set up and monitoring of offsite health service claims and the addition of 18 FTE) and the annual 5% increase customary to this contract, and does not in any way change any other language or term of the original contract dated, August 12, 2020.

2. <u>Payment of Services</u> – Effective July 1, 2021, the payment will increase for services outlined in this Amendment and the Original Agreement from ▓▓▓ per inmate per day to ▓▓▓▓ per inmate per day.

3. ~~<u>Rtension of the Original Agreement</u> This Amendment extends the Agreement date from October 5, 2021, to September 30, 2022. This date of extension is subject to change with a 90 day written notice from MDOC to VitalCore.~~

4. <u>Staffing</u> - Staffing increase to promote onsite medication administration stabilization and the claims processing staff include:

   a. 16.0 FTE (40 hours per FTE) CMA's at CMCF
   b. 2.0 FTE (40 hours per FTE) Administrative Claims Processing staff

JEREMY 001391

IN WITNESS WHEREOF, the parties have signed this instrument.


_____                Date: ___7/27/2021_____

Viola Riggin
CEO-Co-Owner
VitalCore Health Strategies, LLC


_____                Date: _2/23/21_____

Burl Cain,
Commissioner
Mississippi Department of Corrections


_____                Date: ___2/23/21_____

Karel McDonald
Deputy Commissioner, Finance
Mississippi Department of Corrections


VCt
2 | P a g e

JEREMY 001392

C#: 8400002010

SECOND EMERGENCY AGREEMENT
BETWEEN MISSISSIPPI DEPARTMENT OF CORRECTIONS
AND VITALCORE HEALTH STRATEGIES, LLC
FOR ONSITE INMATE HEALTH CARE SERVICES

THIS SECOND EMERGENCY AGREEMENT ('Second Agreement") is entered into as of this
the 5th day of October, 2021 by and between the Mississippi Department of Corrections (hereinafter
referred to as "MDOC") and VitalCore Health Care Strategies, LLC ("VitalCore"). The MDOC and
VitalCore are sometimes referred to herein collectively as the "Parties" or individually as "Party."

WITNESSETH:

WHEREAS, the MDOC is responsible for the care and control of inmates within its custody,
whether incarcerated in state correctional facilities, county regional facilities or privately operated
facilities; and

WHEREAS, on July 1, 2016 the MDOC entered into an agreement ("Original Agreement") with
Centurion of Mississippi, LLC ("Centurion") through RFP No. 16-009 to provide or arrange for the
provision of medical, dental, pharmacy and mental health services for inmates in its custody at the
following facilities: Mississippi State Penitentiary ("MSP") at Parchman, Mississippi; Central Mississippi
Correctional Facility ("CMCF"), and Youthful Offender Unit ("YOU"), at Rankin County, Mississippi,
South Mississippi Correctional Institute ("SMCI"), at Leakesville, East Mississippi Correctional Facility
("EMCF"), at Meridian, Wilkinson County Correctional Facility ("WCCF") at Woodville, Walnut Grove
Correctional Facility ("WGCF") at Walnut Grove, and Marshall County Correctional Facility ("MCCF")
at Holly Springs, (known as the "Facilities"). The Original Agreement also included responsibilities for
services at MDOC's fifteen County Regional Sites, seventeen Community Work Centers; and for
minimum security inmates residing at the three male Restitution centers, and the Governor's Mansion
(collectively known as the "Satellite Facilities" and Individually as a "Satellite Facility)"; and

WHEREAS, the Original Agreement was amended on June 17, 2019 and June 30, 2020; and

WHEREAS, on July 7, 2020 Centurion gave ninety (90) days written notice of termination of the
Original Agreement.; and

WHEREAS, due to the short notice of termination, MDOC was faced with the limitations and
risks of being without a vendor to provide healthcare services as outlined in the Original Agreement and
lacked sufficient time to conduct a fair and competitive procurement process to establish an alternate
vendor; and

WHEREAS, on October 6, 2020 MDOC and VitalCore entered an Emergency Agreement ("First
Agreement") for Onsite Inmate Healthcare Services; and

WHEREAS, the First Agreement was amended on October 5, 2021 and July 27, 2021.

