JACOB VIGLIANTE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**EXHIBIT 12**

ANGELA RUSSELL, AS ADMINISTRATRIX
OF THE ESTATE OF JEREMY T. RUSSELL
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JEREMY T. RUSSELL           PLAINTIFF

VS.                       CASE NO. 3:22-cv-294-HTW-LGI

MANAGEMENT & TRAINING CORPORATION;
MICHAEL MCCLINTON; ASHLEY RAY;
MARCUS ROBINSON; ROXIE WALLACE;
JACOB VIGLIANTE; JOHN AND JANE DOE
CORRECTIONAL OFFICERS;
VITALCORE HEALTH STRATEGIES, LLC;
EVELYN DUNN; STACEY KITCHENS;
WILLIAM BRAZIER; and
JOHN AND JANE DOE MEDICAL PROVIDERS          DEFENDANTS


DEPOSITION OF JACOB VIGLIANTE

taken on Wednesday, January 11, 2023,
commencing at approximately 2:36 P.M.
at East Mississippi Correctional Facility
10641 Highway 80 West
Meridian, Mississippi


*****CONFIDENTIAL*****


REPORTED BY:  CYNTHIA HARRIS, RPR, CCR #1828
              SOUTHERN STENO REPORTERS
              3541 Highway 13 South
              Morton, MS 39117
              601-507-0849
              cynthiaharr@att.net

CONFIDENTIAL

```
 1                        APPEARANCES
 2
 3    GRAFTON E. BRAGG, ESQ.
      grafton@graftonbragglaw.com
 4    BRAGGLAW, PLLC
      1060 East County Line Road, Suite 3A-120
 5    Ridgeland MS 39157
      COUNSEL FOR PLAINTIFF
 6
 7
 8    R. JARRAD GARNER, ESQ.
      jarrad.garner@arlaw.com
 9    RAY A. YOUNG, JR., ESQ. (VIA ZOOM)
      ADAMS AND REESE, LLP
10    300 Renaissance
      1018 Highland Colony Parkway, Suite 800
11    Ridgeland, MS 39157
      COUNSEL FOR MANAGEMENT & TRAINING CORPORATION,
12    MICHAEL MCCLINTON, ASHLEY RAY, AND MARCUS ROBINSON
13
14
15    MICHAEL D. CHASE, ESQ. (VIA ZOOM)
      mchase@mitchellmcnutt.com
16    MITCHELL, MCNUTT & SAMS
      105 South Front Street
17    Tupelo, MS 38804
      COUNSEL FOR VITALCORE HEALTH STRATEGIES, LLC;
18    EVELYN DUNN; STACEY KITCHENS; AND WILLIAM BRAZIER
19
20
21    ALSO APPEARING VIA ZOOM:   JAMISON WILKINSON
22
23
24
25
```

CONFIDENTIAL

1           MR. GARNER:  Object to the form.
2      BY MR. BRAGG:
3           Q.   Let's make this a little more specific.  In
4      October of 2021, Jeremy was in camp support; correct?
5           A.   Yes.
6           Q.   He had been in suicide watch, but on the 7th,
7      he was in camp support?
8           A.   Yes.
9           Q.   He did not have a suicide smock when he was in
10     camp support; is that right?
11          A.   To my knowledge, yes.  I wasn't there that
12     day, but on the 7th, I was in --
13          Q.   And, to your knowledge, he didn't have a
14     suicide blanket; is that correct?
15          A.   Yes.  To my knowledge, yes.
16          Q.   Could he have been given those things, even
17     though he wasn't in suicide watch, even though he was
18     in camp support?
19          A.   Only if medical determined that he needed to
20     be on the suicide watch, and he would have been placed
21     in the medical department.
22          Q.   Okay.  He would not have been in camp support?
23          A.   If he was on any type of suicide watch by
24     VitalCore, he would have been -- on an acute suicide
25     watch, he would have been in medical, which is a one