NOW THEREFORE, in consideration of mutual covenants and agreements contained herein, the
"Parties" agree as follows:

ARTICLE I THROUGH ARTICLE XI. INCORPORATION OF PREVIOUS TERMS – Article I through
Article XI of the Original Agreement between MDOC and Centurion, dated July 1, 2016, Amendment
Number 1 dated June 17, 2019 and Amendment Number 2 dated June 30, 2020 are hereby made part of,

1

and incorporated into this Second Agreement. Except as provided herein below, MDOC and VitalCore agree to honor those ARTICLES as written.

ARTICLE XII. NON-WAIVER OF BIDDING RIGHTS - VitalCore shall have the right to offer a competitive proposal on any RFP for inmate healthcare services released by the MDOC without any prejudice or penalty brought on by the signing of this Second Agreement between the Parties.

ARTICLE XIII. PAYMENT STRUCTURE – Notwithstanding ARTICLE VII COMPENSATION, MDOC agrees to compensate Vital Core at an increased per diem rate of $8.902568 per inmate per day up to a Base ADP (guaranteed population floor) of 17,300 inmates.

Subsequently, VitalCore and MDOC agree to re-evaluate the payment structure and negotiate an appropriate per inmate per day payment if the cost of healthcare, administration, and litigation defense services exceeds the monthly payment.

ARTICLE XIV. LIMITS OF LIABILITY VitalCore shall not be responsible for any work product, grievance, litigation, liability, debt, nor any other inmate health care processes prior to midnight October 5, 2020. However, VitalCore understands that litigation for declaratory and injunctive relief is pending, and that VitalCore's obligations, duties and responsibilities under this section include, but are not limited to, the duty to defend and indemnify MDOC and its officials and employees in *Amos v. Taylor*, 4:20-CV-07-DMB-JMV (N.D. Miss.) and *Lang v. Taylor*, 4:20-CV-00030-DMB-RP (N.D. Miss.) after October 6, 2020. VitalCore shall be responsible for any work product, grievance, litigation, liability, debt, or any other inmate health care process based upon its performance of the Original Agreement after October 6, 2020, pursuant to Article X of the Agreement with Centurion.

ARTICLE XV TERM. Notwithstanding ARTICLE VIII TERM AND TERMINATION, of the Original Agreement, VitalCore and MDOC agree to provide Onsite Inmate Health Care Services beginning October 6, 2021 and ending October 5, 2022.

ARTICE XVI PERSONNEL. Notwithstanding ARTICLE II HEALTHCARE AND RELATED SERVICES, Section 2.3 Personnel of the Original Agreement, Vital Core shall be responsible for setting up and monitoring offsite healthcare appointments and hospitalizations. It shall remain the responsibility of MDOC to provide payment for said services. To promote offsite patient service stabilization, the staffing plan is hereby increase to include 4.0 FTE (40 hours) LPNs.

Vital Core shall also be responsible for setting up and monitoring offsite health service claims and the addition of 18 FTE.

2

JEREMY 001394

IN WITNESS WHEREOF, the Parties hereto have caused their duly appointed representatives to set forth hands and seals hereto as of the day and year first above written.

ATTEST:

_____
TITLE: Exec. Dep. Commissioner

_____
DATE  10/4/21

MISSISSIPPI DEPARTMENT OF CORRECTIONS

BY: _____
BURL CAIN, COMMISSIONER

_____
10/04/21
DATE

ATTEST:

_____
TITLE: President of Administration

10/12/2021
DATE

VITALCORE HEALTH STRATEGIES, LLC

BY: _____
VIOLA RIGGINS, CEO-CO-OWNER

10/12/2021
DATE

3