CONFIDENTIAL                                              Page 34

1   BY MR. BRAGG:
2       Q.   -- Exhibit 2.  And do you recognize that
3   document?
4       A.   Yes.
5       Q.   I'm just going to come over here and look at
6   it with you, if you don't mind.
7       You see the control room there?  It's got a "C" on
8   that from Major McClinton.  You see that?
9       A.   Uh-huh.
10      Q.   And so this document, is it a diagram of the
11  camp support housing area?
12      A.   Yes.
13      Q.   And then do you agree that where Major
14  McClinton marked the "C" is the control room?
15      A.   Yes.
16      Q.   Can you hear what's going in the camp support
17  area from the control room?
18      A.   Any dayroom activity, yes.
19      Q.   Any what?
20      A.   Dayroom activity.
21      Q.   Okay.  Any dayroom activity.
22      A.   Uh-huh.
23      Q.   And the dayroom - I should have been using
24  that word all along - that just refers to what I'm
25  calling the --

CONFIDENTIAL

Page 35

```
 1      A.   Common area.
 2      Q.   -- camp support area.  The common area.
 3   Could you hear what was going on in cells?
 4      A.   Not necessarily all the time.
 5      Q.   In between the housing control and any of the
 6   cells, is there any sound barrier?
 7      A.   Well, you have -- you know, you have your
 8   windows and your walls and stuff in there, so,
 9   obviously, yes.
10      Q.   So those are windowed and walled off?
11      A.   Yeah.  You have -- you know, you're sitting
12   down, and it's cemented off here.  And then you have,
13   what, probably a window the size of maybe that picket
14   -- I mean, that TV throughout the front.
15      Q.   Okay.  So there is a barrier.
16      If an inmate were on suicide watch, there would
17   always be an officer who could hear everything that
18   was happening with the inmate?
19      A.   If it's on the acute and one-on-one, yeah, you
20   would have a person sitting in front of them at all
21   times.
22      Q.   What about non-acute?
23      A.   You would just have -- you would be in
24   medical, which is limited property, but you would
25   still be in the medical department.
```

CONFIDENTIAL

Page 44

```
 1        Q.   Okay.  Do you recall the last conversation
 2   that you had with him before he died?
 3        A.   No, not anything specific, anything like that,
 4   no.
 5        Q.   Do you recall when it was in relation to when
 6   he died?  It wasn't the day of.
 7        A.   No, it wasn't the day of.  I was not here; I
 8   was not present.  I just -- I know just checking on
 9   him because me and the mother had conversation.  So I
10   can't give you the exact date or the time frame, but I
11   was kind of just checking on him because I know the
12   mother was nervous about him.
13        Conversations - "Are you okay?"
14        "Yeah, I'm fine."
15        "Do you need to talk about anything?"
16        "No, I'm okay.  I'm good."
17        "Okay.  I'm kind of just checking on you.  You
18   know, talking to your mom.  I'm just making sure
19   you're okay."
20        "Okay, sir."
21        And that was it, and I would kind of relay the
22   message back to the mom.  But I couldn't really tell
23   you dates, sir.
24        Q.   I understand.
25             (Exhibit 27 marked for identification.)
```

1    A.    Yes, sir, that's what it is.
2    Q.    And that's when you responded and explained
3  where he was and that you had spoken to her several
4  times?
5    A.    That's correct.
6    Q.    After you received this e-mail from Ronald
7  King, did you go check on Jeremy Russell again?
8    A.    I do not recall.
9    Q.    Okay.  Do you know if anyone did?
10   A.    No, I don't recall.
11   Q.    What about after you sent this e-mail to
12 Mr. King?  Did you go check on Jeremy Russell?
13   A.    I do not recall.
14   Q.    So at that point, October 6th was the day
15 before he passed away.
16   A.    Uh-huh.
17   Q.    And you said that you had spoken to Angela
18 several times for over a week?
19   A.    Yeah, it was about a week.  I remember --
20   Q.    Several times a day for over a week.
21   A.    It was a couple of times, uh-huh.
22   Q.    So she was calling quite frequently.
23   A.    She called me a few times, uh-huh.
24   Q.    And she was very worried?
25   A.    She was -- I didn't ever talk to her in a

CONFIDENTIAL

CONFIDENTIAL

Page 47

```
 1   panic stage, but, obviously, she was concerned.  I
 2   never sensed panic when she spoke to me.
 3        Q.   Would you agree that she is a very logical
 4   person?
 5        A.   I don't know her.
 6             MR. GARNER:  Object to the form.
 7   BY MR. BRAGG:
 8        Q.   Could you perceive that -- Okay.  But she was
 9   concerned?
10        A.   She expressed concern, yes.
11        Q.   What concerns do you remember, and I want to
12   know every concern that you can say that she expressed
13   to you?
14        A.   About medications.  She was very -- she did
15   not want to believe that her son was -- had substance
16   abuse problems.
17        Q.   So did you tell her that he was having
18   substance abuse?
19        A.   I had told her that it was under the medical
20   VitalCore stuff that he had substance-abuse issues as
21   well.  That he came here -- came to us under some
22   substance-abuse issues with drug use.  But it was kind
23   of just really about medication and just that her --
24        Q.   What medication?  Do you recall?
25        A.   I think it was Haldol.  I think it was
```

1  something about Haldol. So I had followed up with
2  HSA, and just telling them, "Hey, this is, you know,
3  what's going on."
4     "Well, he's on the right meds. We got him on the
5  correct medication now. He's compliant with the meds,
6  and he seems to be doing better, and we are going to
7  release him" --
8     Q.  So she said that he didn't need to be on
9  Haldol. Angela told you that he didn't need to be on
10 Haldol?
11    A.  She had concerns about him being on Haldol. I
12 know it was concerns. The exact wording -- it was
13 just concerned about being Haldol. "He's not supposed
14 to be taking Haldol," something to that effect. The
15 exact verbiage, but she was concerned about the Haldol
16 medication.
17    Q.  And what did you do with that information?
18    A.  I went to the HSA at the time, which was
19 Mr. Gibson.
20    Q.  Mr. Gibson.
21    A.  Yes. And I go, "Hey, this is what the mom is
22 relaying." You know, just, "I don't know if you have
23 it in your notes or whatnot, but maybe it's something
24 worth following up on."
25    Q.  And what did he say?

CONFIDENTIAL

1    A.   He says that, "He is on the right medications
2  now, that he's improving," and they were probably
3  going to be releasing him off from the suicide watch
4  or mental health hold, one of the two.  But I refer
5  that --
6    Q.   Did he say whether the right medications were
7  Haldol?  Did he indicate that Jeremy was no longer on
8  Haldol?
9    A.   No, not that I can remember.  I just remember
10 him saying that, "We got him on the right medications.
11 He's doing better, and his state is improving."
12   Q.   And did you relay that information to Angela?
13   A.   Yes.
14   Q.   So you told Angela that he was on the right
15 medications?
16   A.   Yes, I do -- yes, yes.  I want to say, yes.
17 Yeah, I talked to her on the phone.  Yes.
18   Q.   Did she seem relieved when she heard he was on
19 the right medications?
20   A.   I believe so, sir.  I think that -- if I can
21 recall, I think that she was just -- I think that she
22 was glad that somebody was checking up on her son, you
23 know.
24   Q.   Right.  But based on your conversation with
25 her -- Well, based on your conversation with

Page 62

1  at MTC was aware that Jeremy Russell had made suicidal
2  threats; is that right?
3      A.   Yes.
4      Q.   And so did you and Angela talk about suicide
5  as being a specific concern when you spoke to her?
6      A.   Who's Angela?
7           MR. GARNER:  Russell.
8  BY MR. BRAGG:
9      Q.   Angela, Jeremy's mother.
10     A.   Oh.  Okay, repeat the question.
11     Q.   Did you and Angela Russell ever talk about
12 suicidal threats or suicidal ideations?
13     A.   Oh, man, I just -- it's a possibility.  Like I
14 said, a lot of my conversation was concerns and things
15 of that nature.  I don't remember -- I don't remember
16 if we discussed direct like, "Hey, he wants to hang
17 himself."
18     Q.   But you knew that he had some suicidal --
19     A.   I know he was -- based on him coming in and
20 being under suicide watch, yes.
21          MR. BRAGG:  Okay.  I think that's all I have.
22          MR. GARNER:  Mike, are you there?
23          MR. CHASE:  Can you hear me now?
24          MR. GARNER:  Yes.
25          MR. CHASE:  Yeah, I've been trying to make